JD-53-24
Grand Haven, MI

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

TRINITY HEALTH GRAND HAVEN HOSPITAL

Respondent

and                                             Cases  07-CA-323321
                                                       07-CA-323743
SEIU HEALTHCARE MICHIGAN                                07-CA-326861

Charging Party

*Patricia Fedewa, Esq.,* for the General Counsel
*Richard W. Fanning* and *Brian D. Shekell, Esqs.*
 *(Clark Hill PLC),* Detroit, MI, for the Respondent
*Anthony J. Kaled, Esq.,* Detroit, MI, for the Charging Party

DECISION

STATEMENT OF THE CASE

MICHAEL A. ROSAS, Administrative Law Judge. This case was tried over the course of eight days between April 3 and May 15, 2024, in Grand Rapids, Michigan.  Based on timely filed charges by SEIU Healthcare Michigan (SEIU or Charging Party), the General Counsel issued a Complaint and Notice of Hearing in Case 07-CA-326861 on January 5, 2024.  On January 29, 2024, the General Counsel issued a Consolidated Complaint adding allegations from Cases 07-CA-323743 and 07-CA-326861 (the complaint).

The complaint alleges that Trinity Health Grand Haven Hospital (the Respondent) violated Section 8(a)(1) of the National Labor Relations Act (the Act)[1] at various times in 2023 by:[2] (1) supporting the circulation of a decertification petition; informing employees that they had to remove union stickers  from their uniforms; (2) informing employees that they could not discuss or hand out flyers concerning the Charging Party; (3) promising employees increased benefits if they rejected the Charging Party; (4) informing employees that they could not solicit employee membership in the Charging Party; (5) interrogating employees about their intentions

---

[1] 29 U.S.C. § 158(a) 1).
[2] All dates are in 2023 unless stated otherwise.

to participate in a strike and how they voted in the decertification petition; and (6) threatening employees with attendance points for participating in a strike and creating the impression that their union activities were under surveillance.[3]

The complaint also alleges that the Respondent violated Section 8(a)(3) by: (1) raising the wages of unrepresented employees to the exclusion of recognized bargaining unit employees; and (2) issuing discipline to employees, charging leave and assessing attendance points to employees for failing attend work despite the Charging Party's timely notice that employees were going to strike.

Finally, the Respondent is alleged to have violated Section 8(a)(5) during collective-bargaining by: (1) repeatedly demanding that the SEIU provide evidence that it was the certified representative of the employees it represented, and conditioned agreement and providing information on receiving this information; (2) on May 15, 2023, by unilaterally implementing multiple policies that conflicted with the CBA and bargaining proposals; (3) on August 2, after a decertification petition was filed, cancelling a bargaining session and (4) refusing to meet and bargain; and engaging in bad faith bargaining.

The Respondent denied the material allegations and affirmatively alleges that: (1) the certification election did not prevent it from complying with the wishes of bargaining unit employees and lawfully withdrawing recognition; (2) portions of the complaint should be dismissed as untimely;[4] (3) it lawfully enforced it attendance policy for all employees who were absent during the August 4, 2023 strike; (4) it bargained in good faith; (5) it lawfully granted non-bargaining unit employees a raise on May 25, 2023; and (6) the instant proceedings are unconstitutional.

FINDINGS OF FACT

I. JURISDICTION

The Respondent, a corporation with an office and place of business in Grand Haven, Michigan, operates a hospital providing inpatient and outpatient medical care.  In conducting its operations, the Respondent annually derives gross revenues in excess of $250,000 and purchases and receives at its Grand Haven facility goods valued in excess of $5,000 directly from points outside the State of Michigan. The Respondent admits, and I find, that it is an employer engaged

---

[3] On March 29, 2024, the General Counsel notified the Respondent that she would move at the hearing to amend the complaint to allege an additional supervisor and agent at Paragraph 6, an additional alleged interrogation at Paragraph 11, and change in the name of agents in Paragraph 16.  That motion was granted at the outset of the hearing over Respondent's objection. (GC Exh. 2; Tr. 7-9.)

[4] The Respondent's posthearing brief contends that the allegations in Paragraphs 10, 11(d), 14, 18, 19, 22, and 24,and portions of Paragraphs 16 and 21, are time-barred.  The Respondent further asserts that those allegations have no relation to the allegations in the initial charges filed on August 2, 2023 in Cases 07-CA-323321, 07-CA-323743, and 326861, and are rooted solely in the allegations contained in the untimely amended charge filed on December 1, 2023. For purposes of completeness, the timeliness of each of those allegations is discussed in the Legal Analysis of this decision pursuant to the framework in *Redd-I, Inc.,* 290 NLRB 40 (1988).

in commerce within the meaning of Section 2(2), (6), and (7) of the Act and that the Charging Party is a labor organization within the meaning of Section 2(5) of the Act.

## II. Alleged Unfair Labor Practices

### A.  The Respondent's Organizational Structure

In October 2022, Trinity Health, a national health system with over 100 facilities across 27 states, over 121,000 employees, and 36,000 physicians, acquired North Ottawa Community Hospital (NOCH) and changed its name to Trinity Health Grand Haven Hospital (the Respondent or hospital). The Respondent is a medium-sized community hospital in residential Grand Haven, Michigan with approximately 350-400 employees.  The hospital is rated as a level four (the lowest level) trauma center, has an average daily census of less than 25 patients, and specializes in day-to-day health care serving the Grand Haven community.

At the relevant times, the following individuals served as supervisors and agents of the Respondent within the meaning of Section 2(11) and Section 2(13) of the Act, respectively: Shelleye Yaklin—president; Cynthia Van Kampen—Chief Nursing Officer; Dianne Zimmerman—Regional Director, Colleague and Labor Relations; Timothy Gengle—Director of Human Resources; Karla Gonzalez—Manager of Surgical Services; James Donnellon—Interim Director of Food, Environment, and Housekeeping; David Rehm—General Counsel; Elise Pavlige—Manager; Sabrina Frank—Laboratory Supervisor; Cindy Van Kampen—Nurse Manager; and Nicole Wilbur—Laboratory Director.

The hospital's integration into the Trinity Health organization involved a significant overhaul of NOCH's employee benefits package, employee files, and compensation structures. The Respondent's policies on attendance points, salary ranges, and job titles were also aligned with Trinity Health's national standards, including those relating to time and attendance.[5]

### B.  The Respondent's Time and Attendance Policy[6]

Effective December 1, 2020, NOCH applied a hospital-wide attendance and tardiness policy. Absences were documented as a certain number of "occurrences" depending on whether they were unplanned time off, partial day absences, no call/no show. Corrective actions included a progressive disciplinary system ranging from counseling based on four occurrences and discharge based on nine and one-half occurrences.[7]

NOCH's attendance policy remained in effect until May 15, 2023, when the Respondent applied Trinity Health's system-wide attendance and tardiness policy, "subject to any modifications necessary to comply with applicable state and local laws and regulations, collective bargaining agreements, written employment agreements, accreditation requirements or otherwise

---

[5] Yaklin testified that THGH's existing job classifications had to be reviewed to make sure they matched the ones used by Trinity Health. (Tr. 791-792, 860-864.)

[6] The Respondent's policies were usually approved by Yaklin, managers, or department directors before being implemented. (Tr. 878.)

[7] GC Exh. 97.

and that are approved by the Trinity Health EVP, Chief Human Resources Officer or an appropriate designee, in consultation with the Trinity health Legal Department as necessary." The policy states, in pertinent part:[8]

> Exempt Employees are expected to be available during core business hours at their designated work location and are expected to work the hours necessary to fulfill their job responsibilities. An exempt employee whose time away from work interferes with the Employee's work performance, except for time covered under Excused Absences, will be managed through our performance management and or corrective action processes.

> Employees must follow department notification policies for reporting absences and tardiness. Employees that do not comply with department notice requirements may also be subject to corrective action for failure to follow policies/procedures.

> Incidents of unexcused absence or tardiness will be subject to review and the assignment of attendance incident points by the Employee's manager, according to the following guidelines.

> The organization uses a "no fault" approach to managing Employee attendance. This approach recognizes that Employees may present a variety of reasons for unscheduled absences or tardies, including situations that are unavoidable, but the reason itself (with exception of excused absences noted below) is not the focus; it is the quantity of incidents and he impact on the department.

> The most common attendance incidents and resulting attendance points are as follows: each instance of tardiness results in 1 point; each missed swipe/Kronos entry results in 1 point; each unscheduled absence results in 2 points; each unscheduled absence before or after a holiday or an approved absence results in 3 points; each pattern absence/tardiness results in 3 points; each unscheduled absence on a holiday results in 4 points; and each unreported absence/no call/no show" results in 8 points.[9]  Certain exceptions apply and absences are defined as follows:

> Excused absences do not accrue points. Excused absences consist of Worker's Compensation, Bereavement, Jury Duty, Military Obligations, Approved time under Trinity Health Leave of Absence Policies, Approved PTO, Low Census, and other leave protected by state or federal requirements.[10]

> Unscheduled Absences: Employee called in absent for one day or multiple days that are consecutive, will result in a total of 2 attendance points for each unscheduled absence.

---

[8] GC Exh. 31.

[9] Gengle did not recall whether employees' points were eliminated ("zero out") in the process of switching them from the previous attendance policy to the new one implemented in May. (Tr. 808.)

[10] Points can result in discipline and termination. (Tr. 100.) Yaklin did not know whether taking time off and exercising a protected right under federal law should be treated as an excused absence. (Tr. 103-104.)

Unreported Absence, "No Call/No Show." When an Employee does not notify their supervisor of an unscheduled absence in accordance with departmental policies. An incident of No Call/No Show may result in corrective action of 8 attendance incident points, if no prior corrective action.

*C. The Bargaining History Between the Respondent and NOCHEA*

The Respondent has historically maintained positive relationships with two labor unions: the Michigan Nurses Association (MNA) and the North Ottawa Community Hospital Employees Association (NOCHEA). Typically, contract negotiations between NOCH and NOCHEA proceeded smoothly. No unfair labor practice charges were filed, and no strikes occurred.[11]

NOCHEA and the Respondent were parties to a collective bargaining agreement (CBA) that expired on June 30, 2021.[12] On November 18, 2021, NOCHEA and the Respondent agreed to extend the CBA through June 30, 2022.[13] Article 2 of the CBA recognized the following bargaining unit (the Recognized Unit):

All full-time and regular part-time employees in the following nursing departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Emergency, Intensive Care-Coronary Unit, Med.-Surg., Family Birthing Unit, Pediatrics, Surgery, Emergency Medical Services (excluding Secondary Emergency Medical Technicians), Social Service, Physician Practice, and Central Processing Department; but excluding the Vice President/Nursing Service, all House Supervisors (whether full-time or part-time), all Nurse Managers, Managers, and/or Assistant Managers, all registered nurses, all confidentials (including Secretary to the Vice President/Nursing Service), all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act;

All full-time and regular part-time employees in the following technical departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Respiratory Therapy, Laboratory, Medical Imaging, and Pharmacy; but excluding all Managers, all Assistant Managers, all confidentials, all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act; and

---

[11] Gengle testified that NOCHEA adhered to ground rules and its representatives were "very professional, very collegial, [and capable of] working together to get a good, sound proper contract." In their bargaining sessions, NOCHEA easily reached agreements with the Respondent and the Respondent was fully able to explain its positions and proposals. (Tr. 794.)

[12] Jt. Exh. 6.

[13] GC Exh. 93.

All full-time and regular part-time employees in the following service departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Patient Registration, Patient Accounting, Medical Records, Housekeeping, Food Service, Maintenance, Materials Management and Volunteer Services (Ambassador only); but excluding the Vice President/Fiscal Services, all Managers, all Assistant Managers, the Payroll Coordinator, the Food Service Supervisors, all confidentials (including the Secretary to the Vice President/Fiscal Services and the Accounts Payable person), Accountants, all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act, and further excluding all employees of the Human Resources Department, the Ancillary Services/Marketing Department, the Administration Department, and the Volunteer Services Department (except Ambassador).

### D. Initial Contact Between the Respondent and Charging Party

In late August 2022, aware that NOCH was being absorbed into the national Trinity Health organization, Cheryl Smithe and Ricky Kauffman, long-term employees and members of NOCHEA Board of Directors reached out to Larry Alcoff, the Charging Party's deputy trustee. They met with representatives of the Charging Party, which already represented employees at nearby Trinity Health's Muskegon hospital, on several occasions by telephone and at the hospital. At some point prior to November 2022, Yaklin became aware of the Charging Party's involvement with NOCHEA when employees notified her that NOCHEA board members were meeting with Charging Party representatives in the private dining room.[14]

On November 3, NOCHEA members voted to affiliate with, and became a chapter of, the Charging Party.[15] Around the same time the Respondent was transitioning to Trinity Health. The transition involved a significant overhaul of NOCH's benefits package, employee files, and compensation structures to align with the Trinity Health system. The Respondent's policies on attendance points, salary ranges, and job titles were also updated.

On November 4, 2022, Yaklin emailed employees announcing that the hospital was officially part of Trinity Health. The email also announced, in pertinent part, the Respondent's intention to award wage increases and bargain with the bargaining unit employees' labor representative:[16]

In the meantime, Trinity Health recently approved a 2.5% across the board increase for Trinity Health Grand Haven colleagues. This across-the-board increase will be implemented effective October 23, 2022, for non-union and MNA represented colleagues. For those staff covered by the NOCHEA collective bargaining agreement,

---

[14] It is undisputed that NOCHEA board members and the Charging Party's representatives met to discuss an affiliation agreement during the fall of 2022 and Yaklin became aware of those discussions. (Tr. 137-139, 868.)

[15] It is undisputed that the Charging Party's representatives neither conducted nor attended the meeting at which NOCHEA members voted to affiliate with it. (Tr. 140; GC Exh. 12.)

[16] GC Exh. 13; R. Exh. 1 at 10-11.

we have been notified that of November 3rd you are now represented by the SEIU. As a result, we now need to meet and bargain with the SEIU in order to reach agreement prior to any change in wages as the law requires. We are awaiting receipt of formal notification and contact information for your new legal representative.

5

The same day, Alcoff informed Rehm, the hospital's in-house counsel, that he would be working directly with NOCHEA members. Alcoff also mentioned that he saw Yaklin's email regarding the proposed pay increase and requested detailed employee information "to prepare for our upcoming negotiations."[17]

10

On November 7, 2022, Gengle asked Alcoff if he had "any official information on the status of the bargaining unit and its relationship or affiliation with SEIU."[18] On November 10, 2022, Alcoff responded:

15
As you are aware, the NOCHEA membership voted to affiliate with Service Employees International Union, Healthcare Michigan (SEIU HCMI) in a vote on November 3rd. As Shelleye Yaklin stated in her November 4th email to Trinity Health of Grand Haven employees:

20
For those staff covered by the NOCHEA collective bargaining agreement, we have been notified that as of November 3rd you are now represented by the SEIU. As a result, we now need to meet and bargaining with the SEIU in order to reach agreement prior to any change in wages as the law requires.[19]

25
The current NOCHEA Board and current stewards stay in place. If there are any changes in the future, we will provide written notification. The current NOCHEA Board and current stewards stay in place. If there are any changes in the future, we will provide written notification. Dian Palmer as Trustee and I as Deputy Trustee are authorized to make agreements and sign documents going forward for the Union. The Employer should
30
continue to withhold dues and remit to NOCHEA accounts as the current collective bargaining agreement remains in full force and effect.

Emily Ricards, copied on this email, is assigned as the Union Representative who will work with the NOCHEA members and Trinity Health Grand Haven. I am the key point of contact
35
for purposes for negotiations and will soon send an information request in order to prepare for bargaining. I will, also, offer available dates at that time.

Regarding the 2.5% wage increase referenced in Ms. Yaklin's memo, please provide what is proposed in writing to us so we may present it to NOCHEA members so we can then
40
move quickly to reach agreement on the 2.5% increase for NOCHEA/SEIU HCMI

---

[17] GC Exhs. 12, 14-15.
[18] R. Exh. 3.
[19] Alcoff omitted Yaklin's statement that the Respondent is "awaiting receipt of formal notification and contact information for your new legal representative" because he thought it was "unnecessary." He believed the email, detailing NOCHEA's vote to affiliate with SEIU and listing representatives, served as "formal notification." (Tr. 384.)

represented employees. If you have any further questions please feel free to contact me at 607- 759-9561 or via email. We should review possible 'meet and greet' dates during the first week of December.

5    On the same day, NOCHEA board members and SEIU signed an affiliation agreement effective November 11, 2022.[20] The agreement, which was not shared with the Respondent at that time, states, in pertinent part:[21]

10    This Agreement is entered into by North Ottawa Community Hospital Employee Association ("NOCHEA") and HealthCare Michigan of the Service Employees International Union ("SEIU HCMI") (or collectively, the "Parties") for the sole purpose of affiliating these two labor organizations and setting forth the goals, and understandings which have brought about this affiliation.

15    This Agreement constitutes the sole and complete Agreement between the Parties with respect to the terms of their affiliation and is intended to be binding upon them and their successors until modified or amended by mutual agreement or by the operation of law or terminated pursuant to Section 13 of this Agreement.

20    Effective November 11, 2022, NOCHEA will be a bargaining unit represented by SEIU HCMI and NOCHEA members will have full rights and responsibilities of membership in SEIU HCMI pursuant to the SEIU HCMI and SEIU Constitution and Bylaws subject to the terms and conditions set forth below.

25    Consistent with its Constitution and Bylaws, the Charging Party agreed not to impose its higher dues until NOCHEA negotiated and ratified its first contract. Once the contract was in place, NOCHEA was expected to gradually transition to the Charging Party's dues rates over two years. Throughout this process, the bargaining unit was to remain the same, with the Charging Party assuming the role of labor representative.

30    On November 30, 2022, after briefly bargaining over a contract extension, six NOCHEA representatives, Alcoff, and Rehm agreed to a "Memorandum of Understanding Between SEIU

---

[20] Alcoff explained that although the Charging Party became a successor to the existing bargaining unit, its agreement to keep NOCHEA's name intact was consistent with its past practices with other affiliates. (Tr. 142-143.)

[21] Alcoff provided inconsistent explanations as to why he did not mention the affiliation agreement to Gengle or Rehm at that time. First, he asserted that Yaklin's November 4, 2022 email was proof of the affiliation vote. He then testified that his November 7, 2022 email was formal notification of the affiliation agreement because it had not yet been signed. (Tr. 380-382.) Yaklin, on the other hand, conceded that she was aware of the affiliation vote by the NOCHEA membership and the Respondent's "HR department . . . had received communication from likely LeAnn LaFrance as the president of NOCHEA, that the SEIU would be part of their unit now. I don't know what her words exactly were to Tim, but that's what I'm trying to convey here. It's not because I received any formal notification. . . . .I think we would have expected to be able to see something coming from the NLRB or a certifying body." (Tr. 872-874; GC Exh. 10; R. Exh. 1 at 2-5.)

8

Healthcare Michigan/NOCHEA (the 'Union') And Trinity Health Grand Haven Hospital (the 'Employer') RE: Contract Extension:"[22]

The Union and Employer agree to extend the expired collective bargaining agreement between NOCHEA and North Ottawa Community Hospital to which the Union and the Employer are successors as follows:

1. All bargaining unit employees' base wage rates shall be increased by 2.5% effective the first full pay period beginning on or after November 20, 2022.

2. The collective bargaining agreement shall be extended, in full force and effect until 11:59 p.m. on February 28, 2023. The parties may extend the contract further by mutual agreement.

### E. The Early Stages of Negotiations

1. The Parties Disagree Over the Size of the Negotiating Teams

On January 20, 2023, Dianne Zimmerman informed Alcoff that she would be the Respondent's chief negotiator. She agreed to schedule the first two sessions for February 2 and 9. Prior to February 2, Zimmerman and Alcoff had several telephone conversations regarding ground rules and contract provisions. Zimmerman sought an agreement on ground rules for the negotiations, but Alcoff refused, stating that they were neither necessary nor legally required. In addition, Alcoff indicated that he would not adhere to the number of negotiators for each side at the bargaining table specified in the current contract, which limited the negotiating teams to "no more than five (5) members (including outside representatives), plus one other person to serve as secretary to [NOCHEA's] negotiating team."[23]

As a result, the February 2 bargaining session was cancelled at Zimmerman's request until the parties agreed to the size of the negotiating teams. On February 7, Zimmerman rejected Alcoff's proposal for a 15-member negotiating team and offered to double the contractual limit from five to ten. Alcoff disagreed:[24]

The contract extension expires on 2/28. Our committee is our committee. We are asking your committee to agree to the full committee on Thursday and any other dates that we

---

[22] The Respondent contends that the Charging Party perpetuated confusion by signing the MOU and future proposals as "SEIU Healthcare Michigan/NOCHEA" instead of "SEIU Healthcare Michigan"—the signatory to the affiliation agreement. (Jt. Exh. 7; R. Exh. 4; Tr. 368-372.) The Respondent also asserts it could have refused to bargain or sign the extension until Alcoff produced the agreement but it was determined to award employees the 2.5% wage increase it offered to NOCHEA.

[23] Gengle's undisputed testimony established that: (1) he and NOCH's in-house counsel typically represented NOCH at the bargaining table, while NOCHEA's bargaining team typically consisted of four to five employees; and (2) NOCH and NOCHEA usually agreed to ground rules. (Tr. 793-794.)

[24] Alcoff testified that the Charging Party eventually agreed to limit its negotiating team to ten people until February 28. (Tr. 154-155.) Zimmerman confirmed such an understanding by her explanation that she had the management team walk out of an early March bargaining session because the number of people present "was way over" what she agreed to with Alcoff. (Tr. 539, 571-572.)

JD-53-24

may agree upon between now and the end of the month.  We are prepared to bargain and offer a full proposal on Thursday.

5   Although no agreement was reached as to the size of the negotiating teams, the parties commenced bargaining at the hospital on February 9.  The Charging Party described their initial proposal as a "bridging contract," with a view toward promoting stability and continuity of the Respondent's relationship with NOCHEA, while focusing on several areas. The proposal included a comprehensive wage proposal and several bargaining priorities, including union security and elevating wages to those of Trinity Health employees in Muskegon.[25]

10

However, disputes over the size and structure of the bargaining committee continued throughout several bargaining sessions in February and March.[26]  Without ground rules and the consent of the Respondent's bargaining team, Alcoff implemented "open bargaining" in March, which meant any member could come into the meeting to observe and go as they pleased during
15   nonwork hours. Zimmerman communicated her concerns to Alcoff that bargaining unit employees coming and going during negotiations was disruptive and an inefficient way to reach agreements. During one bargaining session in March, the Respondent's negotiating team waked out due to the size of the Charging Party's negotiating team.[27]

20   On March 20, Alcoff finally provided Zimmerman with a list of people on his bargaining team for the virtual bargaining session on March 21.  On March 21, Alcoff and Zimmerman participated remotely while those on the in-person lists attended in-person.  During the bargaining session, Zimmerman learned that more employees had attended off-camera than listed in his email. She emailed Alcoff, pointing out that his practice of open bargaining "continues to be
25   unacceptable" to the Respondent.  That issue was never resolved.[28]

2.   The Charging Party Demands the Inclusion of a Union Security Clause

On March 17, Cheryl Goodell, Trinity Health's Chief Human Resources Officer,[29] issued
30   a "Contract Negotiation Update" to "Trinity Health Grand Haven Colleagues."  In pertinent part,

---

[25] The Charging Party's insistence on wage parity with Muskegon Hospital, a larger, level 2 trauma hospital, would become a major area of disagreement throughout the negotiations. (Tr. 152-156; GC Exh. 16; R. Exh. 4.)

[26] The email communications between Alcoff and Zimmerman indicate that Alcoff subsequently agreed at the March 21 negotiating session to limit the size of the Charging Party's negotiating team to a contingent of 10 employee/members participating in-person plus Alcoff and organizer Emily Ricards. (Tr. 151-152. 387-389, 535-538; R. Exhs. 18-19.)

[27] I credit Zimmerman's testimony that she informed Alcoff of the Respondent's concerns over "open bargaining" as disruptive and an inefficient way to bargain.  Alcoff conceded that he implemented the "open bargaining" concept and equivocated as to what language she used. (R. Exh. 19; 400-402, 537-540.)  On the other hand, Zimmerman failed to adequately demonstrate how "employees coming and going" to observe impacted bargaining resulted in "unnecessary time preparing the team and discussing it and hashing it out and trying to work on this issue when we could have been working on the terms of the contract." (Tr. 538-539.)

[28] Alcoff did not refute Zimmerman's testimony about the additional people appearing off-camera. (R. Exh. 19-20; Tr. 541-545, 571-572.)

[29] The Respondent conceded Goodell's status as its agent pursuant to Section 2(13). (Tr. 350-351.)

she reported that: (1) the parties had reached tentative agreements (TAs) in 14 of the 32 CBA Articles; (2) the Respondent presented its existing employee benefits; (3) the Respondent "[planned] on reviewing compensation information and proposals" at the May 23 bargaining session; (4) the CBA expired on February 28 and, since the Charging Party still had not signed a contract extension, union dues would no longer be deducted beginning with the next payroll period; (5) "With the repeal of Michigan's Right to Work Law, we continue to be concerned about the union's proposals that you be required to make payments to the union as a condition of employment (i.e., in order to keep your job);" and (6) "any Tentative Agreement or final agreement is contingent upon our receiving confirmation that the [Charging Party] is the legitimate, certified bargaining representative for this group of colleagues; we have not received that confirmation."[30]

### F.  The Parties Arrive at Tentative Agreements on Non-Economic Issues

#### 1.  The Respondent Changes the Bargaining Location

By mid-April, the parties reached several tentative agreements,[31] but not without difficulty. On April 17, Zimmerman emailed Alcoff, indicating readiness to sign off on the TAs regarding "the outstanding non-economic proposals."  She noted, however, that the negotiating team had not responded to the Charging Party's economic proposals because they were "still awaiting wage and benefit information and authority from the Compensation and Benefits team."   Finally, Zimmerman stated that, due to concerns for patient care and hospital operations, the Respondent was changing the venue of the April 18 bargaining session to a nearby community center after learning that all bargaining unit members had been asked "to congregate at a certain location and time at the hospital" in order "to confront the management team."[32]

#### 2.  The April 18 and 26 Bargaining Sessions

On April 18 and 26, the parties signed off on a dozen Articles in the contract, which were amended at the April 26 bargaining session. They included tentative agreements as to Article 4 (Union Representation), Article 6 (Management Rights), and Article 11 (No Strike).[33]  However, the parties did not agree to the Charging Party's proposal to modify the dues check-off provision at Article 5 by adding a union security clause conditioning continued employment on union membership or the payment of an agency fee determined by the Charging Party, and giving the Charging Party the right to request termination for noncompliance.[34]

---

[30] GC Exh. 20.
[31] TAs are agreements regarding individual contract sections that become part of the final contract once all terms are agreed to. (Tr. 547.)
[32] Alcoff did not dispute Zimmerman's assertions about the Union's plan to have employees congregate at the bargaining location. (GC Exh. 16; R. Exh. 5; Tr. 545-547.)
[33] R. Exh. 5 at 2-5, 11.
[34] R. Exh. 4 at 13.

### G.  Managers Confront Employees About Union Activity

#### 1.  Sabrina Frank

As bargaining became more confrontational, managers began to confront employees about their union activities. Beth Ruiter, a lead technologist in the hematology section of the laboratory and member of the bargaining committee, has been with the hospital for 39 years.  Her immediate supervisor is Sabrina Frank; Frank's supervisor is Nicole Wilbur.  In early March, Ruiter was working near Wilbur's office—and within Franks's line of sight—when Sharlene Pant, another member of the bargaining committee, came to the laboratory to drop off specimens. While there, Pant and Ruiter briefly conversed about the February 28 bargaining session a few days earlier.  Months earlier, Frank had warned her against engaging in such discussion while working.[35]

A few minutes later, Frank called Ruiter into her office and reiterated that employees were not allowed to speak about the union during work time.  Ruiter replied that she had a text message on her cell phone with a link to an NLRB document that Alcoff sent her stating that an employer could not prevent union-related discussion in the workplace if employees were permitted to engage in personal conversations.  Frank replied that hospital managers received an email directive from Trinity Health that they were not to allow employees to speak about the union during working hours.  Ruiter asked to see the email but Frank refused to show it to her.[36]

#### 2.  Cynthia Van Kampen

Around the middle of May, Chief Nursing Officer Van Kampen approached laboratory employee Erin Dexter in the ultrasound room, asked her to participate in the hospital's promotional video for National Healthcare Week, and handed her a release form.  Dexter replied that she was not interested and handed the form back to Van Kampen.  Van Kampen got closer to Dexter and

---

[35] I credited Ruiter's background testimony that Frank told her sometime in the fall of 2022 that "Trinity" did not allow employees to speak about the union during work time.  Ruiter's testimony was spontaneous, extremely detailed, and responsive throughout, including cross-examination. (Tr. 286-288.) For her part, Frank testified that she last spoke with Ruiter about "three to five years ago" about "personal conversations at work that went on for extended time." (Tr. 771-774.)  When asked if she admonished Ruiter about union-related discussion, Frank "[didn't] think so" because "[w]e weren't given any instructions at that point." (Tr. 772.) On cross-examination, Frank could not recall when she started getting such instructions from either Wilbur or Trinity Health.. (Tr. 780-781.)  See *Flexsteel Industries*, 316 NLRB 745, 745 (1995), affd. 83 F.3d 419 (5th Cir. 1996) (employees' testimony contradicting statements of their supervisor was "likely to be particularly reliable" because, in doing so, they testified "adversely to their pecuniary interests.")

[36] Again, I credit Ruiter's detailed version of her conversation with Frank in early March. (Tr. 288-290, 300-304.)  Frank vaguely described the length of Ruiter's conversation with Pant as "an extended conversation" and knew of Ruiter's support for the Charging Party.  Yet, she could not recall "a specific conversation" that was union-related conversation during work time. (Tr. 772-776, 783.) Moreover, Frank conceded that employees were permitted to speak about nonwork-related matters but was evasive or simply did not know when asked if they were allowed to discuss union-related matters. (Tr. 787-788.)

looked at the union sticker on her scrubs.  In a stern voice, she told Dexter that the sticker was not part of her uniform and to remove it.  Dexter refused and Van Kampen left.[37]

Van Kampen encountered Dexter again in July when she was sitting and talking with
5   employees Chelsea Bixby and Sarah Stadler in a Surgical Services waiting room.  Dexter had left her work area to speak with Bixby and Stadler about union-related matters.  Van Kampen was doing her rounds when she noticed the three employees in the room, which was customarily used by the families of surgical patients.  Knowing Dexter worked in another department, she interrupted the meeting and directed Bixby and Stadler to get back to work.  Van Kampen then
10   asked Dexter if she was on break and told her to return to her area.[38]  She did not take any action against any of the three employees.[39]

<em>H. The Respondent Implements New Policies</em>

15         1.  The Respondent Notifies Employees and Charging Party of the Policy Changes

On April 28, Gengle notified the Charging Party and all employees that the Respondent would be "introducing/implementing a variety of policies in a phased-in approach," effective May 15, starting with 16 listed policies, including attendance, at-will employment, dress and
20   appearance, employee counseling and corrective action, guidelines for employee conduct, harassment, solicitation, distribution, off-duty access, termination of employment, and code of conduct. Each policy was subject to the following savings clause:

25       This policy is intended to be a system-wide policy that applies to all Employees of Trinity Health, its Health Ministries and Subsidiaries, subject to any modifications necessary to comply with applicable state and local laws and regulations, collective bargaining agreements, written employment agreements, accreditation requirements or otherwise and that are approved by Trinity Health EVP, chief Resources Officer or an appropriate designee, in consultation with the Trinity health Legal Department as necessary. For
30       purposes of this Policy, the Trinity Health SVP, system Office Chief Human Resources Officer is an authorized designee to approve such modification.[40]

---

[37] I credit Dexter's detailed, credible version of her exchange with Van Kampen. (Tr. 208-209, 217-222.)  Van Kampen, on the other hand, did not recall "the exact words" but conceded telling Dexter that the button was not part of the uniform.

[38] Dexter and Van Kampen agreed on the essential facts but disagreed as to the tone of Van Kampen's voice.  I credit Dexter's detailed explanation over Van Kampen's less certain testimony that she spoke in a similar manner that in the hearing. (Tr. 208-217, 221-222, 495-503.)

[39] Van Kampen oversees nine departments as Chief Nursing Officer.  The Laboratory and Medical Imaging Department is not one of them. (Tr 492.)  Nevertheless, she was "hopeful" that employees would listen to her directive to return to work and conceded that she "might have" told their manager to discipline them if they refused. (Tr. 510-511.) In any event, Van Kampen's interaction with Dexter in July is not alleged as a violation.

[40] Gengle's testimony that the Respondent sought to align its operations and policies with those in the Trinity Health System is mostly undisputed. (R. Exh. 7; GC Exh. 17; Tr. 791-793, 862-865, 877.)  With respect to compensation, however, it is also undisputed that the Respondent did not want to raise its employees' wages to the level of those paid to employees at Trinity Health's nearby Muskegon Hospital. (Tr. 825-826.)

2.  Alcoff Objects to the Policy Changes

On the same day, Alcoff asked Zimmerman if the parties were meeting "on site or at the community center" on May 2 and May 9.  Zimmerman replied that she was canceling the May 2 meeting in order to present the Charging Party with the economic proposals requested on May 9.  Alcoff disagreed with the decision to cancel and requested that the Respondent rescind the policy changes announced by Gengle, "all of which are mandatory subjects of bargaining and many of which contradict tentative agreements and current proposals."  He urged the Respondent to present the policy changes that it was "serious about" at the bargaining table.[41]

On May 1, Zimmerman canceled the May 2 session because the Respondent would not be prepared to bargain over economic proposals until May 9 and rejected Alcoff's objections to the new policy changes:

> As to the implementation of the Trinity policies addressed in Tim's email, we are fully within our authority as a new employer under the law and our strong management rights clause, to implement our initial terms of employment, subject to any prior comments you wish to offer, and subject to any subsequent, legally required bargaining in the case of mandatory subjects of bargaining not addressed by our management rights clause.

Alcoff disagreed, asserting that the management rights provision was "not relevant in this context," and the Respondent was "well past the time to introduce initial terms of employment and several of those items are mandatory subjects of bargaining, especially with an expired agreement."[42]

3.  Alcoff Attempts to Bargain Over the Policy Changes and Requests Information

On May 5, Alcoff emailed Zimmerman and Gengle a list of 11 of the new or modified policies that the Charging Party could agree to.  He added, however, that "if Trinity insists on either requiring employees to sign for the other policies or implementing them for bargaining unit employees, then we will file 8(a)(5) charges at the Board."[43]

On May 10, Alcoff also emailed Zimmerman a request for information on the Respondent's health, dental, and vision plan and a "description of any operational reasons to delay the implementation to 1/1/2024 for the leave policies, retirement plan, and/or various health plans."  On May 12, Zimmerman replied that she would respond with the "appropriate and relevant items . . . assuming you provide us with satisfactory evidence of that certification, which we do not have yet."  She also stated that the "document" sent to her on May 8 "was not such evidence."[44]  On July 7, Shekell responded to a June 27 information request and, in the course of doing so, shared that he was "in the process of reviewing the other requests and pulling the relevant information, and will get back to you on those as soon as possible."[45]

---

[41] R. Exh. 21 at 3-5.
[42] Id. at 2-3.
[43] R. Exh. 6; GC Exh. 18.
[44] GC Exh. 19.
[45] R. Exh. 13.

JD-53-24

On May 12, Zimmerman replied that the Respondent would proceed to "implement our Trinity policies and benefits, as scheduled, on May 15, 2023, subject to any effective dates on some of them, because these are our initial terms of employment, as a new employer, and in the absence of any contract, but we will, of course, bargain about any actual mandatory bargaining subjects thereafter."[46]  Three minutes later, the Respondent announced 23 additional policy changes that would take effect on or after January 1, 2024, including holiday benefit, paid time off, sick and safe leave, and transfer.[47]

*H. The Respondent Informs Employees that the Charging Party is Insisting on Union Security*

As bargaining continued, the Charging Party continued to press its proposal for a union security clause.  On May 18, Gengle issued the following "Update" to bargaining unit employees:

Just a note to inform you that the SEIU is demanding at the bargaining table that you be forced to pay union dues as a condition of employment in any new contract, and that this is a non-negotiable item for the union.

As you know, Michigan legislators recently repealed the state's right-to-work law, which means if the SETIJ gets its way, you will be forced to pay a portion of your wages to the SETIJ, or the union can force us terminate you.

If you have any questions about this union demand, please don't hesitate to ask me directly. I would be happy to explain further.[48]

*I. The Respondent Conditions Future Agreements on Proof of Union Certification*

On May 8, Zimmerman confirmed the next bargaining session on May 9 at the community center and renewed the Respondent's demand for proof of the Charging Party's legitimacy as the bargaining unit's representative:[49]

However, we have a serious concern about SEIU's representation status with these colleagues. We can't find anything which confirms that SEIU is the certified collective bargaining representative, so we must ask that you provide us, ASAP, with evidence of your certification as bargaining representative. Until we receive such evidence, we must state that any bargaining proposals on our part and any TAs are conditional and contingent on satisfactory confirmation of your certification status.

---

[46] It is undisputed that the announced changes went into effect on May 15.

[47] Zimmerman testified that she did not find any conflict between the policies in Gengle's email and what was negotiated. (Tr. 547-549.)  Alcoff, on the other hand, testified that it was unfair that the Respondent "believed seven-and-a-half months after becoming the Employer of record, they can make unilateral changes as initial terms and conditions of employment." (GC Exh. 17; Tr. 158-160.)

[48] GC Exh. 21.

[49] This allegation was originally pled at Paragraph 23 as having occurred on May 23.  At hearing, I granted the General Counsel's motion, over objection, to amend the date to May 8. (Tr. 343-344.)

About an hour later, Alcoff replied that "[t]here were several communications between the Hospital and the Union including the attached that recognized the Union as the successor to NOCHEA.  Attached were Yaklin's November 4 email and the November 30, 2022 MOU between the Charging Party, Respondent, and NOCHEA. However, Zimmerman did not find
5    these documents satisfactory and continued to press Alcoff for verification.[50]

On May 23, Zimmerman began including a disclaimer at the bottom of the Respondent's bargaining proposals, stating in part that any future agreements were contingent upon the Charging Party providing evidence of their certification as the authorized bargaining
10   representative.[51]

Please note: the Hospital has requested but not yet received confirmation that SEIU is the legitimate, certified bargaining representative of this group of colleagues, and genuine question remains whether this is the case. Therefore, any TA or final agreement is
15   contingent upon confirmation of the aforementioned certification.

*J. Wage Proposal Disagreement*

At the May 23 bargaining session, Anathea Collar presented the Respondent's initial
20   wage proposal to the Charging Party. The wage proposal consisted of new wage scale and a chart showing the wage rates each year throughout the contract. The wage scale included market and equity adjustments provided by Respondent's compensation team. Collar explained that employees would be placed on the wage scale based on their years of experience, role, and length of service, with these factors determined by data from the Respondent's compensation team and
25   market surveys.  The overall average increase was 4.9%.  As part of the proposal, the Respondent proposed to increase the "floor" for wage rates and then have across-the-board increases applied thereafter. The minimum increase proposed for the first year was 1.5%.[52]

The Charging Party, which aimed to achieve wage parity with Muskegon Hospital's
30   represented employees, considered the proposal well below the wage rates agreed to by Trinity Health in 2022.  Alcoff indicated that, unlike the Muskegon Hospital contract, the Respondent's proposal did not reward longevity.  The Charging Party was also concerned that the proposed wage scales stopped at four years, while the Muskegon Hospital scales increased at yearly steps of up to 15, 20, and 25 years.[53]  After briefly caucusing, the Charging Party rejected the

---

[50] Zimmerman disagreed with Alcoff's interpretation of Yaklin's November 4, 2022 email and testified that acceptable proof of certification would have been "documentation from the NLRB that recognized [the Charging Party] as the certified bargaining representative." (GC Exh. 70; Tr. 374, 584, 686.)

[51] Zimmerman began adding this disclaimer because "senior leadership," or Cheryl Goodell and Yaklin, were concerned about the Charging Party's status as the legitimate bargaining representative of employees. (R. Exh. 24; Tr. 374-376, 583-584.)

[52] Collar did not know whether it was a sound proposal based on the market, but assumed that the compensation team provided her with accurate data. (Tr. 675-676, 820-824, 827; R. Exhs. 10, 24-26.)

[53] Alcoff explained that the bargaining committee had "a real concern that [the Respondent's proposal] was below the labor market" because Muskegon Hospital was ten miles from the Grand Haven facility and workers could go to either place.  They disagreed with the proposal to pay certain job titles more than others. (Tr. 174-175, 438-440.)

16

Respondent's wage proposal and requested a more competitive offer.   The Respondent's bargaining team agreed to go back and look at the proposals again.[54]

5    In late May, Alcoff and Erin Dexter, another member of the Charging Party's bargaining committee, proposed bringing in a federal mediator into the negotiations to help resolve the ongoing disputes. They met with Collar and Zimmerman and contacted the mediator, Daniel Sims, for his availability for future sessions.  On May 23, Alcoff emailed Sims the following message, copying Zimmerman:[55]

10    I left you a voicemail. Trinity Health and SEIU HCMI agree that we want FMCS to attend future negotiations. We are scheduled to bargain at the Grand Haven Community Center from 1p to about 5p on Tuesday 5/30. We'd like you to attend.[56]

On May 26, however, Zimmerman replied to Sims, saying:[57]

15

In a side-bar meeting with the union last Tuesday, I understand that we agreed to meet again with the union on May 30th for future negotiations and to check with you for your future availability as needed. During Tuesday's bargaining session, the union asked the
20    employer to increase its initial offer before the union would be willing to respond, however the employer has no intent to negotiate against itself. As the appropriate next step in this process, we are awaiting a good faith response from the union to employer's economic proposals before considering the utility of mediation.

25    Alcoff replied to Zimmerman claiming that they all agreed to move forward with negotiations with the federal mediator at their last bargaining session. He asserted that the Respondent had not bargained in good faith by backpedaling on the mediator, and that their "initial wage proposal was unacceptable and we told you that it was so off that we needed the mediator to assist in the process going forward."

30    As bargaining dragged on, there was discussion in the workplace of a potential strike. On May 24, Gengle emailed employees about the repercussions of strike activity:[58]

Strikes are protected concerted activities under federal labor law.

35    For those who do go on strike, it's important to know that while you have the right to strike, an employer is not obligated to pay you when you don't show up to work. And that could include benefits, as they are a form of compensation in the U.S. You cannot use PTO to go on strike.

---

[54]  Collar confirmed Alcoff's assertion that the Respondent's wage proposal was lower than what Muskegon Hospital employees were paid. (Tr. 439-440, 826.)
[55]  R. Exh. 27.
[56]  Alcoff testified that Zimmerman was sitting with him when he made the call on speakerphone to Sims: "She agreed to the whole thing and there were four of us in that room." (Tr. 182.)
[57]  R. Exh. 27.
[58]  GC Exh. 49.

In economic strikes, striking workers can be replaced by their employer, and in some circumstances those replacements can be permanent.

Strikes can come with serious consequences for workers, the organization, and most importantly, the people in our care.

The Charging Party's bargaining team responded by accusing Gengle of acting in bad faith:

Your email is another example of Trinity offering no real answers to the needs of workers, our patients and our community. When Trinity proposes cuts from what people currently receive and wages that for many are up to $15 less than workers who do the same jobs a mere 11 miles away at Trinity-Muskegon (Mercy), it is no wonder that all you can offer are veiled threats and encourage fear.

Our goal is not to strike but rather to reach an agreement on a contract that pays fair wages, respects our work and our union. The fact that Trinity continues to violate Federal Labor Law and bargain in bad faith is not helpful. Maybe Trinity should spend more time trying to abide by the law and reach a fair agreement rather than sending out misleading emails full of half-truths.

So let's fill in the blanks on your half-truths:

- Striking workers cannot be permanently replaced during an unfair labor practice strike (google it)

- We do not *implement* decisions as a union the way Trinity illegally implements policies.

- Our members are adults. They can make the choice as whether they should strike for 1 day and stand with their coworkers to equal pay for equal work with Trinity workers in Muskegon rather than give Trinity the permission to cut their premium pay and implement second-rate wage rates.

On May 25, Yaklin announced a "surprise" wage increase of two and one-half percent "for non-represented colleagues who are not in leadership roles." She also expressed her gratitude to "have the direct relationship with you, which allows us to make such adjustments as needed when we can." It was not otherwise part of a scheduled pay adjustment.[59]

### K. The Decertification Campaign

1. Employees Begin a Campaign to Decertify the Charging Party

In or around April 2023, employee Rose Hernandez and former employee Russell Channel went to Chief Nursing Officer Van Kampen's office and asked her about the process for terminating the Charging Party's representation of the bargaining unit. Van Kampen referred the

---

[59] Yaklin testified that the wage information was part of a market adjustment within the Trinity Michigan market. (GC Exh. 4; Tr. 879-881.)

employees to the NLRB website for more information.[60]

Jamie Quinn, a cardiac sonographer, heard about Channell's interest in decertifying the Charging Party and worked with him to put together a decertification petition.  The petition was titled, "We the undersigned, are the employees of Trinity Health Grand Haven, Michigan and are represented by SEIU. We no longer wish to be represented by SEIU."[61] (the petition)

Quinn then took the lead in collecting signatures for a petition throughout the hospital to decertify the Charging Party (the petition).  Quinn routinely informed employees (her "spiel") about Michigan's Right To Work Law, and that the Charging Party would charge them $100 in union dues,[62] had been investigated for embezzlement, and had been placed in a trusteeship as a result.  Quinn told certain employees the purpose of the petition was to decertify the Charging Party as the bargaining unit's labor representative.[63]

2. Gonzalez Takes Employees to Meet with Quinn About the Decertification

In or around May, as news about the effort to remove the Charging Party as bargaining representative spread, surgery technicians Jessica Addington, Chelsea Bixby, Sara Stadler, and Tyson Cobb (the Addington group) expressed interest in getting more information about the Charging Party.  Addington reached out to Karla Gonzalez, the Surgical Services Manager, on behalf of the group.  Gonzalez, aware of Quinn's role in the decertification effort, responded by arranging for Quinn to meet with the Addington group.[64]  Quinn situated herself in the stairwell as Gonzalez escorted the employes to meet with her there and listen to what she had to say.[65]

---

[60] Van Kampen's testimony regarding this encounter is undisputed. (Tr. 494-495.)

[61] GC Exh. 9.

[62] I credit the consistent testimony on this issue by surgical technicians Sara Stadler and Chelsea Bixby that Quinn warned of $100 union dues over Quinn's hesitant testimony that she "believed it was $30, so that's probably what I would have said." (Tr. 227, 265, 836.)

[63] As to the purpose of the petition, however, the preponderance of the credible evidence demonstrated that Quinn routinely informed employees that she wanted to get rid of the Charging Party. (Tr. 837.)  The testimony of Stadler and Bixby, the only employees to testify regarding Quinn's "spiel," did not effectively repudiate that fact.  They went into the meeting with Quinn believing they were merely going to get more information about the Charging Party and were concerned about paying significantly more in union dues.  Although they later believed that Quinn misinformed them about the facts, it is clear that they knew the purpose of the petition was decertify the Charging Party as their bargaining unit representative, even though the top of the sheet that they signed did not repeat the stated purpose of the petition. (Tr. 225-231, 238-243, 262-267, 274-276, 283.; GC Exh. 9 at 3.)

[64] Stadler's credible testimony that Gonzalez had never before gathered employees to discuss non-work matters is undisputed. (Tr 267.)

[65] Gonzalez's testimony regarding Quinn's contacts with her staff was not credible.  Her testimony was vague, evasive, and inconsistent as to why she referred the employees to Quinn and whether she already knew that Quinn was leading the decertification effort.  Although she could not recall when she first learned of Quinn's role, Gonzalez conceded that she understood that Quinn was involved" with the "decertification of the union."  (Tr. 263-265, 275, 593-594, 609-611.)  I also found it incredible that Gonzalez would need to escort employees to the stairwell because they did not know how to get there. (Tr. 595-597.)

In the stairwell, Quinn solicited signatures for the decertification petition, which she explained as an effort to remove the Charging Party as bargaining representative.  She spoke about the amount of union dues involved, the Michigan Right to Work Law, the Charging Party's trusteeship status, and related accusations of embezzlement involving the Charging Party.[66]

5

As the Addington group met with Quinn, Gonzalez brought an additional group of employees to the stairwell area to meet with Quinn.  They included Mattie LaRose, Terry Miller, and Erin Whitten.  As the next group of employees waited to meet with Quinn, Gonzalez stood outside the stairwell door.  Addington, Bixby, Stadler, and Cobb all signed the page on the clipboard, which was blank at the top.  Quinn made the same presentation to La Rose, Miller and Whitman, and each also signed the petition.[67]

Eventually, one employee who signed the petition, Chad Nickerson, asked to have his name removed and Quinn complied by crossing out his name.[68]  However, no one in the Addington group requested to have their name removed from the petition until Bixby emailed such a request to the Regional Director for Region 7 on August 4.[69]

### 3.   Quinn Enlists the Support of Others

20

Quinn also received the support of other employees in collecting petition signatures.  Steve Payne, a lead employee in Environmental Services, accompanied Quinn in his department and approached Kellie Walker, a coworker.  Payne took Quinn's clipboard with the petition and asked her to sign it.  Walker asked what it was.  Payne told him it was "union-related."  Walker, who was in a hurry and had voted for the Charging Party in the decertification election, signed the petition.[70]

---

[66] Quinn denied that she received any assistance from management in her decertification campaign. (Tr. 834-838.)  However, she was not credible about her conversation with Gonzalez regarding the purpose for meeting with employees in the stairwell.  Quinn's answers were not spontaneous and she had a selective recollection of the events.  Nor did Quinn recall the details about Gonzalez escorting employees to the stairwell or why Gonzalez chose to have Quinn rather than a Charging Party representative speak to the employees:

> Q: And do you recall talking with Karla Gonzalez about this event in the stairwell at all?
> A: I mean just about the fact that she had employees that had questions.
> Q. Okay. And what do you recall about that conversation with Karla?
> A:  Just stating that if they had questions, that I would be willing to talk to them, and that, where I would be.
>
> *               *               *
>
> Q: Okay. And had you told Ms. Gonzalez that you were going to pass the petition around?
> A:  I mean not specifically that I recall, no.

[67] Given that Gonzalez was not credible about the circumstances of Quinn's meeting with her staff, I credit Stadler's testimony that Gonzalez was standing on the outside the stairwell door during the meeting. (Tr. 227-229, 265-266, 277, 594-597.)  Bixby testified that Gonzalez "left out of the area," but it is unclear if she simply meant the stairwell area at the time, since it is undisputed that Gonzalez returned with more employees to meet with Quinn. (Tr. 226-227.)

[68] Quinn crossed-out the signature after Ricky Kauffman approached her with the employee and said that the employee wanted his name removed. (Tr. 898-840; GC Exh. 9 at 1, line 15.)

[69] GC Exh. 75.

[70] I credit Walker's undisputed testimony regarding the encounter with Quinn and Payne.  (Tr. 69-71,

Sometime between April and August, Bixby saw a petition sheet containing four signatures at lines 98-102 on the daily assignment clipboard. That clipboard was where room assignments were posted along with other relevant information for that day or week. Bixby did not realize that the paper was a petition sheet and asked coworkers if it related to training or education but no one knew. Bixby and Stadler eventually removed it from the clipboard and brought it to Erin Dexter, a former ultrasound technician and supporter of the Charging Party. Dexter also did not know what the sheet was for but later learned that it was a petition sheet. In any event, the sheet was not included in the list which was eventually submitted to the Respondent.[71]

### L. Summer 2022 Bargaining Sessions

In early June, Brian Shekell replaced Zimmerman as the chief negotiator for the Respondent. Shekell initially did not think mediation was necessary but agreed to a mediator in early July.[72] Throughout June and July, Shekell and Alcoff had numerous sidebar conversations between bargaining sessions in person and over the telephone. They continued to reach and sign TAs.[73] Both noted progress towards an agreement, although significant issues like wage parity, pay practices, job titles, and access to healthcare facilities remained unresolved.

On July 11, Alcoff emailed a "supposal" to Shekell and Gengle to find a path to wage parity with Muskegon over a longer period. The supposal created more steps and slowed the wage increases to a range between $16.43 to $34.50, with 4% wages increases for employees when they exceeded the scale.[74] On July 20, the Respondent proposed increased across-the-board hourly wage increases for the first four years ranging from $15.03 to $29.02, or 1.75%, 2.25%, and 2.75%, with some of the rates identical to those proposed on May 23.[75]

During the summer bargaining sessions and mediation, Shekell reiterated the Respondent's concerns about the Charging Party's status as the legitimate representative of the bargaining unit.[76] Shekell repeatedly asked Alcoff for certification or documents confirming this status. In response, Alcoff once again directed Shekell to Yaklin's email in November of 2022 and the memorandum of understanding between SEIU/NOCHEA and the Respondent. Shekell

---

74-78.) Payne, who he referred to as her supervisor, was in the bargaining unit and was the fifth person to sign the petition. However, given that Walker was the 33rd person to sign the petition, I find that she signed it prior to the September decertification election. (GC Exh. 9 at 2.)

[71] Bixby's testimony that she did not do anything with the sheet was contradicted by Dexter's testimony that Bixby and Stadler brought her the sheet. (Tr 211-214, 231-232, 249-250; GC Exhs. 9, 35.)

[72] Earlier efforts in late May by Alcoff to bring a mediator into the negotiations were unsuccessful. (R. Exh. 28; Tr. 180-181.)

[73] R. Exh. 13.

[74] Alcoff explained that a supposal is a "what if that tries to find a path where the parties can supposedly . . . agree, if we could do this, could you do that, kind of thing." He clarified that, at this point, that the Muskegon wages were a goal, not a priority: "Our goal was to get eventually to Muskegon wages, but we were indicating that we were clearly willing to modify the proposals or the demands in order to find a path toward parity between the two institutions." (Tr. 417-419; R Exh. 37.)

[75] R. Exh. 38.

[76] Shekell was provided a copy of the expired contract when he became the lead negotiator and understood that Zimmerman and Yaklin previously questioned SEIU's status. (Tr. 685.)

did not accept these documents as recognition because they did not explicitly designate the Charging Party as the bargaining representative.[77] On July 25, Alcoff finally sent the affiliation agreement to Shekell.[78] Shekell was satisfied and did not raise that issue again.

5    Despite continued discussions and some agreements, additional issues remained with respect to union activity and access, wages, health insurance, retirement, overtime, holidays, and pay practices.[79] July 31 was the last day the parties met to bargain a new contract.[80]

### M. The Respondent Pauses Bargaining After Decertification Petition is Filed

10    On July 31, Quinn informed Yaklin that she filed a decertification petition with the Board.[81] On August 2, Shekell emailed Alcoff suggesting a pause in negotiations:[82]

15    Since the SEIU's future representation of these colleagues is currently the subject of a decertification petition, we believe it is appropriate to pause future negotiation sessions, including the August 3, 2023 session, until the decertification process is resolved. We are willing to discuss future dates to schedule bargaining sessions once the decertification process is resolved and if there is a duty to bargain. Please let me know if you would like to discuss potential future dates.

20    Alcoff replied, the same day: "Absolutely not. This is a refusal to bargain and acting in continued bad faith. Our expectation is that Trinity will attend negotiations on [August 3] with the intent of reaching an agreement."[83] The Respondent did not meet with the Charging Party on August 3.

25    In emails between August 4 to 7, Alcoff, Shekell, and Mediator Dan Sims attempted but failed to secure another bargaining date.[84] On August 7, Shekell emailed the others, "Since Larry [Alcoff] is out of the country and everyone's schedules appear to be very dynamic at this time, let's touch base when Larry gets back." The parties would not meet again for bargaining.[85]

30

### N. The Charging Party Issues a 10-Day Strike Notice

On July 21, Alcoff emailed a 10-day notice to Yaklin informing her that bargaining unit employees would strike and picket at the hospital entrances and exits between 6:00 a.m. on

---

[77] Shekell testified that Alcoff would frequently refer to Yaklin's emails "relying on misstated or omitted pretty critical components that certainly, to me, when I read the email, made it clear… that Ms. Yaklin was not saying 'We are recognizing the fact that the SEIU is the bargaining representative." (Tr. 686.)

[78] R. Exh. 1.

[79] Alcoff believed the parties were close to a deal. (Tr. 176-177.) Shekell disagreed, citing the parties disagreement over several issues, including wage parity with Muskegon. (Tr. 682-684.)

[80] GC Exh. 96.

[81] R. Exh. 49.

[82] GC Exh. 23.

[83] GC Exh. 94.

[84] GC Exh. 23.

[85] Shekell testified he was very busy and involved in pending litigation, yet the parties had been bargaining weekly. (R. Exh. 42; GC Exh. 96.)

August 4 and 6:00 a.m. on August 5.  He asserted that the employees would be engaged in "an unfair labor practice strike caused by the [Respondent's] bad faith bargaining and failure to reach an agreement on a new collective bargaining agreement."[86]  The notice prompted concerns about hospital coverage during the Coast Guard Festival, a local event marked by an influx of visitors and increased demand for the Respondent's services.[87]  In light of these concerns, Yaklin relayed the following directive to managers before the strike:

> To gather did we have any concepts of the number of people that we may be in short in respective areas so that we could put together an appropriate plan, or that we could have to say we're going to divert patients, or we're going to closer services, or we're going to reduce available services, and we need to do that with proper notification.

### N.   Managers Ask Employees if They Plan to Strike on August 4

#### 1.   Sabrina Frank

On August 2, in anticipation of the strike, laboratory supervisor Sabrina Frank asked all the employees who reported to her if they would be at work that day because she "needed to know how much staff [she] had available."  In one instance, she text messaged the same inquiry to a non-bargaining unit employee.  The employee was not sure but because she was concerned about crossing the picket line.  Frank asked the witness to let her know "as normal call in policy still applies."  On August 3, the employee replied that she would not come to work on August 4 because "I have to stand with my coworkers."[88]

Prior to August 4, Frank did not mention anything to employees being assessed attendance points if they did not show up to work that day.  After the strike, however. Frank was told to apply the points to employees who did not come into work that day.[89]

#### 2.   James Donnellon

Similarly, a day or two before the strike, Sonya Ascencio and two other housekeeping employees asked Donnellon, Interim Director of Food, Environment, and Housekeeping, in the break room what would happen to them if they participated in the strike.  Donnellon replied that it was his understanding that they could participate in the strike but would be assessed attendance points for missing work.[90]

Around the same time, at Gengle's instruction, Donnellon, asked kitchen and housekeeping employees if they "were planning on working or attending the strike."[91]  On August 3, before

---

[86] GC Exh. 5.

[87] Yaklin was contacted by multiple community members, including the chief of police for Grand Haven and ambulance providers, regarding concerns about the hospital's capacity. (Tr. 887.)

[88] Frank's testimony that the employee was not in the unit was not disputed. (GC Exh. 86; Tr. 777-778.)

[89] I credit Frank's testimony that she was instructed to apply a neutral policy of assessing attendance points to anyone who did not report to work on August 4. (Tr. 781-783.)

[90] Tr. 753-754.

[91] Donnellon explained that the City of Grand Haven scheduled a festival for August 4 as part of

housekeeping employee Michael Coyle Payne began his shift, Donnellon asked if he planned to attend the strike the next day. Coyle responded, "yes," and Donnellon said that he would get two attendance points but it "was no big deal."[92]

5        3. Elise Pavlige

On August 2, Pamula Ivy, a unit technician and clerk, spoke with Pavlige, her supervisor. Ivy asked Pavlige if she would be assessed an attendance point if she went on strike. Pavlige replied that it was up to Ivy to decide if she wanted to strike but, if she did, she would be assessed

10      an attendance point. Ivy shared that information with Brandy Glynn, a respiratory therapist who also served as shop steward and bargaining team member. Glynn went to Pavlige and asked if Ivy's information was true. Pavlige confirmed that any employee who did not show up to work on August 4 would be assessed attendance points. She also explained that she was following Trinity Health's policies and needed to know what her staffing would be on August 4. Glynn

15      replied that it was unlawful for employers to give employees points for a lawful strike. Pavlige reiterated that she was simply following Trinity Health policy and was concerned about her staffing level for that day. Ivy subsequently participated in the strike on August 4. That day she received an email indicating that Pavlige assigned "Sick Leave" for Ivy's absence.[93]

20      4. Karla Gonzalez

On August 3, Gonzalez approached Stadler in the break room and asked what her plans were for August 4. Stadler replied that she would not be coming into work the next day. Gonzalez also approached Bixby in the hallway and asked her the same thing. Bixby replied that she was

25      not coming into work on August 4. Gonzalez then stated that she needed to know so she could put it into the payroll system. Bixby repeated her answer and added that she did not have to give her a reason. She did ask Gonzalez, however, who we could contact if the strike did not happen. Gonzalez stated that employees should call Erin Whitten, the scheduling clerk. At that point, however, Whitten said she was also coming not coming into work on August 4. Gonzalez became

30      angry at Whitten and told her that she thought Whitten was coming into work that day. Nurse Tiffany Rodriguez pulled Gonzalez away at this point and told her that she could not talk about the strike.[94]

---

Coast Guard Week and there would be an "influx of people into the community for the festival." He was able to staff his operations on August 4 with bargaining unit employees that did not attend the strike and help from his employer, Sodexo, to get meals to the patients. Coyle confirmed that festival day was expected to be a busy day for the hospital. (Tr. 84-85, 751-753, 762, 764-765.)

[92] I credited Coyle's testimony over Donnellon's version that Coyle initiated the conversation due to the fact that their conversation occurred during the timeframe when Donnellon was asking his staff whether they would be participating in the strike. (Tr. 79-80, 85-86, 756-757.)

[93] The testimony of Ivy and Glynn regarding their interaction with Pavlige on this issue is undisputed. (Tr. 310-311, 313, 320-323, 454-455; GC Exh. 87.)

[94] Stadler and Bixby provided detailed, credible explanations of how, when, and where Gonzalez approached each of them on August 3 to ask whether they would come to work on August 4. However, Stadler had more direct knowledge and proximity to Gonzalez's interaction with Whitten. (Tr. 232-235, 251-252, 256-257, 268-269.) Gonzalez denied that she asked any employees about their plans for August 4 but stressed that it was important for her to know who was working because they had surgeries scheduled. That response hardly suggests that it was employees who conveyed that information to her.

5. Alcoff Complains that Managers are Threatening to Discipline Strikers

On August 3, Alcoff emailed Yaklin that he was getting reports from bargaining members about being threatened with disciplinary action, such as no call/no shows and docked attendance points, leading up to the strike. Alcoff reminded her that she could not issue threats or discipline for participating in a federally and lawfully protected activity.[95]

*O.  Pre-Strike Activities*

1. Gengle Speaks With Brandy Glynn About Her Behavior

On August 2, at Yaklin's direction,[96] Gengle called Glynn's department and asked to meet with her in his office.[97]  Glynn agreed but asked a union member, Ricky Kauffman, to accompany her there.  When they got to Gengle's office, he said that Kauffman did not need to be there since the meeting would not be disciplinary in nature, but rather, a friendly conversation.  Glynn told Kauffman to leave.

After Kauffman left, Gengle told Glynn that he received complaints about her bullying, harassing, handing out flyers and stickers to employees, and that she had been misinterpreting the application of attendance points to strike activity.[98]  Glynn replied that she did not know what would happen on August 4 but asserted that it was illegal to assess points for a lawful strike and disciplining employees.  Gengle replied that he was following trinity Health's policies in place since May and his hands were tied.  Also, reading from a piece of paper, Gengle stated that the Respondent's policy prohibited handing out flyers, pamphlets, stickers, any kind of union solicitation.  He then told Glynn to stop that activity and think about her relationships with colleagues.  Glynn reiterated that it was a lawful strike, employees had given the Respondent enough notice, and it was unlawful for managers to threaten employees with eight points for no call/no show due to a lawful strike. Gengle again stated that these were Trinity Health's policies and his hands were tied.  He told Glynn to "just stop" because her handing out union flyers was making people uncomfortable.  As the meeting wrapped up, Glynn again asked if the meeting was disciplinary in nature.  Gengle said it was not and that it was just a friendly, fire-side chat.[99]

---

Moreover, she could not recall whether she raised her voice with Whitten. (Tr. 597-599.)

[95] GC Exh. 22.

[96] Gengle testified that Cynthia Van Kampen said that "something needed to be done about Brandy" because she was "pressing people as to whether or not they were going to participate in the strike." (Tr. 798.) Yaklin called Gengle, reporting that "Brandy was being pretty aggressive and somewhat confrontational with folks and we needed to address it." LeAnn LaFrance also called Gengle because she heard complaints that Glynn was being "aggressive" with people. (Tr. 799.)

[97] Gengle met with employees in his office three to four times a year. (Tr. 804.)

[98] There was no corroboration for the testimony of Gengle and Yaklin that other employees accused Glynn of bullying, harassing them, pressuring them to participate in the strike, and calling them scabs if they did not participate. (Tr. 797-799, 894.) While the Respondent established that numerous employees blocked Glynn's telephone number, that merely established that certain employees did not want to hear from Glynn. Moreover, Glynn testified that the blocking occurred around March, not August. (Tr. 324.)

[99] Glynn and Gengle both agreed that the meeting was not tense and was more like a friendly chat, although Glynn sensed the seriousness of the meeting by asking if it was disciplinary in nature. (Tr. 330,

2.   Gonzalez Speaks to Employees About the Strike

On August 2, Gonzalez went around the Surgical Services Department asking staff what they thought would be accomplished by striking on August 4 and stating that they would be assessed attendance points if they went through with it.[100]

*P..  The Respondent's Actions in Response to the Strike*

1.   The Respondent Issues Attendance Points to the Strikers

On August 4, 77 employees went on strike and picketed outside the hospital. The Respondent applied a "neutral policy to those who were absent on the day of the strike.  It did not distinguish between those who were engaged in the strike or who were absent for other reasons."[101] At Gengle's direction, strikers were to be assessed two attendance points.[102]

A total of 73 employees went on strike on August 4.  All but two received strike pay.  The Respondent issued attendance points to 42 of the striking employees.[103]   The following 36 employees received 2 attendance points for their absence on August 4 and engaged in the strike: Jessica Addington,  Sonya Ascencio, Chelsea Bixby, David Bradley, Jenna Bolduc, Chad Bolito, Tyson Cobb, Michael Coyle, Gabby Craig, Kayshira Cunningham, Meghan DeFabrizio, Greg Gillissie, Nicole Guenther, Jessica Hambright, Lori Homik, Shawndrea Ingram, Pamula Ivy, Emerald Johnson, Jordan Kleyn, Courtney Lodholtz, Ashley Miller, Ashlee Moore, Jason Moscynski,, Chad Nickerson,[104] Melissa Robart, Brittany Ronan, Beth Ruiter, Lisa Sanford, Steve Sasinski, Susan Sikkenga, Kimberly Siple, Sarah Stadler, Virgnia Swan, Kelly Walker, Erin Whitten, and Yakiea White.[105]  The following six employees received 1 attendance point: Tenaw Yiberhu, Rachel Kammeraad, Ruth Zylstra, Lynn Ruwe, Dottie Nevins, and Sharlene Pant.  In

---

801.)  Where they diverged, however, I credited Glynn's detailed and responsive testimony. (Tr. 313-316, 324-329.)  Gengle, on the other hand, displayed a limited recollection of the event and mostly denied Glynn's allegations in response to leading questions. (Tr. 797-798, 799-803.)  On cross-examination, he also confirmed that he was applying the Respondent's "policies that are in place that deal with intimidating behavior, standards of conduct. . . . and if there was concern" that the person "crossed the line" and made a coworker "uncomfortable, our employees need to be comfortable" so they can perform their work "and not feel pressured by a colleague." (Tr. 803-804.)

[100] I credit Stadler's testimony as to what Gonzalez said about the strike. Gonzalez was tentative in her response to a leading question and then could not recall whether she ever said words to the effect that the strike would not be able to get them anything. (Tr. 267, 600.)

[101] Respondent's Position Statement at 19. (GC Exh. 89.)

[102] Gengle told Donnellon: "We are assessing anybody that participated in the strike two points attendance for missing the day." Donnellon added, "When there's an absence according to hospital policy, they get two points for missed work," regardless of whether it was excused or not. (GC Exh. 40; Tr. 760.)

[103] GC Exh. 98.

[104] There were 74 SEIU Michigan "Strike – Pay Forms" submitted by striking employees.  However, Chad Nickerson submitted two of them, the first for reimbursement, and a second form cancelling his request for a stipend. (GC Exh. 34.)

[105] White was absent on August 4 but did not request strike pay.  However, she subsequently disputed the 2 attendance points issued her for that day, asserting that she "[wasn't] a no scall no show because that was the strike and I [can't] be penalized for that." (GC Exh. 78.)

addition to Nickerson and White, the following employees did not receive strike pay and were also assessed attendance points for being absent on August 4: Kristie Firestone, Teresa Hippchen, and Cynthia Merrell.[106]

5          2.   The Respondent's Varied Absence Classifications for the Strikers

Although Respondent's attendance policy is silent on the Respondent's ability to issue attendance points when absences are excused, the following 22 employees who received attendance points also had an "excused absence:"  Jessica Addington, Sonya Ascencio, Chelsea Bixby, Chad Bolito, Tyson Cobb, Michael Coyle, Kristie Firestone, Nicole Guenther, Teresa Hippchen, Pamula Ivy, Emerald Johnson, Rachel Kammeraad, Jordan Kleyn, Cynthia Merrell, Ashlee Moore, Jason Moscynski, Lisa Sanford, Kimberly Siple, Virgnia Swan, Kelly Walker, Erin Whitten, and Tenaw Yiberhu.[107]

15          The Respondent's managers took varying approaches in how they classified the absences of strikers who received attendance points.  Donnellon recorded Sonia Ascencio's absence on August 4 as an "unexcused absence."[108]  Karla Gonzalez did not assess any attendance points to Tyson Cobb and Cynthia Merrell—someone else did—but she documented each of their absences on August 4 as a "non-paid time, excused absence."[109]  Pavlige took yet another approach, documenting Pamula Ivy's as taking "sick leave" on August 4.[110]

The Respondent issued discipline to the following employees, in part due to their absences August 4:  Pamula Ivy (final written warning);[111] Tami Biesbrock (final written warning);[112] Beth Ruiter (written warning);[113] Yakiea White (written warning);[114] Jenna Bolduc (written warning);[115] and Steve Stasinski (verbal counseling).[116]

On August 8, Alcoff demanded that "the Employer rescind all points and/or disciplinary actions assigned to employees for participation in the strike. The Union is further requesting a list of all bargaining unit employees who received points and/or disciplinary actions between August 1, 2023 and August 8, 2023."[117] The Respondent declined to answer.

---

[106] GC Exh. 98.

[107] GC Exh. 88.

[108] When Ascencio texted him asking whether she "was marked as a no show, no call, or got any points" for the day of the strike, Donnellon responded, "Hi I had to assess 2 attendance points and could not put in PTO. Sorry." (GC Exh. 40, 43; Tr. 45-46.)

[109] Gonzalez did not know who issued the points to Cobb and Merrell. (Tr. 609; GC Exh. 98.)

[110] GC Exh. 87.

[111] GC Exh. 74.

[112] GC Exh. 80.

[113] Ruiter protested the issuance of her first written warning for absenteeism by Sabrina Frank.  She asserted that the Respondent could not discipline her for going on strike, but Frank replied that she was following the Respondent's directive.  (GC Exh. 32; Tr. 290-293.)

[114] GC Exh. 78.

[115] GC Exh. 82.

[116] GC Exh. 81.

[117] GC Exh. 48.

*Q. The Charging Party Attempts to Resume Bargaining in September*

On September 14, Alcoff and Shekell called to discuss a new wage proposal. During the call, Alcoff found out that the Respondent communicated to employees that everyone except represented employees would be moving to an approved health insurance plan:

> I don't recall his direct response on the phone… but I was very aware that the Employer communication to employees at the time, in the midst of the decertification election coming up, was largely also built on the fact that we weren't going to get the same benefits. They were going to- we were going to- that the employees were sort of going to get screwed. And it was, we had some urgency to try and resolve this because we had been proposing it all along, and they had not been wanting to agree to it until at that point. So we wanted people to get the same insurance benefits as everybody else in the same timeline, and they were not agreeing to it at that point." (Tr. 185.)

As a result, Alcoff notified Gengle and Shekell that the Charging Party was prepared to sign an agreement to implement some Trinity policies and insurance plans. In the email, Alcoff also included additional bargaining dates and expressed that he wanted to present a revised economic proposal.[118] He initially forgot to include Shekell in the email and forwarded it to him on September 17. Shekell responded that he would get back to him but never did.

*R.  The Decertification Election*

1.  Quinn Files Decertification Petition

Eventually, Quinn gathered enough signatures for a decertification petition.  On July 31, she filed the petition with the Board and emailed a copy to Yaklin.[119]  On August 31, the Regional Director approved a Stipulated Election Agreement between the Charging Party, Respondent, and Quinn for a decertification election to be held on September 18 and 19.[120]  Section 12 of the agreement addressed how and when ballots would be tallied:

> Immediately upon conclusion of the last voting session, all ballots cast will be commingled and counted and a tally of ballots prepared and immediately made available to the parties.

2.  Charging Party Files Blocking Request

On August 8, the Charging Party filed a blocking request in connection with Cases 07-CA-318279, 07-CA-323321 and 07-CA-323743.  The decertification election proceeded on September 18 and 19.  However, based on the determination that those charges alleged violations of Section 8(a)(1) and challenged the circumstances surrounding the decertification petition, the Regional Director granted

---

[118] Shekell asked Alcoff to present the proposal through a mediator because he believed it would be more organized and consistent with their procedure for previous proposals. Alcoff refused and was insistent on scheduling a full bargaining session. (Tr. 427, 695; GC Exh. 27.)

[119] R. Exh. 49; Jt. Exh. 1.

[120] Jt. Exh. 2.

the Charging Party's blocking request and impounded the ballots before they could be counted in accordance with Section 103.20(c) of the Board's Rules and Regulations Section 103.20(c).[121]

     3.  Pre-Election Activity

In late August, Glynn created a document labeled, "We're voting YES to Stick with our Union."[122] She and Ricky Kauffman, a fellow employee and NOCHEA board member, helped members sign the document virtually before the decertification vote.

In September, shortly before the decertification election, housekeeping employee Kellie Walker was working in the operating area.  Walker was walking in the hallway when Surgical Services Manager Gonzalez stopped her and asked how she planned to vote.  Walker responded that she was voting for the Charging Party.  Gonzalez asked Walker why she was voting that way. Walker explained that she was a single woman who could not live on $13 per hour and was "voting for the union to better my life."  Gonzalez said, "okay," and they parted ways.[123]

     4.  Regional Office Impounds Ballots

The decertification election took place on September 18 and 19.  During the morning on September 19, Quinn and Shekell were notified by the Regional Office of the blocking determination during the morning on September 19.  Later that evening, they emailed their objections to the impounding of ballots stating, in pertinent part, that the unfair labor practice charges predated the Regional Director's approval of the Stipulated Election Agreement.[124]

     5.  Charging Party Prevails in Decertification Election

On September 25, the Charging Party withdrew its blocking request.  On September 27, the Regional Director granted the Charging Party's withdrawal request and informed the parties that the impounded ballots would be opened and counted on September 29.[125]

*S.  The Respondent and Decertification Supporters React to Delayed Count*

     1.  Decertification Supporters Obtain Additional Signatures

The Regional Director's announcement that ballots would be counted on September 29 spurred additional spurred a last-minute flurry of solicitation by Quinn and other supporters of the decertification effort.[126]  On September 28, Samantha Justian, a shipping and receiving clerk, also

---

[121] The Respondent was not notified that the ballots would be impounded until "some point" on September 19. (Jt. Exh. 4 at 2, fn. 2; Tr. 696-697, 896.)

[122] GC Exh. 25.

[123] I based this finding on Walker's credible testimony that the conversation with Gonzalez took place just before the election.  The Respondent asserts that Walker worked in a different department, which is not true because surgical suites would utilize housekeeping services.  (Tr. 71-73, 600.)

[124] R. Exh. 45.

[125] Jt. Exh. 9.

[126] It is undisputed that Quinn obtained more signatures after the election.  However, I do not credit her uncorroborated testimony responding to a leading question that unidentified employees signed

assisted in soliciting signatures.  That day, she was led to Brittany Burns, a newly-hired laboratory assistant who was at a computer station completing her orientation.  Justian asked if she was "Brittany."  Burns said, "yes," and Justian handed her the petition and told her that she needed to sign it.  The top of the sheet was covered with a white piece of paper, so Burns did not see the portion that explained the purpose of the petition. Confused, Burns asked what it was about. Justian told her that it related to an effort to help employees get better pay. Burns proceeded to sign the petition.  Before leaving the room, Justian told Burns not to tell anyone in the laboratory because then "they would have a hit out on me."  Burns subsequently learned that she had been misinformed about the purpose of the document but did not take any action to have her signature removed from the petition.[127]

### 2.  The Respondent Withdraws Recognition

During the morning on September 28, Quinn delivered to Yaklin a seven-page disaffection petition containing 94 signatures with no dates.  Pages 1, 4, 6, and 7, containing 48 signatures, included headings stating that the employees no longer wanted to be represented by the Charging Party. Pages 2, 3 and 5, however, containing 46 signatures, had no headings or statement about the purpose for the signatures.[128]  Ten signatures were not accompanied by printed names and other printed names were illegible.  Operating on the belief that there were 180 employees in the bargaining unit, Yaklin concluded that a majority of them signed the petition and moved swiftly to withdraw recognition.[129]

At 12:34 p.m., Shekell emailed Alcoff that he was suspending future bargaining based on "objective evidence demonstrating that the Union has lost the support of a majority of colleagues it represents."[130]  Two minutes later, at 12:36 p.m., Yaklin emailed managers and bargaining unit employees that the Respondent received "objective evidence" earlier that morning that the Charging Party "lost majority support of the colleagues it has represented."  She also shared that the Respondent

---

because they were upset by the Charging Party's blocking charge. (Tr. 842, 848.)

[127] Although Burns was not certain of the exact date of her encounter with Justian—it was her second or third day after she started working there—I credited her detailed testimony.  (Tr. 338-339.) Justian's testimony, on the other hand, was inconsistent and evasive as to whether she was randomly walking around soliciting signatures or had been steered to Burns. (Tr. 953-959.)

[128] Quinn and Yaklin were not credible about their interaction—or lack thereof—regarding the disaffection petition.  Both alleged that Quinn transmitted the petition to Yaklin via email.  However, unlike Quinn's July 31 email transmitting a copy of the decertification petition to Quinn, no evidence of an email was produced. (Tr. 842, 902.)

[129] Yaklin's testimony also indicated that the Respondent had some involvement in the disaffection petition.  Most revealing was Yaklin's testimony that she decided to withdraw recognition based on "my understanding . . . that *if we had secured*, or if we had been presented, I should say, with majority of folks asking to no longer be represented . . ." (emphasis provided). Moreover, It was also clear that Yaklin moved quickly to withdraw recognition without knowing whether everyone on the petition was eligible to be counted as a bargaining unit employee.  She had no personal knowledge as to where she got the 180 total from and speculated that it was "probably" from "the HR department,"  Nor did Yaklin know when the signatures were collected.  She knew only some of the names on the petition and did not authenticate the information to determine if those who signed were still employed. (GC Exh. 9; Tr. 109-113, 116-117, 903.)

[130] GC Exh. 6; R. Exh. 46.

had withdrawn recognition of the Charging Party and terminating further bargaining.[131]  Finally, the Respondent issued a press release later that day announcing its withdrawal of union recognition.  The Respondent recognized that the Charging Party prevailed in the decertification election on September 18-19 but insisted that the withdrawal of recognition took precedence because "the evidence of the loss of majority support was received prior to the counting of the ballots on September 29." The Respondent also announced that it was granting wages increases "for its colleagues, including those formerly represented by the SEIU."[132]

On September 30, Yaklin essentially repeated the same message in an email to all employees stating in part:

> As a follow up to my note yesterday about our decision to withdraw recognition of the SEIU as a bargaining unit at Trinity Health Grand Haven, I want to share the outcome of the de-certification election that took place on Sept. 18-19.  Although the results were in favor of the union, our notice of withdrawal arrived 10 days after the election and prior to the ballot count, thereby  taking precedence over the outcome of the election.

> We have therefore decided to honor the wishes of the majority of our colleagues who no longer want to be represented by the SEIU. We are proceeding under federal law with direct partnership. On Sept. 28, we notified the SEIU that we have withdrawn recognition of the union and are terminating further bargaining.

> We remain committed to providing competitive and sustainable wages to our valued colleagues. As a first step, we are implementing an across-the-board wage increase, including colleagues formerly represented by the SEIU, effective October 1. Details about this increase, and additional compensation announcements, will be coming soon.[133]

### T. The Charging Party Prevails and is Certified as Representative

On September 29, the ballots were counted and the Corrected Tally of Ballots reported 89 votes cast for the Charging Party, 66 against, and 7 non-determinative challenged ballots.[134]

On October 6, Respondent timely filed objections to conduct affecting the results of the election with a supporting offer of proof.[135]  On October 17, the Regional Director overruled the Respondent's objections to the election on the grounds that they did not raise any material and substantive issue of fact that warranted a hearing or setting aside the election results.  Accordingly, she certified that a majority of the votes had been cast for the Charging Party and issued a Certification of Representative that "SEIU Healthcare Michigan" was the exclusive representative of the following employees (the Certified Unit):[136]

---

[131] GC Exh. 7 at 1.
[132] GC Exh. 30.
[133] GC Exh. 7 at 2.
[134] Jt. Exh. 3.
[135] R. Exh. 15.
[136] Jt. Exh. 4.

All full-time and regular part-time Social Worker MSW, Medical Technologists ASCP II, Nuclear Medicine Technologist, Ambassador, ARRT/CT Scan Technologist, HIM Analyst Coder, Biller, Cashier, Central Scheduler, PACS Administrator/Clinical Application Specialist, Certified Surgical Technologist, CT Scan Technologist, Clinical
5      Documentation Specialist, Clinical Quality Assurance Liaison, Coder Assistant, Communications Specialist, Cook, CPD Lead Technician, CPD Technician, Custodian, Financial Counselor, Echocardiography Technician, EMT, Exercise Physiologist, Health Information Management Clerk, Histologist- Reg., Housekeeping Aide, Lab Assistant I-Phlebotomist, Lab Assistant II, Lead Housekeeper, Logging Clerk, LPNII,
10    Mammography Technologist, Mammography Technologist II, M.I Technician Assistant, Materials Management Buyer, Materials Handler, Mechanic I, Mechanic II, Mechanic III-Electrician, Medical Imaging Pt. Reg. File Clerk, Medical Imaging Technical Assistant, Medical Technician ASCP I, Medical Technologist ASCP II, Medical Assistant, Nuclear Medicine Technologist, Nurse Aide, Paramedic, Patient Accounts Specialist, Patient
15    Registration Clerk, Patient Service Representative, Pharmacy Lead Technician, Pharmacy/Certified Technician, Pharmacy Assistants, Pre-Admission Review Specialist, Production Worker, RDMS/RVT, Registered Polysomnographer, Registered Respiratory Therapist, Social Worker MSW, Supply Aide/Courier, Surgical Technologist, Surgical Services Scheduler, Systems Support Specialist, Technologist Reg ARRT, Technician
20    NReg ARRT Tissue Technician, Transcriptionist, Ultrasound Technologist, Unit Clerk, Unit Technician and Unit Technician/Clerk employed by the Employer at its Grand Haven facilities; but excluding guards and supervisors as defined in the Act.

25    On October 31, the Respondent filed with the Board a request to review the Regional Director's October 17  decision and stay the decertification matter until the unfair labor practices were fully litigated.  On December 7, the Board denied the Respondent's request for review and stay the proceedings, finding that the motion "raised no substantial issues warranting review."[137] In addition to finding that the Respondent's "objections failed to allege objectionable conduct by any party . . . before or on the two days when employees voted," the Board rejected the
30    Respondent's assertion that the Charging Party experienced a postelection loss of majority support:

35    We additionally deny review based on well-established precedent holding that an alleged postelection loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election.  *Community Support Network,* 363 NLRB 833, 833 (2016); *Alta Vista Regional Hospital,* 356 NLRB 1331, 1332-1333 (2011), enfd. 697 F.3d 1181, 1187 (D.C. Cir. 2012); *Sunbeam Corp.,* 89 NLRB 469,473 (1950); *Teesdale Mfg.* Co., 71 NLRB 932,935 (1946).

40                   *U.  The Respondent Refuses to Resume Bargaining*

On October 17, having received notification of the Regional Director's decision certifying the decertification election vote tally and issuing the Certification of Representative, the Charging Party demanded that the Respondent immediately provide available dates and times for
45    bargaining in October and November by October 18.[138]

---

[137] Jt. Exh. 5.
[138] GC Exh. 28.

The Respondent did not respond to any of the Charging Party's requests to bargain after September 28.  On October 19, Yaklin announced several "changes for our formerly-SEIU represented colleagues."  She noted that the changes were a "good first step, but they are only first steps, and they are possible only because of the direct relationship we are now honored to share."  They included a minimum 2.5% wage increase for employees, implementation of the Trinity Health $15 per hour minimum wage, additional rate increases, and decreases in health insurance premiums for underrepresented employees "wanting to have a direct relationship" with the Respondent.[139]

On January 31, 2024, the Charging Party again requested that the Respondent resume bargaining.  Alcoff provided his availability to meet in person or virtually each week in February and March.  He also requested contact information for all bargaining unit employees, access to hospital bulletin boards for the Charging Party's representatives, and recission of the 16 policies that were unilaterally changed by the Respondent.[140]

LEGAL ANALYSIS

I.   THE ALLEGED SECTION 8(A)(1) VIOLATIONS[141]

Section 8(a)(1) makes it unlawful for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 of the Act. Section 7 guarantees employees the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. The concept of "mutual aid or protection" focuses on the goal of concerted activity; chiefly, whether the employee or employees involved are seeking to improve terms and conditions of employment or otherwise improve their lot as employees. *Fresh & Easy Neighborhood Market*, 361 NLRB 151, 153 (2014). Concerted activity includes that which is engaged in with or on behalf of other employees, as well as where an employee brings truly group complaints to management's attention. See *Meyers Industries*, 268 NLRB 493, 497 (1984) (*Meyers I*), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), supplemented *Meyers Industries*, 281 NLRB 882, 887 (1986) (*Meyers II*), affd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988).

In deciding whether an employer's statement or conduct violates Section 8(a)(1), the Board applies the objective standard of whether it would reasonably tend to interfere with the free exercise of an employee's statutory rights, and does not consider the motivation or actual effect. *Midwest Terminals of Toledo*, 365 NLRB No. 158, slip op. at 21 (2017), enfd. 783 Fed. Appx. 1

---

[139] GC Exhs. 8.
[140] GC Exh. 50.
[141] Paragraph 12 of the complaint alleges that Gengle's May 18 email "threatened employees with adverse consequences if they selected the Charging Party as their bargaining representative."  In her posthearing brief, the General Counsel did not address this allegation.  In any event, I would not have found this allegation to be a threat, but rather a factor to be considered in the context of the Respondent's alleged Section 8(a)(5) bargaining violations, *infra*.  Accordingly, that allegation is dismissed.

(D.C. Cir. 2019); *Farm Fresh Company, Target One, LLC*, 361 NLRB 848, 860 (2014); *Divi Carina Bay Resort*, 356 NLRB 316, 320 (2010), enfd. 451 Fed. Appx. 143 (3d Cir. 2011); *Joy Recovery Technology Corp.,* 320 NLRB 356, 365 (1995), enfd. 134 F.3d 1307 (7th Cir. 1998); *Miami Systems Corp.*, 320 NLRB 71, 71 fn. 4 (1995), affd. in relevant part 111 F.3d 1284 (6th
5   Cir. 1997); *Midwest Terminals of Toledo*, 365 NLRB No. 158 (2017).

### A.  Frank's Directive to Ruiter [¶ 10]

An employer may lawfully forbid employees from talking about a union during work time
10   if that prohibition also extends to all other subjects not associated or connected with their work
tasks. However, an employer violates Section 8(a)(1) when, as here, employees are forbidden to
discuss unionization but are free to discuss other subjects unrelated to work.  *Olympic Medical
Corp.,*  236 NLRB 1117, 1122 (1978), enfd. 608 F.2d 762 (9th Cir.1979); *Larid Printing,* 264
NLRB 369, 374, 376 (1982).
15

In early March, while Beth Ruiter was working in the laboratory, she briefly conversed
with Sharlene Pant, another member of the Charging Party's bargaining committee, about the
February 28 bargaining session a few days earlier.  A few minutes later, her supervisor, Sabrina
Frank called Ruiter into her office and said that employees were not allowed to speak about the
20   union during work time.  A few months earlier, Frank admonished her for engaging in such
discussion while working. Ruiter replied that the Respondent could not prohibit employees from
speaking about a union if it permitted them to engage in personal conversations.  Frank responded
that the Respondent's policy did not allow employees to speak about the union during working
hours.
25

By prohibiting Ruiter from engaging in union-related speech while allowing other nonwork
speech during work time, Frank interfered with Ruiter's Section 7 rights.  See *Industrial Wire
Products, Inc.*, 317 NLRB 190, 190 (1995) (employer unlawfully applied disparate treatment in
forbidding employees from talking about the union on company time while giving them the
30   freedom to talk about other matters).

However, this allegation is based solely on the untimely-filed amended charge in Case 07-
CA-323321, which was filed on December 1, 2023—"Employer issued overly broad directives"—
and is unrelated to any of the claims in the timely-filed initial charges in Cases 07-CA-323321,
35   07-CA-323743, and 07-CA-326861.  Accordingly, this allegation, which arose more than six
months prior to the filing of the applicable charge, is time-barred pursuant to Section 10(b) of the
Act and is dismissed.

### B.  Van Kampen's Directive to Remove Union Sticker [(¶ 14]
40

Employees have the protected right to display union insignia at work, absent "special
circumstances." *Republic Aviation Corp.* v. NLRB, 324 U.S. 793, 801-803 (1945).  Such a right,
however, must be balanced against an employer's right to manage its business in an orderly and
safe manner.  However, a rule restricting or prohibiting the wearing of union insignia logos must
45   be narrowly tailored to justify the rule. See *Tesla, Inc.*, 371 NLRB No. 131, slip op. at  (2022) (in
the absence of evidence that black union shirts caused seat mutilations, car manufacturer failed to
establish special circumstances for its team-wear policy's implicitly prohibiting employees from

34

wearing union shirts).  In the case of a healthcare facility like the hospital at issue, the Board recognizes a narrow exception for immediate patient area, where "restrictions on wearing insignia in immediate patient care areas are presumptively valid." *Healthbridge Management, LLC*, 360 NLRB 937, 938 (2014), enfd. 798 F.3d 1059 (D.C. Cir. 2015).

5

Around the middle of May, Chief Nursing Officer Van Kampen was speaking with Erin Dexter in an ultrasound room-a nonpatient care area—when she noticed the union sticker on Dexter's scrubs.  Van Kampen told her that the sticker was not part of the uniform and to remove it.  Dexter refused and Van Kampen left.  The Respondent advanced no justification for the

10    directive.

In the absence of special circumstances showing that the ban was "'necessary to avoid disruption of health-care operations or disturbance of patients," as explained in *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978)), Van Kampen's directive to Dexter to remove the

15    union sticker from her uniform was coercive.

However, this allegation is based solely on the untimely-filed amended charge in Case 07-CA-323321, which was filed on December 1, 2023—"Employer issued overly broad directives"—and is unrelated to any of the claims in the timely-filed initial charges in Cases 07-CA-323321,

20    07-CA-323743, and 07-CA-326861.  Accordingly, this allegation, which arose more than six months prior to the filing of the applicable charge, is time-barred pursuant to Section 10(b) of the Act and is dismissed.

*C. Gonzalez Provided Ministerial Aid to the Decertification Campaign* [¶ 11(a)]

25

An employer violates Section 8(a)(1) of the Act by "actively soliciting, encouraging, promoting, or providing assistance in the initiation, signing, or filing of an employee petition seeking to decertify the bargaining representative." *Wire Products Mfg. Co.,* 326 NLRB 625, 640 (1998), enfd. sub nom. mem. *NLRB v. R.T. Blankenship & Associates, Inc.*, 210 F.3d 375 (7th Cir.

30    2000). In determining the legality of an employer's assistance in a decertification effort, the appropriate inquiry is "whether its conduct constitutes more than ministerial aid." *Times Herald*, 253 NLRB 524 (1980).

Around May, as news about the decertification effort spread, surgical technician

35    Addington, on behalf of herself, Bixby, Stadler, and Cobb, reached out to Gonzalez for more information about the Charging Party.  Gonzalez knew that Quinn had a major role in obtaining signatures for a decertification petition.  Rather than simply refer the Addington group to Quinn, however, Gonzalez took it several steps further.  She arranged for Quinn to meet with the Addington group and other employees in the hospital stairwell.  Gonzalez then instructed the

40    employees to follow her there to meet with Quinn.  As Quinn solicited their signatures for the petition, Gonzalez split her time between standing outside the closed door and gathering more employees to meet with Quinn.  However, there was no evidence that employees felt coerced by Gonzalez remaining there.

45    The evidence clearly established that Gonzalez, who previously coerced employees regarding their strike activity, also took an active role in connecting employees with Quinn.  Her actions, however, dd not cross the line.  Under extant Board law, Gonzalez's conduct in funneling

JD-53-24

employees to Quinn, which ensued after the Addington group initially approached her for more information about the Charging Party, did not amount to more than ministerial aid to the decertification campaign.  See *Sears, Roebuck and Co.,* 368 NLRB No. 30, slip op. at  (2019) (store manager, in response to unsolicited inquiry by antiunion employee on how to get rid of the union  did not provide more than ministerial aid by telling the employee that she could find a decertification form in his desk drawer; *Eastern States Optical Co.*, 275 NLRB 371, 372 (1985) ("some assistance" by employer's attorney in response to request by antiunion employees "in wording [decertification] petition" did not amount to more than ministerial aid); *KONO-TV-Mission Telecasting*, 163 NLRB 1005, 1006 (1967) (employer's president did not unlawfully assist employees interested in decertifying union by directing them to write the Board and then acquiescing to their request for help in writing the letter).

This allegation is dismissed.   There is no evidence that Gonzalez initiated the decertification petition, solicited signatures for the petition, or discussed the petition with any employee.  See, e.g., *New Concepts for Living, Inc.,* 371 NLRB No. 157, slip op. at 1-2 (2022) (employer unlawfully assisted a decertification campaign by distributing a memorandum urging employees to withdraw their memberships and dues deduction authorizations); *Kauai Veterans Express Co.,* 369 NLRB No. 59, slip op. at 1-2 (2020) (employer's memorandum initiative manifested its direct involvement in campaign resulting in decertification petition).  *All Seasons Climate Control, Inc. v. NLRB*, 540 Fed Appx. 484, 487 (6th Cir. 2013) (employer tainted petition by asking an employee to initiate a decertification petition, told him what the petition should contain, when to gather signatures, and to deny their conversation had occurred); *Mickey's Linen & Towel Supply,* 349 NLRB 790, 791 (2007) (employer violated Section 8(a)(1) by serving as an interpreter for employee who was soliciting signatures for decertification petition); *V&S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 276 (6th Cir., 1999) (employer's president tainted petition by through his "an affirmative role in procuring signatures on the decertification petition, as well as in instigating the petition by leaving it in an envelope in [an employee's] truck"); *Hearst Corp.*, 281 NLRB 764 (1986) (employer tainted petition by directly soliciting signatures for decertification petition, interrogating employees about their sympathies, promising benefits, and threatening to "keep away" from the union).[142]

### D.  Gonzalez's Statement that Strike Activities Would be Futile [¶ 11(b)]

A statement regarding futility violates Section 8(a)(1) when it expressly or implicitly threatens that it would be useless to support a union.  See *Overnite Transportation Co.*, 329 NLRB 990, 992 (1999) (respondent unlawfully gave employees the impression that bargaining would be futile where it "gave a special meaning" to statement pay raises "will have to wait for negotiations" by repeatedly citing example of years of unproductive bargaining at its own separate unionized facility), enfd. in relevant part 280 F.3d 417, 430 (4th Cir. 2002); *Wellstream Corp.,* 313 NLRB 698, 706 (1994) (president's statements that no "son of a bitch" would bring a union into the company and he would see to it that company never unionized conveyed to employees the futility of their support for the union); *Soltech, Inc.,* 306 NLRB 269, 272 (1992) (statement that company did not need a union and would do everything it could to assure it remained nonunion was designed to notify employees that union representation efforts would be futile).

---

[142] In contrast, Gonzalez

On August 2, Gonzalez went around the Surgical Services Department asking staff what they thought would be accomplished by striking on August 4 and stating that they would be assessed attendance points if they went through with it.  On its face, Gonzalez's question was just that—a question.  According to Stadler's credited testimony, Gonzalez was clearly expressing her disagreement with the strike.  However, she did not state that employees' strike activities would be met with negative consequences or not accomplish any of the employees' objectives for the strike. See e.g., *NP Red Rock LLC,* 373 NLRB No. 67, slip op. at   (2024) (employer violated Section 8(a)(1) by "implicitly threatening that employees' selection of the union would be futile because the respondent would adopt a bargaining strategy that would prevent any agreement with the Union); *Grand Central Partnership,* 327 NLRB 966 (1999) (manager's statement that he "did not think the Union would be a good idea for the employees to have at that moment" and urging employees to wait to see what the Union achieved in bargaining at another facility, did not "expressly or implicitly threaten that it would be useless to vote for the Union.").  This allegation is dismissed.

### E.  Mangers Question Employees About Union Activities

The Board considers the totality of the circumstances in determining whether the questioning of an employee would have reasonably tended to restrain or coerce an employee in the exercise of union activity. *Rossmore House*, 269 NLRB 1176 (1984), affd. sub nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985).  In conducting such analysis, it is also appropriate to consider the five factors set forth in *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964): (1) whether there is a history of employer hostility and discrimination; (2) the nature of the information sought; (3) level of the supervisor or manager; (4) place and method of the interrogation; and (5) the truthfulness of the interrogated employee's response. However, relevant factors "are not to be mechanically applied in each case." 269 NLRB at 1178 fn. 20.

### 1.  Gonzalez's Interrogation of Employees About The Strike [[¶ 11(c)]

On August 3, Surgical Services Manager Gonzalez asked Stadler and Bixby if they planned to work on August 4.  Both told Gonzalez that they would not be coming into work.  In Bixby's case, Gonzalez asked her for the reason so she could enter it into the payroll system.  Bixby repeated that she would not come into work and insisted she did not have to give a reason. She then asked Gonzalez who to call if the strike did not happen.  Gonzalez stated that she should call Erin Whitten.  At that point, however, Whitten said she was not coming to work on August 4. Gonzalez became angry at Whitten because she thought Whitten was coming into work that day.

An employer may question employees regarding their strike intentions where it has a reasonable basis for believing a strike is imminent such that the employer has a legitimate need to determine its ability to adequately staff its operations. See *W.A. Sheaffer Pen Co.*, 199 NLRB 242, 243 (1972).  However, questioning employees regarding their intention to participate in a strike, with certain exceptions, is inherently coercive and tends to interfere with employees' Section 7 rights. *Transportation Management*, 257 NLRB 760, 767 (1981).  In lessening the coercive effect of such questioning, an employer is obliged to fully explain its purpose, assure employees that their responses will not result in reprisal, and otherwise refrain from creating a coercive atmosphere. P*reterm, Inc.*, 240 NLRB 654, 656 (1979).  Cf. *Mercedes-Benz U.S. International, Inc.,* 369 U.S. No. 38, slip op. at 2-3 (2020) (healthcare institution's questioning of employees if

they intended to strike and stating there would be no reprisals for those who did not show up on the first day of the strike was lawful).

Here, the Respondent had received a 10-notice of a strike by bargaining unit employees on August 4.  As such, Gonzalez was lawfully entitled to ask her department's employees whether they planned to come into work that day.  However, by going further and asking Bixby twice to explain why she was not coming to work, it was evident that Gonzalez wanted to know a previously undisclosed fact—whether Bixby would be participating in the August strike.  Gonzalez also enhanced the coercive nature of her questioning by yelling at Whitten for stating that she too would not be coming into work on August 4.  Further, Gonzalez did not clarify that there would be no adverse consequences if Bixby participated in the strike.  Finally, the questioning followed a series of unfair labor practices by the Respondent relating to bargaining, unilateral changes to policies, and threats by managers that employees would be assessed attendance points if they participated in the strike. Under the circumstances, the Respondent violated Section 8(a)(1).

2. Gonzalez's Interrogation of Walker [[¶ 11(d)]

In September, shortly before the decertification election, Gonzalez stopped housekeeping employee Kellie Walker in the operating area and asked how she planned to vote.  Walker responded that she was voting for the Charging Party.  Gonzalez asked Walker why she was voting that way.  Walker replied that she wanted a better wage.  Gonzalez said, "okay."

The Board has found that such interrogation regarding union elections is inherently. *Shepherd Tissue, Inc.,* 327 NLRB 98 (1998).  Gonzalez's also unlawfully polled Walker because it suddenly placed her in a position where she reasonably felt pressured to express her voting preferences. *Space Needle, LLC,* 362 NLRB 35, 36 (2015). Under the circumstances, Gonzalez unlawfully interrogated Walker in violation of Section 8(a)(1) of the Act.

The Respondent's contention that the allegation at Paragraph 11(d) of the complaint is time-barred lacks merit.  At hearing, I granted the General Counsel's motion to add that allegation over objection that Gonzalez interrogated employees in September about their support of the Charging Party.  That allegation closely relates to the following alleged Section 8(a)(1) violation in the timely-filed initial charge in Case 07-CA-323321: "Coercively questioning employees about their own or coworkers' union activities or sympathies, in violation of their rights under Section 8(a)(1) of the Act."

3. Frank and Donnellon Question Employees About their Availability on August 4 [¶ 15]

On August 2, Laboratory Supervisor Frank asked all the employees who reported to her if they would be at work that day because she "needed to know how much staff [she] had available." A text message from Frank to a non-unit employee regarding the employee's availability on August 4 corroborated Frank's testimony that the Respondent would apply the "normal call-in policy" to any employee who did not report to work that day.  The credited evidence established that Frank was simply inquiring about employees' availability on August 4 and did not mention anything about attendance points at that point.  Accordingly, this allegation regarding Frank is dismissed.

On August 2, Interim Director Donnellon was approached by Ascencio and several other employees and asked if there would be any consequences if they went on strike.  Donnellon replied that it was his understanding that they could participate in the strike but would be assessed attendance points for missing work.  In this instance, Donnellon did not question employees about their intentions on August 4.  It was the employees who questioned Donnellon in the breakroom.  In this instance, Donnellon did not coercively questioned employees and this allegation is  also dismissed.

### F.  Donnellon and Pavlige Question Employees About their Availability on August 4 [¶ 16]

On August 2, Pamula Ivy asked her supervisor, Elise Pavlige, if she would be assessed attendance points if she went on strike.[143]  Pavlige replied that it was up to Ivy to decide if she wanted to strike but, if she did, she would be assessed an attendance point.  Ivy shared the information with Shop Steward Glynn, who protested to Pavlige.  Pavlige reiterated the Respondent's policy to assess points to absent employees.  Ivy subsequently participated in the strike on August 4 and Pavlige placed her on sick leave for August 4.  In any event, it was Ivy who initiated the conversation with Pavlige.  Aside from the legality of the Respondent's assessment of attendance points to strikers, the circumstances do not establish a coercive interrogation by Pavlige.  This allegation is dismissed.

On August 3, without first giving assurances that their responses would not be met with reprisal, Donnellon asked his department's employees, including Coyle, if they "were planning on working or attending the strike.  In response to Coyle statement that he intended to go on strike, Donnellon replied that he would get two attendance points but it "was no big deal."  Under the circumstances, Donnellon violated Section 8(a)(1) by threatening employees with reprisal in the form of attendance points if they engaged in the strike. P*reterm, Inc.*, 240 NLRB 654, 656 (1979); cf. *Mercedes-Benz U.S. International, Inc.,* 369 U.S. No. 38, slip op. at 2-3 (2020) (healthcare institution's questioning of employees if they intended to strike and stating there would be no reprisals for those who did not show up on the first day of the strike was lawful).

### G.  Gengle's Admonitions to Glynn [¶ 17]

On August 2, Human Resources Director Gengle called employee/shop steward Brandy Glynn's department and instructed her to meet with him in his office.  Gengle told Glynn that he received complaints about her bullying, harassing, handing out flyers and stickers to employees, and misinterpreting the application of attendance points to strike activity.  Glynn replied that it was illegal to assess points for a lawful strike and disciplining employees.  Reading from a piece of paper, Gengle stated that the Respondent's policy prohibited handing out flyers, pamphlets, stickers, any kind of union solicitation.  Without delineating between work time and nonwork time and work locations and nonwork locations, he simply told Glynn to stop that activity and think

---

[143] The Respondent contends that the amendment at hearing substituting Pavlige's name in place of Gengle , is time-barred.  The General Counsel notified the Respondent of her intention to move for the amendment at hearing.  I granted the objection on the grounds that the Respondent received adequate notice of the change and was not prejudiced.  The legal theory involved did not change, nor did the assertion that managers were threatening employees with attendance points on August 2. Hence, the allegation against Pavlige is not time-barred.

about her relationships with colleagues.  Glynn maintained that the strike was lawful and reiterated that it was unlawful for managers to threaten employees with points for their absence due to such a strike. Gengle repeated that he was following Trinity Health policy and told Glynn to "just stop" because her handing out union flyers was making people uncomfortable.  Glynn sensed the seriousness of the meeting, asking Gengle if it was disciplinary in nature.  Gengle said it was not and that it was just a friendly chat.  However, the formality of the meeting was clearly evident to Glynn.

Gengle's sweeping directive that Glynn stop handing out flyers, pamphlets, stickers, and any kind of union solicitation, which clearly included solicitation of union membership, violated Section 8(a)(1), as alleged at ¶¶ 17(a)-(b) of the complaint. *Republic Aviation Company v. NLRB*, 324 U.S. 793, 803-804 (employees are permitted to engage in solicitation and to distribute union literature during non-working time and in nonworking areas, absent a showing of "special circumstances" necessary for the employer to "maintain production or discipline."); *Holy Cross Hospital,* 370 NLRB No. 16, slip op. at 1, fn. 3 (2020) (security guards acting as agents for unlawfully told hospital employees that it was illegal to talk about the union within the facility). Whether certain employees were made uncomfortable or even offended by her aggressive campaigning that was hardly justification for stifling union activity. *United Technologies Corp.,* 274 NLRB 609, 610 (1985) (the Board does not "police or censor propaganda").

As alleged at ¶ 17(c), the evidence also established that Gengle violated Section 8(a)(1) by confirming to Glynn the Respondent's new policy requiring that employees be assessed attendance points  if they participated in the August 4 strike. *NP Red Rock LLC,* 373 NLRB No. 67, slip op. at 3 (2024) (employer unlawfully threatened "that employees' selection of the Union would result in increased chance of job loss as a result of the strike.")

Finally, in evaluating the allegation at ¶ 17(d) that Gengle unlawfully created the impression that the Respondent was surveilling employees' union activities, the Board applies an objective test: whether the employer's conduct, under the totality of the circumstances, would reasonably tend to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed under Section 7. *Sage Dining Services, Inc.*, 312 NLRB 845, 856 (1993); *Brown Transportation Corp.*, 294 NLRB 969, 971-972 (1989). Here, Gengle's statements were solely limited to alleged complaints received from employees and managers regarding Glynn's public union activities.  They gave no indication that Gengle was otherwise surveilling employees' union activities and Glynn's confirmed that a segment of the workforce did not align with her views regarding the Charging Party.  This allegation is dismissed.  See *Wal-Mart Stores, Inc.,* 350 NLRB 879, 883 (2007) (the monitoring of openly-conducted union activities by management officials does not create an unlawful impression of surveillance); *Partylite Worldwide, Inc.*, 344 NLRB 1342, 1342 (2005), citing *Arrow Automotive Industries*, 257 NLRB 860 (1981) (management officials may lawfully "observe open and public union activity on or near the employer's premises," so as long as they "do not engage in behavior that is out of the ordinary.")

*H.  Yaklin's Implied Promise to Unit Employees*  [¶¶ 13, 18][144]

On May 25, Yaklin emailed all employees announcing that "non-represented employees who are not in leadership roles" would receive a "surprise increase" in that day's paychecks.  She expressed gratitude "that we have the direct relationship with you, which allows us to make adjustments as needed when we can." An employer may lawfully inform employees of the wages and benefits its nonunion employees receive and respond to requests for information from employees about such benefits.  See, e.g., *Suburban Journals of Greater St. Louis, LLC*, 343 NLRB 157, 159 (2004). However, the Respondent went too far by announcing a wage increase for unrepresented employees and impliedly promising those raises to unit employees if they created a direct relationship with the Respondent by getting rid of the Charging Party.  By communicating these facts to represented employees that they "would reasonably interpret . . . as a promise that they too would receive the [same benefits]" if they ceased to be represented by the Union,, the Respondent violated Section 8(a)(1). *G&K Services, Inc.*, 357 NLRB 1314, 1315 (2011).

The Respondent's affirmative defense that Paragraph 18 of the complaint is time-barred lacks merit.  The allegation that Yaklin, by email on May 25, "promised its employees increased benefits on May 25 if they reject the Charging Party," closely relates to the following alleged Section 8(a)(1) violation in the timely-filed initial charge in Case 07-CA-323321: "Promises of employee benefits if they reject the union and sign a management supported decertification petition."  The fact that the charge refers to the decertification petition involved the same legal theory and did not alter the proof necessary to defend this allegation.  Moreover, the proof demonstrated that the Respondent, by Van Kampen, communicated with employees regarding the filing of a decertification petition prior to May 25.

II. THE ALLEGED SECTION 8(A)(3) VIOLATIONS

*A.  The May 25 Wage Increase to Unrepresented Employees* [¶ ¶19, 21-22]

In determining whether an employer's activity violates Section 8(a)(3), the Board applies the test outlined in *Wright Line*, 251 NLRB 1083 (1980), enfd. on other grounds. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Corp.,* 462 U.S. 393, 399-403 (1983).  The elements commonly required to support such a showing are union and or other protected activity, employer knowledge of that activity, and antiunion animus on the part of the employer. Once the General Counsel makes that showing, "the burden of persuasion shifts to the employer to demonstrate that the same action would have been taken even in the absence of the protected conduct." *Donaldson Bros. Ready Mix, Inc.,* 341 NLRB 958, 961 (2004), citing *Wright Line,* supra at 1089.

The Respondent's implementation of the May 25 wage increase came in the midst of contentious bargaining, especially just two days after the Charging Party rejected the Respondent's initial wage proposal.  In contrast to the one-time 2.5% wage increase for

---

[144] The General Counsel's posthearing brief listed the allegations at Paragraph 18 as a Section 8(a)(3) violation.  However, Paragraph 32 refers to those allegations in the group of alleged Section 8(a)(1) violations at Paragraphs 10 through 18.

unrepresented employees, the Respondent's wage proposal to represented employees only provided for a series of yearly step increases starting well below that amount. Coupled with the implied promise to grant unit employees a wage increase if they ceased to be represented by the Charging Party, the Respondent's discriminatory action revealed animus towards their bargaining

5 position over wages and adversely impacted them. See *Kag-West, LLC,* 362 NLRB 981, 982-983 (2015) (employer violated Section 8(3) by "moving quickly" before union election to grant a wage increase for unrepresented employees only and then following up after the election with a memo announcing the increase without mentioning that it intended to bargain over a wage increase for represented employees). As the Respondent did not meet its burden under *Wright-*

10 *Line* to prove that the May 25 wage increase would have been withheld from unit employees notwithstanding their bargaining activity, the proof was sufficient to establish that the Respondent violated Section 8(a)(3) and (1).

However, these Section 8(a)(3) allegations at Paragraphs 19 and 22, and part of Paragraph

15 21, are based solely on the untimely-filed amended charge in Case 07-CA-323321, which was filed on December 1, 2023—"Excluded unit employees from wage increases in violation of their rights under Section 8(a)(3) of the Act"—and is unrelated to any of the claims in the timely-filed initial charges in Cases 07-CA-323321, 07-CA-323743, and 07-CA-326861. Accordingly, these allegations, which arose more than six months prior to the filing of the applicable charge, are time-

20 barred pursuant to Section 10(b) of the Act and are dismissed.

### B. The Respondent's Assessment of Attendance Points to Strikers[¶20]

Following the August 4 strike, the Respondent's attendance policy was inconsistently

25 applied. Of the 73 employees who went on strike and picketed outside the hospital, only issued 42 were assessed attendance points In addition to the striking employees, four employees who did not participate in the strike were also assessed attendance points for being absent on August 4. Further, although the Respondent's attendance policy is silent on its ability to issue attendance points when absences are excused, 22 employees who received attendance points were

30 documented as having excused absences or on sick leave. Finally, the Respondent issued discipline to six employees for being absent on August 4.

The Respondent's haphazard approach in assessing attendance points to 42 of the 77 employees who went on strike on August 4 violated Section 8(a)3) and (1). The Respondent

35 improperly enforced its attendance policy and violated federal law in the process. In part, the policy states that "[e]xcused absences do not accrue points" and included "[a]pproved time under . . . leave protected by state or federal requirements." As required by Section 8(g) of the Act, the Charging Party provided the Respondent with a 10-day notice of intent to strike on August 4. Thus, employees who participated in the August 4 were on excused absence, approved time, and

40 protected leave under the Act, and could not be assessed attendance points.

In the days leading up to August 4, several managers and supervisors polled their employees to ascertain who would be coming to work on August 4. Some specifically asked if the employees would be participating in the strike. However, the fact that the Respondent did not

45 have knowledge of each employee's participation in the strike when it arbitrarily and improperly applied its policy is irrelevant. It was the Respondent's scheme to chill the anticipated strike activity by assessing attendance points to everyone who was absent on August 4 that is

determinative. *ACTIV Industries*, 277 NLRB 356, fn. 3 (1985) (finding that it was the employer's "mass discharge, and not its selection of employees for the discharge, that is unlawful).

### III. THE ALLEGED SECTION 8(A)(5) VIOLATIONS

#### A.  *The Respondent's Insistence on Proof of Certification* [¶23]

On November 3, NOCHEA members voted to affiliate with, and became a chapter of, the Charging Party.  On November 4, 2022, Yaklin informed bargaining unit employees that she had been "notified that as of November 3rd you are now represented by the SEIU. As a result, we now need to meet and bargain with the SEIU in order to reach agreement prior to any change in wages as the law requires. We are awaiting receipt of formal notification and contact information for your new legal representative."  On November 7, 2022, Gengle asked Alcoff if he had "any official information on the status of the bargaining unit and its relationship or affiliation with SEIU."  On November 10, 2022, Alcoff responded by referring Gengle to the November 3 affiliation vote by the NOCHEA membership and Yaklin's November 4 email recognizing the Charging Party's status.  On November 30, 2022, NOCHEA, the Charging Party, and the Respondent entered into an MOU extending the term of the CBA and providing bargaining unit employees with a 2.5% wage increase.

On March 17, Goodell, Trinity Health's Chief Human Resources Officer reported to employees on the status of negotiations, noting that "any Tentative Agreement or final agreement is contingent upon our receiving confirmation that the [Charging Party] is the legitimate, certified bargaining representative for this group of colleagues; we have not received that confirmation." On May 8, Zimmerman requested proof of certification and added that until such evidence was received, "any bargaining proposals on our part and any TAs are conditional and contingent on satisfactory confirmation of your certification status.  On May 23, Zimmerman began including a disclaimer at the bottom of the Respondent's bargaining proposals, stating in part that any future agreements were contingent upon the Charging Party providing evidence of their certification as the authorized bargaining representative.  On July 25, Alcoff finally satisfied the Respondent by sending Shekell a copy of the NOCHEA affiliation agreement.

The timely requests by Yaklin and Gengle in November 2022, Goodell in March, and Zimmerman beginning in May, for "formal notification," "official information," or "confirmation" of "certified status," respectively, were not unreasonable.   Nor was it unreasonable for the Respondent to mention this outstanding request in its communications with employees.  The evidence established that Yaklin did not have anything in writing from either NOCHEA or the Charging Party when she agreed in November 2022 to commence bargaining with the Charging Party.  Alcoff could have put the issue to rest by providing the Respondent with proof of the affiliation agreement prior to July 25.  Instead, he prolonged the issue by repeatedly referring Yaklin back to her November 4 email.

The General Counsel contends that the Respondent's requests for documented proof of the Charging Party's representative status amounted to a nonmandatory subject of bargaining that complicated bargaining.  I disagree.  Unlike the employer in *Betra Mfg. Co.*, 233 NLRB 1126, 1128 (1977), who insisted on a contract provision "requiring the Union to prove its majority status each year before entering into new contract," the Respondent was simply

requesting documented proof of that status at the outset of its relationship with the Charging Party.

5         There is also insufficient evidence in the record that the Respondent refused to provide the information requested by the Charging Party on or about May 23 as alleged in the complaint. On May 10, Alcoff emailed Zimmerman an information request for information on the Respondent's health, dental, and vision plan and an explanation of the reasons for delaying the implementation to changes to leave policies and benefits until January 1, 2024.  On May 12, 10 Zimmerman replied that she would respond with the "appropriate and relevant items . . . assuming you provide us with satisfactory evidence of that certification, which we do not have yet."  She also stated that the information sent to her on May 8—Yaklin's November 4, 2022 email and the November 30, 2022 MOU—"was not such evidence."  On July 7, Shekell responded to a June 27 information request and, in the course of doing so, shared that he was "in the process of reviewing 15 the other requests and pulling the relevant information, and will get back to you on those as soon as possible."  In essence, the Respondent delayed in providing the requested information in order to get confirmation of representative status, which Alcoff complied with by sending Shekell a copy of the affiliation agreement on July 25.

20         Based on the totality of the circumstances, I conclude that the Respondent's insistence on proof of representative status did not amount to bad faith bargaining.  This allegation is dismissed.

### B. *The Respondent's Four Unilateral Policy Changes* [¶¶ 24-26]

25         On April 28, the Respondent announced unilateral changes to 16 policies, effective May 15.  At the time, the parties were in the midst of bargaining over a successor contract to the CBA, which expired on February 28.  Alcoff objected and demanded that the Respondent rescind the announced policy changes on the grounds that they entailed mandatory subjects of bargaining, including some that contradicted "tentative agreements and current proposals."  He also urged the Respondent to present any of the policy changes that it was "serious about" at the bargaining 30 table.

        On May 1, Zimmerman responded that the Respondent was implement the changes as "a new employer under the law and our strong management rights clause, to implement our initial terms of employment, subject to any prior comments you wish to offer, and subject to any 35 subsequent, legally required bargaining in the case of mandatory subjects of bargaining not addressed by our management rights clause."  Alcoff asserted that the management rights provision was not relevant and the Respondent was "well past the time to introduce initial terms of employment and several of those items are mandatory subjects of bargaining, especially with an expired agreement."
40

        On May 5, Alcoff emailed Zimmerman and Gengle a list of 11 of the new or modified policies that the Charging Party could agree to and continued to object to the four of the policy changes:  attendance; at-will employment; employee complaint appeal procedures; and solicitation, distribution, off-duty access.  On May 12, Zimmerman replied that the Respondent 45 would proceed to "implement our Trinity policies and benefits, as scheduled, on May 15, 2023, subject to any effective dates on some of them, because these are our initial terms of employment, as a new employer, and in the absence of any contract, but we will, of course, bargain about any actual mandatory bargaining subjects thereafter."   Three minutes later, the Respondent

announced 23 additional policy changes that would take effect on or after January 1, 2024, including holiday benefit, paid time off, sick and safe leave, and transfer.

5

An employer "violates Section 8(a)(5) of the Act if it unilaterally changes a term or condition of employment for bargaining unit employees without giving their bargaining representative advance notice and an opportunity to bargain about the change." *NLRB v. Katz*, 369 U.S. 736, 743 (1962); *Omni Hotels Mgmt. Corp.*, 371 NLRB No. 53, slip op. at 3 (2002).  The bargaining obligation continues after a collective-bargaining agreement expires and "an employer must refrain from implementing any changes in terms and conditions of employment until an

10

agreement or overall impasse has been reached on bargaining for the agreement as a whole." *Hilton Anchorage*, 370 NLRB No. 83, slip op. at 2, fn. 3 (2021).

While "the status quo is ascertained by looking to the substantive terms of the expired contract . . . the *obligation* to maintain the status quo arises out of the Act, not the parties' contract,"

15

as "'terms imposed by law.'" *Nexstar Broadcasting, Inc.*, 369 NLRB No. 61, slip op. at 3 (2020) (quoting *Litton Financial Printing Div. v.* NLRB, 501 U.S. 190, 206 (1991)).  Thus, although the CBA between the Respondent and Charging Party expired on February 28, with some exceptions, the contractual provisions continued.  One such exception was the management rights clause, which expired along with the CBA on February 28.  "[A] waiver of bargaining rights contained in

20

a contractual management-rights provision normally is limited to the time during which the contract that contains it is in effect." *Buck Creek Coal, Inc.,* 310 NLRB 1240 at fn. 2 (1987) (citations omitted).

It is undisputed that the Respondent unilaterally implemented policy changes in the past

25

without objection by NOCHEA.  However, NOCHEA's acquiescence to past changes by the Respondent did not constitute a waiver of its right to bargain over unilateral changes in the future. *Nexstar Broadcasting Inc.*, supra at 3-4 ("declining to extend contractual rights of unilateral action beyond the contract's agreed-upon expiration date absent an explicit agreement to do so.")

30

In accordance with the guidelines set forth in *NLRB v. Burns Security Services,* 406 U.S. 272, 294-295 (1972), the Respondent succeeded NOCH as the hospital's employer on October 1, 2022 and was required to bargain with the Charging Party.  First, there was a substantial continuity of operations after the takeover.  Second, the majority of the Respondent's employees were employed by NOCH.  Third, the majority of the bargaining unit employees remained appropriate

35

for collective bargaining under the Respondent's operations.  See *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41–43 (1987); *Van Lear Equipment, Inc.*, 336 NLRB 1059, 1063 (2001).

40

As a *Burns* successor, the Respondent had the right to make it clear prior to or at the time it took over operations that it was setting new terms and conditions of employment. *Spruce Up Corp.,* 209 NLRB 194, 195 (1974), enfd. per curiam 529 F.2d 516 (4th Cir. 1975).  It did not, however, have the right to wait seven months and then unilaterally and change the four policies at issue.

45

Contrary to the Respondent's contentions, the unilateral changes were significant and mandatory subjects of bargaining: (1) the attendance policy changed to a system of "occurrences," which was radically incongruent from the system of "points" that could result in employee

discipline; (2) the at-will employment policy was entirely new, applied to discipline, essentially eliminated the Charging Party's ability to represent its members regarding any term and condition of employment, and entitled the Respondent to change any other term or condition of employment at any time; (3) the employee complaint appeal procedures unlawfully replaces a grievance procedure that is still in effect and excluded the Charging Party from representing employees; and (4) the solicitation, distribution, off-duty access policy altered the parties past practice, which provided periodic access to the Charging Party within the hospital for a variety of purposes involving employee participation, by excluding "third parties" from "solicit[ing] employees or distribut[ing] written materials on the Respondent's property at any time.  See *Frontier Hotel & Casino*, 309 N.L.R.B. 761, 766 (1992) (third-party access to an employer's facility survives expiration of the contract).

Finally, the Respondent's reliance on the savings clause applicable to each of the four policies is unavailing because they required that any changes to these policies required the approval of Trinity Health designee.  Based on the foregoing, it is clear that the Respondent's failed to bargain in good faith with the Charging Party before implementing the four policies at issue.

However, the allegations at Paragraphs 24-26 are based solely on the untimely-filed amended charge in Case 07-CA-323321, which was filed on December 1, 2023—"Unilateral implement new policies in violation of Section 8(a)(5) of the Act"—and is unrelated to any of the claims in the timely-filed initial charges in Cases 07-CA-323321, 07-CA-323743, and 07-CA-326861.  Accordingly, these allegations, which arose more than six months prior to the filing of the applicable charge, are time-barred pursuant to Section 10(b) of the Act and are dismissed.

C.  *The Respondent's Cancellation of Bargaining Session Due to Decertification [¶ 29]*

On August 2, Shekell emailed Alcoff suggesting canceling the August bargaining session and pausing negotiations because the Charging Party's representation of the bargaining unit employees was "currently the subject of a decertification petition."  Alcoff objected the same day, accused the Respondent of acting in bad faith, and said he expected the Respondent to attend the August 3 negotiation session "with the intent of reaching an agreement."  The Respondent did not meet with the Charging Party on August 3 and subsequent efforts by Alcoff and Shekell to schedule another bargaining session were unsuccessful.

"The filing of a decertification petition alone does not provide a reasonable ground for an employer to refuse to recognize a bargaining representative or to withdraw from bargaining." *First Student, Inc.*, 359 NLRB 208, 220 (2012), citing *Dresser Industries*, 264 NLRB 1088, 1088 (1982) ("The filing of a decertification petition, standing alone, does not provide a reasonable ground for an employer to doubt the majority status of a union"); *Hospital Metropolitano,* 334 NLRB 555, 556-557 (2001), enfd. Mem. 49 Fed. Appx. 320 (D.C. Cir. 2022) ("a decertification petition by itself will not support withdrawal of recognition because such petitions require the support of only 30 percent of the unit employees").  Accordingly, the Respondent violated Section 8(a)(5) and (1) by refusing to bargain in good faith with the Charging Party, as scheduled, on August 3.

### D.  The Respondent Engaged in Bad Faith Bargaining [¶ 31]

In *District Hospital Partners, L.P.,* 373 NLRB No. 55 (2024), the Board restated the applicable principles in determining whether an employer engaged in good faith during the bargaining process for a successor collective-bargaining agreement:

> In determining whether a party has violated its statutory duty to bargain in good faith, the Board examines the totality of the party's conduct, both at and away from the bargaining table. From the context of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a con- tract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement. Although the Board does not evaluate whether particular proposals are acceptable or unacceptable, the Board will examine proposals when appropriate and consider whether, on the basis of objective factors, bar- gaining demands constitute evidence of bad-faith bar- gaining. An inference of bad-faith bargaining is appropriate when the employer's proposals, taken as a whole, would leave the union and the employees it represents with substantially fewer rights and less protection than provided by law without a contract. In such circumstances, the union is excluded from the participation in the collective-bargaining process to which it is statutorily entitled, effectively stripping it of any meaningful method of representing its members in decisions affecting important conditions of employment and exposing the employer's bad faith. *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–488 (2001) (citations omitted), enfd. 318 F.3d 1173 (10th Cir. 2003).

Slip op. at 1-2.

The Respondent, which had relatively relaxed bargaining relationship with NOCHEA, had a hard time accepting the Charging Party's approach and bargaining positions.   The Respondent's bargaining representatives became frustrated by the Charging Party's refusal to agree to ground rules, the number of representatives present at the bargaining, and insistence on "open bargaining" that permitted unit employees to observe negotiations.

The Respondent's focus on ground rules and negotiating team size resulted in Zimmerman canceling the February 2 bargaining session.  When the parties finally met on February 9, the Charging Party submitted a comprehensive wage proposal and several bargaining priorities, including union security and elevating wages to those of Trinity Health employees at Muskegon Hospital.  However, the Respondent continued to haggle over the size and structure of the bargaining committee and would continue to do so throughout February and March.

After the CBA expired on February 28, the Respondent began disparaging the Charging Party in communications to employees.  As the Charging Party continued advocating for the inclusion of a union security clause, the Respondent began undermining the bargaining process and planting the seeds for employee disaffection with the Charging Party.  On March 17 and May 18, Goodell and Gengle, respectively, issued "Updates" to employees expressing concern about the Charging Party's demand for union security because, with the repeal of Michigan's Right to Work Law, it would require all employees to make payments to the union as a condition of employment or face termination.  These statements clearly undermined the Charging Party's

position as several employees began the process for a decertification petition around the same time as Gengle's Update. *Whitesell Corp.*, 357 NLRB 1119, 1123 (2011) (employer engaged in bad faith bargaining by undermining Union's status as collective-bargaining representative); *Hospitality Mo- tor Inn, Inc.*, 249 NLRB 1036, 1040 (1980), enfd. 667 F.2d 562 (6th Cir. 1982),
5   cert. denied 459 U.S. 969 (1982) (the assertion of 'philosophical' objections does not satisfy the statutory obligation to bargain in good faith concerning these matters.")

        On May 15, the Respondent engaged in unfair labor practices by unilaterally implementing changes to four policies—including an at-will provision that would have given the Respondent
10   unfettered discretion regarding discipline and other terms of employment—without giving the Charging Party an opportunity to bargain over them.  These changes, which were undertaken as the parties were still bargaining over some of them, were an indications of bad faith bargaining. *Whitesell Corp.*, supra at 1123 (employer's bad faith bargaining violations included attempts to undermine union's status as collective-bargaining representative and unilateral changes);
15   *Columbus Electric Cooperative, Inc.*, 372 NLRB No. 89, slip op. at 1, fn. 1 (2023) (bad faith bargaining by employer included "proposals that deprived the Union of its representative role, including insisting on broad management-rights and no-strike provisions and reserving to the Respondent final authority on adverse employment actions, thereby precluding independent review by an arbitrator").
20

        It was not until May 23 that the Respondent submitted its first economic proposal, a "market analysis" that included wage rates below Trinity Health's $15 per hour minimum wage. Two days later, the Respondent granted unrepresented employees a "surprise" 2.5 percent wage increase that excluded represented employees.  The Respondent communicated to represented and
25   unrepresented employees that it enjoyed the "direct relationship" it enjoyed with unrepresented employees that allowed it to give them the raise.

        Throughout bargaining, Respondent failed to offer a wage proposal that even began to approach wage parity with employees at the nearby Trinity Health's Muskegon Hospital.  The only
30   explanation given by the Respondent was the hospital was a smaller facility than Muskegon Hospital.  In June and July, the Respondent continued to oppose increasing wages and providing basic union clauses.  On July 11, Alcoff emailed a "supposal" to Shekell and Gengle to find a path to  wage parity with Muskegon over a longer period.  The supposal created more steps and slowed the wage increases to range between $16.43 to $34.50, with 4% wages increases for employees
35   when they exceeded the scale.  On July 20, the Respondent, barely budging, proposed drastically lower across-the-board hourly wage increases for the first four years ranging from $15.03 to $29.02, or 1.75%, 2.25%, and 2.75%, with some of the rates identical to those proposed on May 23.  The Respondent wage proposals hardly moved in the direction of compromise.

40        In response to the Respondent's wage proposal, the Charging Party planned a strike to show support for bargaining that would be canceled if the parties obtained a tentative agreement. However, after the decertification petition was filed on July 31, the Respondent unlawfully canceled the August 3 bargaining session, and the parties never met again at the bargaining table. Then, after the ballot count on September 18-19 was delayed due to a blocking charge, the
45   Respondent received the disaffection petition.  Shortly thereafter, and without verifying the signatures on the petition, the Respondent announced it was withdrawing its recognition of the Charging Party as the exclusive collective-bargaining representative of the bargaining unit.

Based on the aforementioned unfair labor practices committed during the bargaining process, that Respondent engaged in bad faith bargaining in violation of Section 8(a)(5) and (1). See *Prentice-Hall, Inc.*, 290 NLRB 646 (1988) (employer engaged in bad faith bargaining by waiting to withdraw recognition after employee dissatisfaction increased due to a protracted and dragged-out negotiation process).

### E.  The Respondent's Withdrawal of Recognition [¶ 30]

1.  The Disaffection Petition Did Not Provide Objective Evidence of the Charging Party's Loss of Majority Support

On September 28, one day before the ballots were counted in decertification election, Quinn delivered to Yaklin a disaffection seven-page disaffection petition containing 94 signatures. Yaklin swiftly concluded that concluded that a majority of the bargaining unit employees signed the petition and moved swiftly to withdraw recognition.  The signatures were not dated, three of the pages containing 46 signatures had no headings or other statement of purpose, ten of the signatures were not accompanied by printed names, some names were illegible, and Yaklin did not personally verify them.

In *Levitz Furniture,* 333 NLRB 717  (2001), the Board explained that a good faith disaffection determination by an employer must be based on "evidence that is objective and that reliably indicates employee opposition to unions—i.e., evidence that is not merely speculative." Id. at 729.  In *Wyman Gordon,* 368 NLRB No. 150, enfd. 836 Fed. Appx. 1, 10 (D.C. Cir. 2020), the Board provided clarification as to what it considers reliable evidence of employee disaffection. There, the Board found that the employer failed to establish the union's loss of majority support at the time of withdrawal where the determinative middle three pages of a five-page disaffection petition lacked "any statement of the signatory employees' intent in signing the petition, let alone their desires concerning union representation." Slip op. at 9.  See also  *Liberty Bakery Kitchen, Inc.*, 366 NLRB No. 19, slip op. at 1 fn. 1 (2018) (same).

Based on the foregoing, it is clear that Yaklin unlawfully withdrew recognition based on a disaffection petition containing only 48 signatures on four pages explicitly stating that the employees no longer wanted to be represented by the Charging Party, far short of the 81 employees needed to demonstrate a loss of majority support.

2.  The Respondent's Unlawful Conduct Tainted the Disaffection Petition

Alternatively, the Respondent engaged in a series of unfair labor practices throughout bargaining that undoubtedly fomented the disaffection leading to its September 28 withdrawal of recognition.  The canceled bargaining sessions, the denigrating of the Charging Party to employees, the unilateral changes to policies, the exclusion of unit employees from the 2.5% wage increase, and overall bad faith bargaining tactics inevitably contributed to employee disaffection from the Charging Party. *SFO Good-Nite Inn*, 357 NLRB 79, 80 (2011), citing *The Hearst Corporation*, 281 NLRB 764 (1986) (employer's unfair labor practices "directly tainted any resulting expression of employee disaffection.")

"An employer may not lawfully withdraw recognition from a union where it has committed unfair labor practices that are likely to affect the union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." *District Hospital Partners, L.P.,* supra at 9, quoting *Lee Lumber & Building Material Corp.*, 322 NLRB 175, 177 (1996), affd. in relevant part and remanded 117 F.3d 1454 (D.C. Cir. 1997).

In *District Hospital Partners, L.P.,* id., the Board recognized bad faith bargaining and other unfair labor practices are indicative of the employer's motivation to eliminate the union. Id. at 9 ("prolonged delay in achieving good-faith bargaining caused by the Respondent's unlawful conduct" demonstrated "that Respondent was simply waiting to withdraw recognition in light of employee dissatisfaction due to the parties' protracted negotiations.")

Finally, analyzing the Respondent's conduct pursuant to *Master Slack,* 271 NLRB 78 (1984), it is also clear that the unfair labor practices tainted any alleged loss of majority support. As discussed above, the presentation of the disaffection petition was preceded by months of unfair labor practices, including bad faith bargaining by the Respondent, its disparagement of the Charging Party and threats to employees if they went on strike.  There is no credible evidence that the Charging Party began to lose support for any reason other than its constant disparagement by the Respondent.  Indeed, employees had been represented by a union long before the Charging Party arrived.

3.  The Respondent's Withdrawal of Recognition in the Midst of the Decertification Election

Finally, even in the absence of unfair labor practices prior to September 29, the Respondent's reliance on the decertification petition preceding the counting of ballots was premature and, thus, unlawful.  "The Board has long held that an employer may withdraw recognition by showing either that the union has actually lost the support of a majority of the bargaining unit employees or that it has a good-faith doubt, based on objective considerations, of the union's continued majority status." *Levitz Furniture,* 333 NLRB at 717, fn. 1, quoting *Celanese Corp.,* 95 NLRB 664 (1951) (limiting this analysis to cases where there have been no unfair labor practices).

In *Levitz,*  the Board recognized "that there are a multitude of options" for determining whether an incumbent union retains majority support.  However, it also "emphatize[d] that Board-conducted elections are the preferred way to resolve questions regarding employees' support for unions."  Here, the election already occurred and ballots were about to be counted. As the Board noted in its December 7, 2023 Order denying review of the Regional Director's October 17, 2023 Decision and Order on Objections and Certification of Representative, the "alleged postelection loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election." (citations omitted)

In these circumstances, the Respondent withdrawal of recognition from the Charging Party 10 days after the stipulated election and one day prior to the counting of ballots violated Section 8(a)(5) and (1).  *Brooks v. NLRB,* 348 U.S. 96, 97, 103-104 (1954) (employer unlawfully refused to bargain with union after receiving a disaffection petition signed by a majority of employees one week after representation election and one day before the union was certified as representative).

CONCLUSIONS

1.   The Respondent, Trinity Health Grand Haven Hospital, is an employer engaged in
5   commerce within the meaning of Section 2(2), (6), and (7) of the Act, and has been a healthcare
institution within the meaning of Section 2(14) of the Act.

2.   SEIU Healthcare Michigan is a labor organization within the meaning of Section 2(5).

10   3.   The following employees in the Recognized Unit constitute a unit appropriate for the
purposes of collective-bargaining within the meaning of Section 9(b) of the Act:

All full-time and regular part-time employees in the following nursing departments at the
Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of
15   Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health,
Dunewood Family Practice, and West Michigan Sports and Family Medicine: Emergency,
Intensive Care-Coronary Unit, Med.-Surg., Family Birthing Unit, Pediatrics, Surgery,
Emergency Medical Services (excluding Secondary Emergency Medical Technicians),
Social Service, Physician Practice, and Central Processing Department; but excluding the
20   Vice President/Nursing Service, all House Supervisors (whether full-time or part-time),
all Nurse Managers, Managers, and/or Assistant Managers, all registered nurses, all
confidentials (including Secretary to the Vice President/Nursing Service), all temporary
employees (including "occasional or casual" employees), all "per diem" employees, all
student trainees and volunteers, all other employees, and all supervisors as defined in the
25   Act;

All full-time and regular part-time employees in the following technical departments at
the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan
locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's
30   Health,  Dunewood Family Practice, and West Michigan Sports and Family Medicine:
Respiratory Therapy, Laboratory, Medical Imaging, and Pharmacy; but excluding all
Managers, all   Assistant Managers, all confidentials, all temporary employees (including
"occasional or  casual" employees), all "per diem" employees, all student trainees and
volunteers, all other employees, and all supervisors as defined in the Act; and
35

All full-time and regular part-time employees in the following service departments at the
Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations
of  Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health,
Dunewood Family Practice, and West Michigan Sports and Family Medicine: Patient
40   Registration, Patient Accounting, Medical Records, Housekeeping, Food Service,
Maintenance, Materials Management and Volunteer Services (Ambassador only); but
excluding the Vice President/Fiscal Services, all Managers, all Assistant Managers, the
Payroll Coordinator, the Food Service Supervisors, all confidentials (including the
Secretary to the Vice President/Fiscal Services and the Accounts Payable person),
45   Accountants, all temporary employees (including "occasional or casual" employees), all
"per diem" employees, all student trainees and volunteers, all other employees, and all

supervisors as defined in the Act, and further excluding all employees of the Human Resources Department, the Ancillary Services/Marketing Department, the Administration Department, and the Volunteer Services Department (except Ambassador).

4. The following employees in the Certified Unit constitute a unit appropriate for the purposes of collective-bargaining within the meaning of Section 9(b) of the Act:

All full-time and regular part-time Social Worker MSW, Medical Technologists ASCP II, Nuclear Medicine Technologist, Ambassador, ARRT/CT Scan Technologist, HIM Analyst Coder, Biller, Cashier, Central Scheduler, PACS Administrator/Clinical Application Specialist, Certified Surgical Technologist, CT Scan Technologist, Clinical Documentation Specialist, Clinical Quality Assurance Liaison, Coder Assistant, Communications Specialist, Cook, CPD Lead Technician, CPD Technician, Custodian, Financial Counselor, Echocardiography Technician, EMT, Exercise Physiologist, Health Information Management Clerk, Histologist- Reg., Housekeeping Aide, Lab Assistant I-Phlebotomist, Lab Assistant II, Lead Housekeeper, Logging Clerk, LPNII, Mammography Technologist, Mammography Technologist II, M.I Technician Assistant, Materials Management Buyer, Materials Handler, Mechanic I, Mechanic II, Mechanic III-Electrician, Medical Imaging Pt. Reg. File Clerk, Medical Imaging Technical Assistant, Medical Technician ASCP I, Medical Technologist ASCP II, Medical Assistant, Nuclear Medicine Technologist, Nurse Aide, Paramedic, Patient Accounts Specialist, Patient Registration Clerk, Patient Service Representative, Pharmacy Lead Technician, Pharmacy/Certified Technician, Pharmacy Assistants, Pre-Admission Review Specialist, Production Worker, RDMS/RVT, Registered Polysomnographer, Registered Respiratory Therapist, Social Worker MSW, Supply Aide/Courier, Surgical Technologist, Surgical Services Scheduler, Systems Support Specialist, Technologist Reg ARRT, Technician NReg ARRT Tissue Technician, Transcriptionist, Ultrasound Technologist, Unit Clerk, Unit Technician and Unit Technician/Clerk employed by the Employer at its Grand Haven facilities; but excluding guards and supervisors as defined in the Act.

5. The Respondent violated Section 8(a)(1) of the Act by:

(a) Interrogating its employees on August 2, 2023 about their activities on behalf of the Charging Party.

(b) Impliedly promising on May 25, 2023 that wage increases granted to unrepresented employees would be given to represented employees if they ceased supporting the Charging Party.

(c) Threatening employees on August 2, 2023 with the assessment of attendance points if they engaged in a strike.

(d) Issuing overly broad directives to employees on August 2, 2023 that they were prohibited from passing out materials relating to the Charging Party and soliciting Charging Party membership.

6. The Respondent violated Section 8(a)(3) and (1) by:

(a) Issuing attendance disciplinary actions, charging leave, and assessing attendance points on and after August 5, 2023 to the following employees: Jessica Addington, Sonya Ascencio, Chelsea Bixby, David Bradley, Jenna Bolduc, Tyson Cobb, Michael Coyle, Gabby Craig, Kayshira Cunningham, Meghan DeFabrizio, Kristie Firestone, Greg Gillissie, Nicole Guenther, Jessica Hambright, Teresa Hippchen, Lori Homik, Shawndrea Ingram, Pamula Ivy, Emerald Johnson, Rachel Kammeraad, Jordan Kleyn, Courtney Lodholtz, Cynthia Merrell, Ashley Miller, Ashlee Moore, Jason Moscynski, Dottie Nevins, Chad Nickerson, Sharlene Pant, Beth Melissa Robart, Brittany Ronan, Beth Ruiter, Lynn Ruwe, Lisa Sanford, Steve Sasinski, Susan Sikkenga, Kimberly Siple, Sarah Stadler, Virgnia Swan, Tenaw Yiberhu, Kelly Walker, Yakiea White, Erin Whitten, and Ruth Zylstra.

7.   The Respondent violated Section 8(a)(5) and (1) by:

(a) Canceling a previously agreed to bargaining session on August 2, 2023 and stating that any further bargaining session should be put off until after the decertification election.

(b) Withdrawing its recognition of the Charging Party on September 28, 2023 as the exclusive collective-bargaining representative of the bargaining unit.

8.   The Respondent's unfair labor practices affected commerce within the meaning of Section 2(6) and (7) of the Act.

9.   The Respondent has not violated the Act except as set forth above.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall recommend it be ordered to cease and desist therefrom.  Under the circumstances, a cease-and-desist order alone would be inadequate to remedy the Respondent's refusal to bargain in good faith and withdrawal of recognition from the Charging Party.  Accordingly, the Respondent shall be ordered to take certain affirmative action designed to effectuate the policies of the Act, including the issuance of an affirmative bargaining order and recission of all adverse actions applied to employees because they engaged in the August 4 strike..

An affirmative bargaining order is appropriate in these circumstances due to the Respondent's coercive conduct towards employees' union activities, the animus evident from its adverse actions in response to employees' union activities, and its refusal to bargain in good faith, all contributing to employee disaffection and its unlawful withdrawal of recognition from the Charging Party.  *Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1462 (D.C. Cir. 1997); *Caterair International*, 322 NLRB 64, 68 (1996).  Having found that the Respondent violated Section 8(a)(5) and (1) of the Act by failing to bargain in good faith with the Union, the Respondent shall be ordered to meet at reasonable times and in good faith with the Union as the exclusive bargaining representative of its employees in the above described bargaining unit with respect to wages, hours, and other terms and conditions of employment and, if an understanding is reached, to embody the understanding in a written agreement.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended

ORDER

5

The Respondent, Trinity Health Grand Haven Hospital, its officers, agents, successors, and assigns, shall

1.  Cease and desist from

10

(a) Refusing to bargain in good faith with the Union as the exclusive collective-bargaining representative of employees in the following appropriate Recognized Unit:

All full-time and regular part-time employees in the following nursing departments at the
15    Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of
Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health,
Dunewood Family Practice, and West Michigan Sports and Family Medicine: Emergency,
Intensive Care-Coronary Unit, Med.-Surg., Family Birthing Unit, Pediatrics, Surgery,
Emergency Medical Services (excluding Secondary Emergency Medical Technicians),
20    Social Service, Physician Practice, and Central Processing Department; but excluding the
Vice President/Nursing Service, all House Supervisors (whether full-time or part-time),
all Nurse Managers, Managers, and/or Assistant Managers, all registered nurses, all
confidentials (including Secretary to the Vice President/Nursing Service), all temporary
employees (including "occasional or casual" employees), all "per diem" employees, all
25    student trainees and volunteers, all other employees, and all supervisors as defined in the
Act;

All full-time and regular part-time employees in the following technical departments at
the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan
30    locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's
Health,  Dunewood Family Practice, and West Michigan Sports and Family Medicine:
Respiratory Therapy, Laboratory, Medical Imaging, and Pharmacy; but excluding all
Managers, all   Assistant Managers, all confidentials, all temporary employees (including
"occasional or  casual" employees), all "per diem" employees, all student trainees and
35    volunteers, all other employees, and all supervisors as defined in the Act; and

All full-time and regular part-time employees in the following service departments at the
Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations
of  Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health,
40    Dunewood Family Practice, and West Michigan Sports and Family Medicine: Patient
Registration, Patient Accounting, Medical Records, Housekeeping, Food Service,
Maintenance, Materials Management and Volunteer Services (Ambassador only); but
excluding the Vice President/Fiscal Services, all Managers, all Assistant Managers, the
Payroll Coordinator, the Food Service Supervisors, all confidentials (including the
45    Secretary to the Vice President/Fiscal Services and the Accounts Payable person),
Accountants, all temporary employees (including "occasional or casual" employees), all
"per diem" employees, all student trainees and volunteers, all other employees, and all

54

supervisors as defined in the Act, and further excluding all employees of the Human
Resources Department, the Ancillary Services/Marketing Department, the Administration
Department, and the Volunteer Services Department (except Ambassador).

5       (b) Refusing to bargain in good faith with the Union as the exclusive collective-
bargaining representative of employees in the following appropriate Certified Unit:

All full-time and regular part-time Social Worker MSW, Medical Technologists ASCP II,
Nuclear Medicine Technologist, Ambassador, ARRT/CT Scan Technologist, HIM
10      Analyst Coder, Biller, Cashier, Central Scheduler, PACS Administrator/Clinical
Application Specialist, Certified Surgical Technologist, CT Scan Technologist, Clinical
Documentation Specialist, Clinical Quality Assurance Liaison, Coder Assistant,
Communications Specialist, Cook, CPD Lead Technician, CPD Technician, Custodian,
Financial Counselor, Echocardiography Technician, EMT, Exercise Physiologist, Health
15      Information Management Clerk, Histologist- Reg., Housekeeping Aide, Lab Assistant I-
Phlebotomist, Lab Assistant II, Lead Housekeeper, Logging Clerk, LPNII,
Mammography Technologist, Mammography Technologist II, M.I Technician Assistant,
Materials Management Buyer, Materials Handler, Mechanic I, Mechanic II, Mechanic III-
Electrician, Medical Imaging Pt. Reg. File Clerk, Medical Imaging Technical Assistant,
20      Medical Technician ASCP I, Medical Technologist ASCP II, Medical Assistant, Nuclear
Medicine Technologist, Nurse Aide, Paramedic, Patient Accounts Specialist, Patient
Registration Clerk, Patient Service Representative, Pharmacy Lead Technician,
Pharmacy/Certified Technician, Pharmacy Assistants, Pre-Admission Review Specialist,
Production Worker, RDMS/RVT, Registered Polysomnographer, Registered Respiratory
25      Therapist, Social Worker MSW, Supply Aide/Courier, Surgical Technologist, Surgical
Services Scheduler, Systems Support Specialist, Technologist Reg ARRT, Technician
NReg ARRT Tissue Technician, Transcriptionist, Ultrasound Technologist, Unit Clerk,
Unit Technician and Unit Technician/Clerk employed by the Employer at its Grand Haven
facilities; but excluding guards and supervisors as defined in the Act.
30

      (c) Interrogating employees about their activities on behalf of the Charging Party or any
other labor organization.

      (d) Threatening employees with adverse employment actions, including accrual of
35      attendance points, if they engage in activities in support of the Charging Party or any other labor
organization or choose the Charging Party or any other labor organization as their exclusive
collective bargaining representative.

      (e) Implying to employees represented by the Charging Party that wage increases would
40      be given to them if the abandoned the Charging Party as their bargaining representative.

      (f) Prohibiting unit members from passing out the Charging Party's materials, soliciting
membership in the Charging Party, or instructing employees that they are prohibited from doing
so.

45

(g) Disciplining, assessing attendance points, charging leave, or applying other adverse actions to employees for engaging in a lawful strike or otherwise engaging in union or protected concerted activity on behalf of the Charging Party or any other labor organization.

5       (h) Withdrawing recognition from the Charging Party as the exclusive collective-bargaining representative of employees in the Recognized and Certified Units regarding their terms and conditions of employment.

(i) Canceling bargaining sessions or otherwise engage in bad faith bargaining with the
10   Union regarding the negotiation of a successor contract for the Recognized and Certified Units.

(j) In any like or related manner fail and refuse to bargain collectively and in good faith with the Union as the exclusive collective bargaining representative of the employees in the Recognized and Certified Units concerning wages, hours, and other terms and conditions of
15   employment.

(k) In any like or related manner interfere with employees' rights under Section 7 of the Act.

2.   Take the following affirmative action necessary to effectuate the policies of the Act.

20       (a) Immediately recognize and bargain collectively and in good faith with the Charging Party as the exclusive collective-bargaining representative of the Certified Unit with respect to wages, hours and other terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

(b) Physically and electronically post the Notice to Employees where such notices are
25   customarily posted for the Certified Unit and on the Respondent's intranet and any electronic mail, text-based mobile messaging platform or internal app provided it customarily uses to communicate with employees through such electronic means.

(c) Reimburse the Charging Party for dues the Respondent failed to deduct and remit
30   from the Certified Unit employees' pay during the time period that it unlawfully failed to recognize the Charging party as the exclusive bargaining representative of the Recognized and Certified Units.

(d) Upon request, supply the Charging Party the contact information, including full
35   names, cellular telephone numbers, personal email addresses and home addresses of the current employees in the Certified Unit.

(e) Upon request, grant the Charging Party access to nonwork areas during employees' nonwork time to address Certified Unit employees.
40
(f) Upon request, grant the Charging Party access to the Respondent's bulletin boards and all places where notices to employees are customarily posted.

(g) Within 14 days after service by the Region, post at its facilities in Grand Haven,

Michigan copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 7, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or internet site, by text message and/or other electronic means, if the Respondent customarily communicates with its employees by such means.

(h)  Within 14 days after service by the Region, e-mail copies of the attached notice marked "Appendix" to all current and former employees who were employed by Respondent at any time since May 25, 2023.

(i)  Rescind and remove from our files the disciplinary actions, attendance points, leave assessments, and other adverse actions resulting from the protected concerted activities that occurred on August 4, 2023, for the following employees: Jessica Addington, Sonya Ascencio, Chelsea Bixby, David Bradley, Jenna Bolduc, Tyson Cobb, Michael Coyle, Gabby Craig, Kayshira Cunningham, Meghan DeFabrizio, Kristie Firestone, Greg Gillissie, Nicole Guenther, Jessica Hambright, Teresa Hippchen, Lori Homik, Shawndrea Ingram, Pamula Ivy, Emerald Johnson, Rachel Kammeraad, Jordan Kleyn, Courtney Lodholtz, Cynthia Merrell, Ashley Miller, Ashlee Moore, Jason Moscynski, Dottie Nevins, Chad Nickerson, Sharlene Pant, Beth Melissa Robart, Brittany Ronan, Beth Ruiter, Lynn Ruwe, Lisa Sanford, Steve Sasinski, Susan Sikkenga, Kimberly Siple, Sarah Stadler, Virgnia Swan, Tenaw Yiberhu, Kelly Walker, Yakiea White, Erin Whitten, and Ruth Zylstra, and notify each affected employee individually in writing, that we have done so and that the adverse actions will not be used against them in the future in any way.

(j)  Submit written bargaining progress reports every 30 days to the compliance officer for Region 7 and serve copies of those reports on the Charging Party.

(k)  Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

(l)  IT IS FURTHER ORDERED that any complaint allegations not found to have violated  the Act are dismissed.

Dated:  Washington, D.C., September 6, 2024.

--------------------------------
Michael A. Rosas
Administrative Law Judge

57

## APPENDIX

NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

## FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**WE WILL NOT** upon request, refuse to bargain collectively and in good faith with the SEIU Healthcare Michigan (the Union) as the exclusive collective bargaining representative of our employees in the following units (Recognized Unit):

All full-time and regular part-time employees in the following nursing departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of  Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Emergency, Intensive Care-Coronary Unit, Med.-Surg., Family Birthing Unit, Pediatrics, Surgery, Emergency Medical Services (excluding Secondary Emergency Medical Technicians), Social Service, Physician Practice, and Central Processing Department; but excluding the Vice President/Nursing Service, all House Supervisors (whether full-time or part-time), all Nurse Managers, Managers, and/or Assistant Managers, all registered nurses, all confidentials (including Secretary to the Vice President/Nursing Service), all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act;

All full-time and regular part-time employees in the following technical departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health,  Dunewood Family Practice, and West Michigan Sports and Family Medicine: Respiratory Therapy, Laboratory, Medical Imaging, and Pharmacy; but excluding all Managers, all    Assistant Managers, all confidentials, all temporary employees (including "occasional or  casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act; and

JD-53-24

All full-time and regular part-time employees in the following service departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of  Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Patient
Registration, Patient Accounting, Medical Records, Housekeeping, Food Service, Maintenance, Materials Management and Volunteer Services (Ambassador only); but excluding the Vice President/Fiscal Services, all Managers, all Assistant Managers, the Payroll Coordinator, the Food Service Supervisors, all confidentials (including the Secretary to the Vice President/Fiscal Services and the Accounts Payable person), Accountants, all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act, and further excluding all employees of the Human Resources Department, the Ancillary Services/Marketing Department, the Administration Department, and the Volunteer Services Department (except Ambassador).

**WE WILL NOT** upon request, refuse to bargain collectively and in good faith with the SEIU Healthcare Michigan (the Union) as the exclusive collective bargaining representative of our employees in the following unit (Certified Unit):

All full-time and regular part-time Social Worker MSW, Medical Technologists ASCP II, Nuclear Medicine Technologist, Ambassador, ARRT/CT Scan Technologist, HIM Analyst Coder, Biller, Cashier, Central Scheduler, PACS Administrator/Clinical Application Specialist, Certified Surgical Technologist, CT Scan Technologist, Clinical Documentation Specialist, Clinical Quality Assurance Liaison, Coder Assistant, Communications Specialist, Cook, CPD Lead Technician, CPD Technician, Custodian, Financial Counselor, Echocardiography Technician, EMT, Exercise Physiologist, Health Information Management Clerk, Histologist- Reg., Housekeeping Aide, Lab Assistant I- Phlebotomist, Lab Assistant II, Lead Housekeeper, Logging Clerk, LPNII, Mammography Technologist, Mammography Technologist II, M.I Technician Assistant, Materials Management Buyer, Materials Handler, Mechanic I, Mechanic II, Mechanic
III-Electrician, Medical Imaging Pt. Reg. File Clerk, Medical Imaging Technical Assistant, Medical Technician ASCP I, Medical Technologist ASCP II, Medical Assistant, Nuclear Medicine Technologist, Nurse Aide, Paramedic, Patient Accounts Specialist, Patient Registration Clerk, Patient Service Representative, Pharmacy Lead Technician, Pharmacy/Certified Technician, Pharmacy Assistants, Pre-Admission Review Specialist, Production Worker, RDMS/RVT, Registered Polysomnographer, Registered Respiratory Therapist, Social Worker MSW, Supply Aide/Courier, Surgical Technologist, Surgical Services Scheduler, Systems Support Specialist, Technologist Reg ARRT, Technician rag ARRT Tissue Technician, Transcriptionist, Ultrasound Technologist, Unit Clerk, Unit Technician and Unit Technician/Clerk employed by the Employer at its Grand Haven facilities; but excluding guards and supervisors as defined in the Act.

**YOU HAVE THE RIGHT** to discuss your working conditions with your fellow employees and **WE WILL NOT** restrict you from doing so or instruct you not to do so.

**YOU HAVE THE RIGHT** to discuss the Union, or any other labor organization, at work, and **WE WILL NOT** instruct you that you cannot.

**WE WILL NOT** provide more than minimal support to any efforts to decertify the Union as your collective bargaining representative or otherwise assist in those efforts.

**WE WILL NOT** interrogate you about your activities and the activities of your co-workers on behalf of the Union or any other labor organization.
**WE WILL NOT** tell you that it is futile to support or otherwise participate in activities on behalf of the Union or any other labor organization or other protected concerted activities.

**WE WILL NOT** threaten employees with adverse employment actions, including accrual of attendance points, if they engage in activities in support of the Union or any other labor organization or choose the Union or any other labor organization as their exclusive collective bargaining representative.

**WE WILL NOT** announce or promise a wage increase for non-union employees and imply to employees represented by the Union that those raises would be given to you if you abandoned the Union as your bargaining representative.

**WE WILL NOT** instruct you to remove Union stickers from your uniforms or prohibit you from wearing such stickers.

**WE WILL NOT** prohibit Unit members from passing out Union materials or soliciting union membership or instruct employees that they are prohibited from doing so.
**WE WILL NOT** create the impression that we are surveilling your union and protected concerted activity by telling you that we know of your union organizing efforts on behalf of the Union or any other labor organization.

**WE WILL NOT** issue you discipline, assess you attendance points, charge you leave, or apply other adverse employment actions for engaging in a lawful strike or otherwise engaging in union or protected concerted activity on behalf of the Union or any other labor organization.

**WE WILL NOT** grant preference in terms and conditions of employment only to our unrepresented employees.

**WE WILL NOT** bypass the Union, as your exclusive collective bargaining representative, and deal directly with you regarding the Union's demands made at the bargaining table, or any other term and condition of employment.

**WE WILL NOT** withdraw recognition from the Union as your exclusive bargaining representative regarding your terms and conditions of employment.

**WE WILL NOT** cancel bargaining sessions, condition our tentative agreements or otherwise engage in bad faith bargaining with the Union regarding the negotiation of a successor contract for the Units listed above.

**WE WILL NOT** in any like or related manner fail and refuse to bargain collectively and in good faith with the Union as the exclusive collective bargaining representative of the employees in the Units concerning wages, hours, and other terms and conditions of employment.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

**WE WILL NOT** in any like or related manner discriminate against you in regard to your hire, tenure, or terms and conditions of employment so as to discourage your support for, membership in, or assistance to the Union or any other labor organization.

**WE WILL** immediately recognize and bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of the Certified Unit with respect to wages, hours and other terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

**WE WILL** physically and electronically post the Notice to Employees where such notices are customarily posted for the Certified Unit and on our intranet and any electronic mail, text-based mobile messaging platform or internal app provided we customarily communicate with its you through such electronic means.

**WE WILL** rescind all unilateral changes we made over the terms and conditions in the Units on about May 15, 2023, without giving the Union notice of or an opportunity to bargain over such unilateral changes.

**WE WILL** reimburse the Union for dues we failed to deduct and remit from the Certified Unit employees' pay during the time period that we unlawfully failed to recognize the Union as the exclusive collective-bargaining representative of the Recognized/Certified Units.

**WE WILL** upon request, supply the Union the contact information, including full names, cellular telephone numbers, personal email addresses and home addresses of the current employees in the Certified Unit.

**WE WILL** upon request, grant the Union access to nonwork areas during employees' nonwork time to address Certified Unit employees.

**WE WILL** upon request, grant the Union access to our bulletin boards and all places where notices to employees are customarily posted.

**WE WILL** make whole the employees in the Recognized Unit for the loss of wages resulting from our failure since about May 25, 2023, to offer to implement wage increases for the Recognized Unit that were granted to unrepresented employees.

JD-53-24

**WE WILL** rescind and remove from our files the disciplinary actions, attendance points, leave assessments, and other adverse actions resulting from the protected concerted activities that occurred on August 4, 2023, for the following employees: Jessica Addington, Sonya Ascencio, Chelsea Bixby, David Bradley, Jenna Bolduc, Tyson Cobb, Michael Coyle, Gabby Craig, Kayshira Cunningham, Meghan DeFabrizio, Kristie Firestone, Greg Gillissie, Nicole Guenther, Jessica Hambright, Teresa Hippchen, Lori Homik, Shawndrea Ingram, Pamula Ivy, Emerald Johnson, Rachel Kammeraad, Jordan Kleyn, Courtney Lodholtz, Cynthia Merrell, Ashley Miller, Ashlee Moore, Jason Moscynski, Dottie Nevins, Chad Nickerson, Sharlene Pant, Beth Melissa Robart, Brittany Ronan, Beth Ruiter, Lynn Ruwe, Lisa Sanford, Steve Sasinski, Susan Sikkenga, Kimberly Siple, Sarah Stadler, Virginia Swan, Tenaw Yiberhu, Kelly Walker, Yakiea White, Erin Whitten, and Ruth Zylstra, and notify each affected employee individually in writing, that we have done so and that the adverse actions will not be used against them in the future in any way.

**WE WILL** bargain collectively and in good faith with the Union, on request, and extend the certification year for one year from the date that bargaining commences in accordance with *Mar-Jac Poultry*, 136 NLRB 785 (1962).

   ___Trinity Health Grand Haven Hospital___
              (Employer)

Dated: _____     By: _____
                        (Representative)    (Title)

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Callers who are deaf or hard of hearing who wish to speak to an NLRB representative should send an email to* [relay.service@nlrb.gov](mailto:relay.service@nlrb.gov)*. An NLRB representative will email the requestor with instructions on how to schedule a relay service call set forth below. You may also obtain information from Board's Website: WWW.NLRB.GOV*

*477 Michigan Avenue, Room 300, Detroit, MI 48226-2543*
*(313) 226-3200, Hours: 8:15 a.m. to 4:45 p.m.*

The Administrative Law Judge's decision can be found at [www.nlrb.gov/case/07-CA-323321](http://www.nlrb.gov/case/07-CA-323321) or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



JD-53-24

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**

This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the Regional Office's Compliance Officer (616) 930-9165.

JD-53-24ER

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

TRINITY HEALTH GRAND HAVEN HOSPITAL
Respondent

         and                             Cases  07-CA-323321
                                          07-CA-323743
SEIU HEALTHCARE MICHIGAN                07-CA-326861
Charging Party

<u>ERRATA</u>

My decision in the above captioned case issued on September 6, 2024.  Please make the following corrections:

Page 3, line 13: Replace "**has an average daily census of less than 25 patients**," with "has an average daily census of less than 25 patients,"

Page 55, line 5: replace "collective-argaining" with "collective-bargaining"

Replace the "Appendix" with the attached "Appendix" in normal font format.

Dated:  Washington, D.C.  September 10, 2024

_____
Michael A. Rosas
Administrative Law Judge

JD-53-24ER

# APPENDIX

NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

**FEDERAL LAW GIVES YOU THE RIGHT TO**

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**WE WILL NOT** upon request, refuse to bargain collectively and in good faith with the SEIU Healthcare Michigan (the Union) as the exclusive collective bargaining representative of our employees in the following units (Recognized Unit):

All full-time and regular part-time employees in the following nursing departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Emergency, Intensive Care-Coronary Unit, Med.-Surg., Family Birthing Unit, Pediatrics, Surgery, Emergency Medical Services (excluding Secondary Emergency Medical Technicians), Social Service, Physician Practice, and Central Processing Department; but excluding the Vice President/Nursing Service, all House Supervisors (whether full-time or part-time), all Nurse Managers, Managers, and/or Assistant Managers, all registered nurses, all confidentials (including Secretary to the Vice President/Nursing Service), all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act;
All full-time and regular part-time employees in the following technical departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Respiratory Therapy, Laboratory, Medical Imaging, and Pharmacy; but excluding all Managers, all  Assistant Managers, all confidentials, all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act; and

All full-time and regular part-time employees in the following service departments at the Employer's Grand Haven, Michigan Hospital and its Grand Haven, Michigan locations of Dunewood Pharmacy, North Ottawa Family Practice, North Ottawa Women's Health, Dunewood Family Practice, and West Michigan Sports and Family Medicine: Patient Registration, Patient Accounting, Medical Records, Housekeeping, Food Service, Maintenance, Materials Management and Volunteer Services (Ambassador only); but excluding the Vice President/Fiscal Services, all Managers, all Assistant Managers, the Payroll Coordinator, the Food Service Supervisors, all confidentials (including the Secretary to the Vice President/Fiscal Services and the Accounts Payable person), Accountants, all temporary employees (including "occasional or casual" employees), all "per diem" employees, all student trainees and volunteers, all other employees, and all supervisors as defined in the Act, and further excluding all employees of the Human Resources Department, the Ancillary Services/Marketing Department, the Administration Department, and the Volunteer Services Department (except Ambassador).

**WE WILL NOT** upon request, refuse to bargain collectively and in good faith with the SEIU Healthcare Michigan (the Union) as the exclusive collective bargaining representative of our employees in the following unit (Certified Unit):

All full-time and regular part-time Social Worker MSW, Medical Technologists ASCP II, Nuclear Medicine Technologist, Ambassador, ARRT/CT Scan Technologist, HIM Analyst Coder, Biller, Cashier, Central Scheduler, PACS Administrator/Clinical Application Specialist, Certified Surgical Technologist, CT Scan Technologist, Clinical Documentation Specialist, Clinical Quality Assurance Liaison, Coder Assistant, Communications Specialist, Cook, CPD Lead Technician, CPD Technician, Custodian, Financial Counselor, Echocardiography Technician, EMT, Exercise Physiologist, Health Information Management Clerk, Histologist- Reg., Housekeeping Aide, Lab Assistant I- Phlebotomist, Lab Assistant II, Lead Housekeeper, Logging Clerk, LPNII, Mammography Technologist, Mammography Technologist II, M.I Technician Assistant, Materials Management Buyer, Materials Handler, Mechanic I, Mechanic II, Mechanic III-Electrician, Medical Imaging Pt. Reg. File Clerk, Medical Imaging Technical Assistant, Medical Technician ASCP I, Medical Technologist ASCP II, Medical Assistant, Nuclear Medicine Technologist, Nurse Aide, Paramedic, Patient Accounts Specialist, Patient Registration Clerk, Patient Service Representative, Pharmacy Lead Technician, Pharmacy/Certified Technician, Pharmacy Assistants, Pre-Admission Review Specialist, Production Worker, RDMS/RVT, Registered Polysomnographer, Registered Respiratory Therapist, Social Worker MSW, Supply Aide/Courier, Surgical Technologist, Surgical Services Scheduler, Systems Support Specialist, Technologist Reg ARRT, Technician rag ARRT Tissue Technician, Transcriptionist, Ultrasound Technologist, Unit Clerk, Unit Technician and Unit Technician/Clerk employed by the Employer at its Grand Haven facilities; but excluding guards and supervisors as defined in the Act.

**YOU HAVE THE RIGHT** to discuss your working conditions with your fellow employees and **WE WILL NOT** restrict you from doing so or instruct you not to do so.

**YOU HAVE THE RIGHT** to discuss the Union, or any other labor organization, at work, and **WE WILL NOT** instruct you that you cannot.

**WE WILL NOT** provide more than minimal support to any efforts to decertify the Union as your collective bargaining representative or otherwise assist in those efforts.

**WE WILL NOT** interrogate you about your activities and the activities of your co-workers on behalf of the Union or any other labor organization.

**WE WILL NOT** tell you that it is futile to support or otherwise participate in activities on behalf of the Union or any other labor organization or other protected concerted activities.

**WE WILL NOT** threaten employees with adverse employment actions, including accrual of attendance points, if they engage in activities in support of the Union or any other labor organization or choose the Union or any other labor organization as their exclusive collective bargaining representative.

**WE WILL NOT** announce or promise a wage increase for non-union employees and imply to employees represented by the Union that those raises would be given to you if you abandoned the Union as your bargaining representative.

**WE WILL NOT** instruct you to remove Union stickers from your uniforms or prohibit you from wearing such stickers.

**WE WILL NOT** prohibit Unit members from passing out Union materials or soliciting union membership or instruct employees that they are prohibited from doing so.

**WE WILL NOT** create the impression that we are surveilling your union and protected concerted activity by telling you that we know of your union organizing efforts on behalf of the Union or any other labor organization.

**WE WILL NOT** issue you discipline, assess you attendance points, charge you leave, or apply other adverse employment actions for engaging in a lawful strike or otherwise engaging in union or protected concerted activity on behalf of the Union or any other labor organization.

**WE WILL NOT** grant preference in terms and conditions of employment only to our unrepresented employees.

**WE WILL NOT** bypass the Union, as your exclusive collective bargaining representative, and deal directly with you regarding the Union's demands made at the bargaining table, or any other term and condition of employment.

**WE WILL NOT** withdraw recognition from the Union as your exclusive bargaining representative regarding your terms and conditions of employment.

**WE WILL NOT** cancel bargaining sessions, condition our tentative agreements or otherwise engage in bad faith bargaining with the Union regarding the negotiation of a successor contract for the Units listed above.

JD-53-24ER

**WE WILL NOT** in any like or related manner fail and refuse to bargain collectively and in good faith with the Union as the exclusive collective bargaining representative of the employees in the Units concerning wages, hours, and other terms and conditions of employment.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

**WE WILL NOT** in any like or related manner discriminate against you in regard to your hire, tenure, or terms and conditions of employment so as to discourage your support for, membership in, or assistance to the Union or any other labor organization.

**WE WILL** immediately recognize and bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of the Certified Unit with respect to wages, hours and other terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

**WE WILL** physically and electronically post the Notice to Employees where such notices are customarily posted for the Certified Unit and on our intranet and any electronic mail, text-based mobile messaging platform or internal app provided we customarily communicate with its you through such electronic means.

**WE WILL** rescind all unilateral changes we made over the terms and conditions in the Units on about May 15, 2023, without giving the Union notice of or an opportunity to bargain over such unilateral changes.

**WE WILL** reimburse the Union for dues we failed to deduct and remit from the Certified Unit employees' pay during the time period that we unlawfully failed to recognize the Union as the exclusive collective-bargaining representative of the Recognized/Certified Units.

**WE WILL** upon request, supply the Union the contact information, including full names, cellular telephone numbers, personal email addresses and home addresses of the current employees in the Certified Unit.

**WE WILL** upon request, grant the Union access to nonwork areas during employees' nonwork time to address Certified Unit employees.

**WE WILL** upon request, grant the Union access to our bulletin boards and all places where notices to employees are customarily posted.

**WE WILL** make whole the employees in the Recognized Unit for the loss of wages resulting from our failure since about May 25, 2023, to offer to implement wage increases for the Recognized Unit that were granted to unrepresented employees.

**WE WILL** rescind and remove from our files the disciplinary actions, attendance points, leave assessments, and other adverse actions resulting from the protected concerted activities that occurred on August 4, 2023, for the following employees: Jessica Addington, Sonya Ascencio,

JD-53-24ER

Chelsea Bixby, David Bradley, Jenna Bolduc, Tyson Cobb, Michael Coyle, Gabby Craig, Kayshira Cunningham, Meghan DeFabrizio, Kristie Firestone, Greg Gillissie, Nicole Guenther, Jessica Hambright, Teresa Hippchen, Lori Homik, Shawndrea Ingram, Pamula Ivy, Emerald Johnson, Rachel Kammeraad, Jordan Kleyn, Courtney Lodholtz, Cynthia Merrell, Ashley Miller, Ashlee Moore, Jason Moscynski, Dottie Nevins, Chad Nickerson, Sharlene Pant, Beth Melissa Robart, Brittany Ronan, Beth Ruiter, Lynn Ruwe, Lisa Sanford, Steve Sasinski, Susan Sikkenga, Kimberly Siple, Sarah Stadler, Virgnia Swan, Tenaw Yiberhu, Kelly Walker, Yakiea White, Erin Whitten, and Ruth Zylstra, and notify each affected employee individually in writing, that we have done so and that the adverse actions will not be used against them in the future in any way.

**WE WILL** bargain collectively and in good faith with the Union, on request, and extend the certification year for one year from the date that bargaining commences in accordance with *Mar-Jac Poultry*, 136 NLRB 785 (1962).

___Trinity Health Grand Haven Hospital___
(Employer)

Dated: _____  By: _____
(Representative)      (Title)

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Callers who are deaf or hard of hearing who wish to speak to an NLRB representative should send an email to relay.service@nlrb.gov. An NLRB representative will email the requestor with instructions on how to schedule a relay service call set forth below. You may also obtain information from Board's Website: WWW.NLRB.GOV*

*477 Michigan Avenue, Room 300, Detroit, MI 48226-2543*
*(313) 226-3200, Hours: 8:15 a.m. to 4:45 p.m.*

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/07-CA-323321 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



JD-53-24ER

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the Regional Office's Compliance Officer (616) 930-9165.