UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH KERWIN, Regional Director,
Seventh Region of the National Labor
Relations Board, for an on behalf of the
NATIONAL LABOR RELATIONS BOARD,

        Petitioner,

                            CASE NO. 1:24-cv-445

v.

                            HON. ROBERT J. JONKER

TRINITY HEALTH GRAND HAVEN HOSPITAL,

        Respondent.

_____/

## OPINION

    The matter is before the Court on the Petition for Injunction Under Section 10(j) of the National Labor Relations Act brought Petitioner Elizabeth Kerwin on behalf of the National Labor Relations Board ("NLRB" or the "Board"). (ECF No. 1). The Court received further briefing in light of the Supreme Court's decision in *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024) and has heard oral argument on the petition. The Court has thoroughly reviewed the record and carefully considered the applicable law. The petition is ready for decision.

### BACKGROUND

#### 1.  *A Positive History of Collective Bargaining*

    Trinity Health is a national health system operating across several states. In October 2022, Trinity Health acquired the North Ottawa Community Hospital ("NOCH") in Grand Haven, Michigan and changed its name to Trinity Health Grand Haven Hospital ("THGH" or

"Respondent").  (ALJ Decision at 2-3, ECF No. 56-1, PageID.3040-3041).[1]  The hospital is a medium-sized community hospital with approximately 350 to 400 employees.  It is rated as a level four trauma center (the lowest level) with an average daily census of less than twenty-five patients. The hospital specializes in providing day-to-day healthcare to the Grand Haven community. (*Id.* at PageID.3041).

Leading up to the acquisition by Trinity Health, NOCH maintained a bargaining relationship with two labor unions: the Michigan Nurses Association (MNA) and the North Ottawa Community Hospital Employees Association (NOCHEA).  (ALJ Decision at 5; ECF No. 56-1, PageID.3043; Admin. Tr. 856, ECF No. 12, PageID.2019).[2]  The latter union represented professional and technical department employees at the hospital.  There is no dispute that NOCH and NOCHEA had a positive relationship before the hospital's acquisition by Trinity Health.

Before the acquisition, there was a collective bargaining agreement governing the relationship between the employer, NOCH, and the employees via their union, NOCHEA.  The latest iteration of that agreement ran from October 24, 2018, through June 30, 2021.  (ECF No. 2-7).  The parties later agreed to extend the agreement through June 30, 2022.  (ALJ Decision at 5, ECF No. 56-1, PageID.3043; NOCH-NOCHEA Tentative Agreement, ECF No. 15-2).

### 2.  *Transitions on Both Sides*

The transition from NOCH to THGH took place during the summer and fall of 2022.  The

---

[1] The decision from the NLRB Administrative Law Judge (ALJ) issued on September 10, 2024, the day before oral argument on this matter.  Respondent did not oppose the submission of the decision to the Court, though it preserved an argument that the entire proceeding before the ALJ was unconstitutional—an argument that is contained in a motion to dismiss that the Court is separately considering.  The Court highlights those background facts from the ALJ's decision, without prejudice to the arguments contained in the pending motion to dismiss.

[2] "Admin. Tr." refers to the transcript from the hearing before the National Labor Relations Board ALJ in this matter.

union was contemplating a change at the same time.  To that end, NOCHEA board members met with representatives of SEIU Healthcare Michigan to discuss a bargaining relationship.  Those meetings were productive and on November 3, 2022, NOCHEA members voted to affiliate with SEIU Healthcare Michigan.  (ALJ Decision at 6, ECF No. 56-1, PageID.3044).

Later that month, following the change on both the employer and union sides, a Memorandum of Understanding was signed between THGH (as the employer) and "SEIU Healthcare Michigan/NOCHEA" (as the union).  The agreement extended the CBA that existed between NOCH and NOCHEA by a few months through February 28, 2023.  (ALJ Decision at 7-8, ECF No. 56-1, PageID.3045-3046; *see also* ECF No. 2-8, PageID.142).

With the added breathing room from the short-term CBA extension, the parties began discussions about a lengthier extension of the agreement.[3]  In the ensuing weeks there were negotiations over the ground rules for the substantive negotiations.   (ALJ Decision at 9-10, ECF No. 56-1, PageID.3047-3048).  The parties eventually reached tentative agreements in several areas, however no complete agreement was reached, and negotiations continued later into the spring and summer of 2023.

### 3.  Decertification Petition

In April of 2023, two THGH employees approached Cindy VanKampen—THGH's Chief Nursing Officer—and asked her about the process for decertifying SEIU Healthcare Michigan as the employees' bargaining representative.  (ALJ Decision at 18, ECF No. 56-1, PageID.3056;

---

[3] THGH does not dispute that it agreed to negotiate, but it maintains it did not recognize SEIU Healthcare Michigan as the certified collective bargaining representative during these negotiations. It points to an alleged ambiguity in the Memorandum of Understanding that referred to the "union" as "SEIU Healthcare Michigan/NOCHEA" and notes that of the seven individuals signing on behalf of the union, six were NOCHEA board members, and one was a SEIU Healthcare Michigan employee.

Admin. Tr. 494, ECF No. 12, PageID.1657).  Ms. VanKampen referred the employees to the NLRB website.[4]  (Admin Tr. 494, ECF No. 12, PageID.1657).  Thereafter the two employees and another employee—Ms. Jamie Quinn—began gathering signatures from coworkers for a petition to decertify SEIU Healthcare Michigan as the certified bargaining representative.  The process continued through the summer, alongside the continued negotiations on extending the CBA.

Ms. Quinn eventually obtained enough signatures to file a decertification petition with the NLRB.  Ms. Quinn filed the petition on July 31, 2023, and informed THGH's President, Shelleye Yaklin, about her actions.[5]  (ECF No. 2-2).  This ultimately led to the end of further negotiations over the extension of the CBA.  (ALJ Decision at 22, ECF No. 56-1, PageID.3060).

### 4. Decertification Election

Respondent and the union agreed to the process over the election.  On August 31, 2023, the Board approved a Stipulated Election Agreement for a decertification election to be held on September 18 and 19, 2023.  (ALJ Decision at 28, ECF No. 56-1, PageID.3066; *see also* ECF No. 2-3).  Among other things, the stipulated agreement contained a provision stating that "[i]mmediately upon conclusion of the last voting session, all ballots cast will be commingled and

---

[4] The NLRB website, among other things, contains manuals that include information on decertifying a union under certain circumstances. *See* NLRB Casehandling Manual, Part Two, Representation Proceedings, §§ 11001.7; 11022.2, 11023.1 (Dec. 2023); *available at* https://www.nlrb.gov/guidance/key-reference-materials/manuals-and-guides

[5] Petitioner's brief claims that Respondent unlawfully coerced the employees to sign the petition during this process.  In particular, Petitioner points to testimony before the Administrative Law Judge about an occasion in May 2023 where several employees testified they felt pressured to sign the petition when they met with Ms. Quinn in a hospital stairwell while Respondent's Surgical Department Manager stood by the door in the stairwell.  (Pet. Br. 3, ECF No. 2, PageID.41 (citing Admin Tr. 226-230, 265, 267)).  The ALJ subsequently determined, however, that there was no evidence that employees felt coerced by the manager's presence and that the manager's actions did not cross the line to a violation of Section 8(a)(1) of the NLRA.  (ALJ Decision, ECF No. 56-1, PageID.3073-3074).  This, along with the other findings by the ALJ, is a preliminary finding only; no final determination by the NLRB has yet been made.

counted and a tally of ballots prepared and immediately made available to the parties."  (ECF No. 2-3, PageID.65).

The election proceeded at the predetermined dates and times.  The results were not immediately announced, however.  Rather the NLRB impounded the ballots based on an August 8, 2023, blocking request SEIU Healthcare Michigan filed with the Board.  (*See* ECF No. 15-8, PageID.2216).[6]  THGH and Ms. Quinn were informed of the blocking request on September 19. (ALJ Decision at 29, ECF No. 56-1, PageID.3067).  Both objected to the delayed count.  (ECF No. 15-9).

### 5.  *THGH Withdraws Union Recognition Before the Decertification Votes are Tallied.*

On September 25, 2023, SEIU Healthcare Michigan withdrew its blocking request with the Board.  The NLRB subsequently informed the parties that the ballots from the decertification election would be opened and counted on September 29.  (ALJ Decision at 29, ECF No. 56-1, PageID.3067).

On September 28, 2023, one day before the vote was set to be tallied, Ms. Quinn delivered

---

[6] Contrary to the suggestion in Respondent's briefing, there was nothing facially improper with the procedure here.  Indeed, under the stipulation, the parties agreed that "the record of this case shall include this Agreement and be governed by the Board's Rules and Regulations."  (ECF No. 2-3, PageID.62).  The relevant provision of the Board's Rule and Regulations states that "[w]henever any party to a representation proceeding files an unfair labor practice charge together with a request that the charge block the election process, or whenever any party to a representation proceeding requests that its previously filed unfair labor practice charge block the election process, the party shall simultaneously file, but not serve on any other party, a written offer of proof in support of the charge."  Furthermore, "[i]f charges are filed that allege violations of section 8(a)(1) . . . the regional director shall impound the ballots for up to 60 days from the conclusion of the election if the charge has not been withdrawn or dismissed prior to the conclusion of the election. . . . . If the charge is withdrawn or dismissed at any time during that 60-day period, or if the 60-day period ends without a complaint issuing, then the ballots shall be promptly opened and counted."  29 C.F.R. § 103.20(a), (c); *available at* https://www.nlrb.gov/guidance/key-reference-materials/rules-regulations

a disaffection[7] petition to Ms. Yaklin.  (*See* ECF No. 2-11).  This document, the parties agree, contained an additional number of signatures from the decertification petition.  The parties disagree whether this was an intentional scramble by Ms. Quinn and other decertification supporters to gather additional signatures in anticipation of the eventual vote count (as Petitioner says) or a natural response based on the employees' disappointment over how the election had been run (as THGH says).  After hearing testimony on the matter, the ALJ determined that Ms. Quinn's testimony that additional employees signed the petition because they were upset by the blocking charge was uncorroborated and not credible.  (ALJ Decision at 29-30 n.126, ECF No. 56-1, PageID.3067-3068).  In any event, there is no dispute about the contents of the document sent to Ms. Yaklin:  It consists of seven pages containing ninety-four signatures.  There are no dates alongside the signatures.  Four of the pages contain headings stating that the employees no longer wanted to be represented by SEIU Healthcare Michigan, and there are forty-eight signatures under those headings.  The remaining forty-six signatures are on pages with no heading or statement about the purpose of the signatures.  Some signatures were accompanied by a printed name and title, others were not.  (ALJ Decision at 30, ECF No. 56-1, PageID.3068).

THGH's review of the document concluded the raw number of signatures was enough to constitute a majority of the number of employees in the bargaining unit.  Ms. Yaklin testified that there were ninety-four signatures on the document, and that there were roughly one-hundred eighty employees in the bargaining unit.  Based on that basic math, Ms. Yaklin made the decision to withdraw recognition of SEIU Healthcare Michigan.  (Admin Tr. 110-113, 117 ECF No. 12,

---

[7] So used in Petitioner's briefing.  Petitioner explains there is a difference between "decertification" and "disaffection" petitions, noting that the latter serves to demonstrate an uncoerced majority of employees no longer support a union. (Pet. Br. 2 n.2, ECF No. 2, ECF No. 42; *see also* Errata, ECF No. 10, PageID.1157).  Respondent does not quibble with the use of this term.  (Resp. Br. 7, ECF No. 15, PageiD.2167).

PageID.1273-1276, 1280).  Beyond the raw count and basic math, THGH did little, if anything, to verify the signatures and ensure there was actually a majority of current members in the bargaining unit that no longer supported the union.  Ms. Yaklin was vague and speculative when it came to specifics about how she arrived at her determination aside from the raw numbers.  She testified she "would have" sent the document to THGH's Human Resources department and that she "probably" relied on reports from the department that there were less than one-hundred ninety employees in the bargaining unit.  (Admin Tr. 111, 903, ECF No. 12, PageID.1274, 2066).  The "expectation would be" that the department would also validate the information.  (Admin Tr. 903, ECF No. 12, PageID.2066).  But Ms. Yaklin testified only that she heard back there was an "appropriate number of signatures." (*Id.*).  She admitted she did not personally know all of the names listed on the document, and she did not refer to a comparative list to determine who was in the bargaining unit.  When the document was submitted, Ms. Yaklin did not know whether all the signatories were currently employed by the hospital.  (Admin Tr. 110-113, 117 ECF No. 12, PageID.1273-1276, 1280).  Nor did Ms. Yaklin provide any details about the human resources review that she had expected.

THGH moved quickly to withdraw recognition.  That afternoon, the hospital announced it had withdrawn recognition of SEIU Healthcare Michigan and that it was terminating further bargaining over the CBA extension.  (ALJ Decision at 30, ECF No, 56-1, PageID.3068).

### 6.  *The Union Prevails When the Votes are Counted*

On September 29, 2023, the votes from the election were counted.  The final tally reflected there were 182 eligible voters and that 89 employees cast ballots in favor of SEIU Healthcare Michigan; 66 employees cast negative ballots; and that there 7 challenged ballots that were not determinative of the outcome.  (ECF No. 2-4).

On October 6, THGH filed an objection to the election results based on the disaffection petition Ms. Yaklin received on September 28, 2023. (ECF No. 2-5, PageID.74-75).  On October 17, 2023, the Regional Director overruled the objection.  Among other things, the director noted:

> [T]he election occurred on September 18 and 19, and the conduct for which the Employer seeks a new election occurred on September 28, which is outside the critical period.  The critical period during which conduct allegedly affecting the results of a representation election must be examined commences at the filing of the representation petition and extends through the election.  *E.L.C. Electric, Inc.*, 344 NLRB 1200, 1201 fn. 6 (2005).  Here, where the ballots were counted after the balloting concluded, the critical period ended on September 19.  See, for example, *Kaiser Permanente*, 358 NLRB 758 (2012), where the Board found the critical period ended on November 8, 2010, the date that mail ballots were due, although the ballots were subsequently counted on November 10, 2010.
>
> The Employer's Objections fail to establish any conduct by any party in the critical period that would be the grounds for setting aside the results of the election or any conduct by any party other than the Employer that, even if it occurred during the critical period, would serve as grounds for setting aside the results of the election.

(ECF No. 2-5, PageID.72).

The Regional Director proceeded to issue a Certification of Representative stating that SEIU Healthcare Michigan was the "exclusive representative of all the employees" in the bargaining unit.  (ALJ Decision at 31, ECF No. 56-1, PageID.3069; ECF No. 2-5).

On October 31, 2023, THGH filed a request with the NLRB to review the Regional Director's October 17th decision and to stay further proceedings.  (ALJ Decision at 32, ECF No. 56-1, PageID.3070).  On December 7, 2023, the Board denied THGH's request for review and for a stay of proceedings.  (ECF No. 2-6).  In a footnote, the Board explained that THGH raised no substantial issues warranting review.  While the Board did not rely on the Regional Director's citation to the *Kaiser Permanente* decision because it was a recess-Board decision, the Board found that denying review was still proper:

> We additionally deny review based on well-established precedent holding that an alleged postelection loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election. *Community Support Network*, 363 NLRB 833, 833 (2016); *Alta Vista Regional Hospital*, 356 NLRB 1331, 1332-1333 (2011), enfd. 697 F.3d 1181, 1187 (D.C. Cir. 2012); *Sunbeam Corp.*, 89 NLRB 469, 473 (1950); *Teesdale Mfg. Co.*, 71 NLRB 932, 935 (1946).

(ECF No. 1:24-cv-445). It appears that to date, THGH has not recognized SEIU Healthcare Michigan, and there have been no meaningful discussions surrounding the CBA.

### 7. *Proceedings Before the NLRB*

SEIU Healthcare Michigan filed charges with the NLRB alleging that THGH had engaged, and was continuing to engage, in unfair labor practices and that THGH's refusal to bargain with the union violated the law. (Pet. ¶ 3, ECF No. 1, PageID.2). The three charges were consolidated and tried over eight days between April 3 and May 15, 2024. On September 6, 2024, the ALJ's decision issued.[8] (ECF No. 56-1).

The ALJ determined as a matter of law that THGH violated the National Labor Relations Act ("NLRA") in several respects. Among other things, the ALJ determined that THGH violated Section 8(a)(5) and (1) by "[w]ithdrawing its recognition of the Charging Party on September 28, 2023 as the exclusive collective-bargaining representative of the bargaining unit." (ALJ Decision at 53, ECF No. 56-1, PageID.3091).

The ALJ ordered a series of remedies, including, among others, an order that THGH cease and desist from refusing to bargain in good faith with SEIU Healthcare Michigan as the exclusive collective bargaining representative of the employees in the bargaining unit. The ALJ further ordered a series of affirmative actions to effectuate the policies of the NLRA, including a

---

[8] An Errata issued on September 10, 2024 (ECF No. 56-1, PageID.3102).

requirement that THGH "[i]mmediately recognize and bargain collectively and in good faith with the Charging Party[.]" (ALJ Decision at 56, ECF No. 56-1, PageID.3094). The matter is now pending before the NLRB for further proceedings.

### 8. The NLRB Seeks 10(j) Relief

The NLRB now seeks a preliminary injunction under Section 10(j) to preserve the status quo until the Board issues its ultimate decision. Petitioner filed its 10(j) request on April 30, 2024, while proceedings were pending before the ALJ and before the ALJ issued his decision. Petitioner, on behalf of the Board, primarily requests that the Court Order THGH to cease and desist from refusing to recognize and bargain with SEIU Michigan in good faith as the exclusive collective bargaining representative of the Certified Unit employees. (Pet. at 8, ECF No. 1, PageID.8).[9] To give effect to the injunction, the NLRB also requests the Court to order THGH to post physical copies of any injunction order on the bulletin boards in Respondent's break rooms and other places where notices are typically posted; to distribute the same via electronic means; and to convene a mandatory meeting during which the injunction would be distributed and read to the employees. (ECF No. 1, PageID.8-9).

### LEGAL STANDARDS

The NLRA "prohibits employers and unions from engaging in 'unfair labor practice[s].'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1574 (2024) (quoting 29 U.S.C. § 158(a), (b)).

---

[9] Petitioner also asked the Court to order THGH to cease and desist from unlawfully assisting with the circulation or a decertification or disaffection petition among its employees. (ECF No. 1, PageID.8). It appears that this request stemmed from an allegation that a THGH manager actively assisted in Ms. Quinn's decertification efforts in May 2023 by allegedly corralling employees in a stairwell while Ms. Quinn solicited signatures. The ALJ dismissed this allegation by concluding that the manager had provided no more than ministerial aid and did not cross the line into unlawful activity. (ALJ Decision at 35-36, ECF No. 56-1, PageID.3073-3074). Petitioner now seeks relief based only on the violations found by the ALJ; Petitioner is no longer seeking injunctive relief based on this allegation. (*See* ECF No. 56, PageID.3035).

Section 10(j) of the NLRA authorizes the NLRB, upon issuing a complaint charging that a person has engaged in an unfair labor practice, "to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order."  29 U.S.C. § 160(j).  For the most part, labor disputes are resolved administratively and enforced to the extent necessary by the courts of appeals.  *Kobell v. United Paperworkers Int'l Union, AFL-CIO, CLC*, 965 F.2d 1401, 1406 (6th Cir. 1992); *see also Starbucks Corp.*, 144 S. Ct. at 1574.  Because the administrative process at times unfolds slowly, "interim injunctive relief occasionally may be necessary to preserve the remedial power of the Board . . . pending the Board's substantive review of [alleged unfair labor practices]."  *Kobell*, 955 F.2d at 1406.  "Section 10(j) reflects Congress's view that interim injunctive relief to restore and preserve the status quo, pending final Board adjudication, may be required to avoid frustration of the basic remedial purposes of the Act and possible harm to the public interest."  *Fleischut v. Nixon Detroit Diesel*, 859 F.2d 26, 29 (6th Cir. 1988) (citing *Levine v. C&W Mining, Inc.*, 610 F.2d 432, 436-37 (6th Cir. 1979)).

The Court's role in deciding a motion under Section 10(j) is to preserve the Board's remedial power by preserving the status quo.  It is not the Court's role to determine the merits of the underlying case.  *Fleischut*, 859 F.2d at 28.  "The question of whether a violation of the Act has been committed is a function reserved exclusively to the Board, subject to appellate court review of final Board orders."  *Id.*  (citing *C&W Mining*, 610 F.2d at 435).  The Court's sole purpose here is to preserve the Board's power to enforce whatever merits decision the Board finally makes.

When the petition was filed, courts in the Sixth Circuit applied a two-part test to determine whether the NLRB was entitled to a preliminary injunction under Section 10(j).  "That test ask[ed]

whether 'there is reasonable cause to believe that unfair labor practices have occurred' and whether injunctive relief is 'just and proper.'"  *Starbucks Corp.*, 144 S. Ct. at 1575 (quoting *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 339 (2017).  Other circuits, however, eschewed the shortened test in favor of the traditional four-part test for preliminary injunctions set out in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  In *Starbucks Corp.*, Supreme Court resolved the circuit split by holding that requests for preliminary injunctions under Section 10(j) must be evaluated under the traditional four-factor test.  Accordingly, to be entitled a preliminary injunction under Section 10(j) a moving party must "make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Starbucks Corp.*, 144 S. Ct. at 1575 (quoting *Winter*, 555 U.S. at 20, 22)).

Following the Supreme Court's June 13, 2024, decision in *Starbucks Corp.* the Court invited supplemental briefing that addressed the petition under the four-part *Winter* framework. (ECF No. 31).  Both sides have provided supplemental briefing (ECF Nos. 45 and 46) as well as responsive briefing (ECF Nos. 52 and 53).

## DISCUSSION

### 1. *Likelihood of Success on the Merits*

The Court starts, as the parties do, with the likelihood of success on the merits.  "On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred" and that a court "would grant a petition enforcing that order, if such enforcement were sought."  *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011).  The Court concludes that Petitioner has met her burden of making a clear showing of likelihood of success on the merits.

When faced with a number of employees questioning their bargaining representation, THGH agreed to hold an election.  Having agreed to do so, and without a hint of any infirmity in the actual election process, THGH was required to live with the results.  Its decision not to engage with the union following the election means that Petitioner has demonstrated a likelihood of success on the merits.  There is no dispute that a decertification election was properly called following the collection of signatures by THGH employees.  Indeed, the parties signed a stipulated election agreement wherein THGH agreed to hold an election.  The election was held, and THGH does not allege anything untoward in how the election was conducted in the lead up to votes being cast.  And when the votes were counted, there is no dispute that the raw number of votes meant that the union won out.

In the Court's mind, having agreed to hold an election and having agreed it was fair, THGH must live with the result.  Instead, THGH has sought to undermine the vote based on signatures they gathered before, during, and after, the actual election.  This undermines the integrity of the election process and the result.  Put differently, Petitioner has demonstrated a strong likelihood of success on its basic claim THGH violated section 8(a)(1) and (5) of the NLRA when it thwarted its employees right to bargain collectively through representatives of their own choosing when it withdrew recognition from, and refused to bargain with, SEIU Healthcare Michigan after THGH lost the decertification election.  "An employer violates Sections 8(a)(1) and 8(a)(5) by 'refus[ing] to bargain collectively with the representative of [its] employees[.]'" *N.L.R.B. v. Galicks, Inc*., 671 F.3d 602, 610 (6th Cir. 2012) (*quoting* 29 U.S.C. § 158(a)(5)).  This "includes unilaterally withdrawing recognition from a union supported by a majority of the bargaining unit's members[.]" *Id.* (citing *Vanguard Fire & Supply Co. v. NLRB,* 468 F.3d 952, 957 (6th Cir. 2006)).

13

THGH resists this conclusion based on the disaffection petition that it received after votes were cast but before they were counted.  It points to Board authority stating that "an employer has no duty to recognize or bargain with a union that represents less than a majority of the employer's employees." *Levitz Furniture Co. of the Pac., Inc.*, 333 NLRB 717, 720 (2001).  The disaffection petition, THGH says, constitutes objective evidence that the union had lost majority support, and thus it was required to withdraw union recognition.  For these reasons, it says, Petitioner has not demonstrated a likelihood of success on the merits of its NLRA claim.  The Court is not convinced and believes that both the applicable legal authority and the facts are against THGH.

As to Board authority, Petitioner points to a line of Board and court decisions for the proposition that "it is well settled that an alleged postelection loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election." *Cmty. Support Network & Serv. Emps. Int'l Union Loc. 1021*, 363 NLRB 833, 833 (2016).  In *Levitz*, the Board framed the issue as follows: "whether an incumbent union should continue to be the bargaining representative while its support is being tested in a Board election." *Levitz*, 333 NLRB at 727. It answered by concluding "[u]nder our approach, the union remains the bargaining representative, and the employer's bargaining obligation continues, while the RM (or RD) election proceedings are underway. *Levitz* 333 NLRB at 727.  In 2019, the Board reaffirmed this line of authority: "we adhere to extant precedent that an alleged postelection loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election." *Johnson Controls Inc.*, 368 NLRB 20 n.46 (2019).

THGH seeks to distinguish this authority on the basis that none of them involve facts like those here, where the CBA had expired and the votes from the election had not yet been counted or the election result announced.  But this distinction is not compelling, in the Court's view.  "The

14

underlying purpose of the [NLRA] is industrial peace." *Brooks v. NLRB*, 348 U.S. 96, 103 (1954); *Am. Bread Co. v. N.L.R.B.*, 411 F.2d 147, 155 (6th Cir. 1969) ("One of the objectives of the National Labor Relations Act is to promote peace and tranquility between labor and management while insuring employees the opportunity to be represented by the union of their choice."). This purpose, combined with the authority marshalled by Petitioner, demonstrate that once an election process is started, it must be carried through to completion without interference from a competing process. Here, the ALJ found—and the record supports—exactly the opposite. Rather than await the official outcome of an admittedly fair election, THGH raced to gather signatures, did little to verify them, and then announced it was relying on them rather than the result of the election. To adopt THGH's view of things would be to undermine the election process that all parties, including THGH, agreed to accept and would reward unilateral action disruptive of labor peace.

Nevertheless, THGH maintains that Petitioner's theory, and the Board authority it relies on, must yield in the face of *Levitz* and its emphasis on employee free choice. To be sure, the Board did remark in *Levitz* that "if a union actually has lost majority support, the union must cease recognizing it, both to give effect to the employee's free choice and to avoid violating [the NLRA]." *Levitz*, 333 NLRB at 724. But THGH pulls this language from the overall context of the issue in *Levitz* and ignores that in this case all parties—including both THGH and the union—agreed to an election to resolve the question of free choice. That election happened. No one is challenging its fairness. And no one contests its outcome in favor of the union. An election, after all, is the "preferred means of testing employee's support for unions[.]." *Levitz*, NLRB at 717. And the Board went on to remark in *Levitz* that "[n]o statutory policy would be furthered by requiring [employers presented with a decertification petition] to withdraw recognition unilaterally in order to avoid violating" the NLRA where there was an election. *Levitz*, 333 NLRB at 731. An

election process that tests whether a majority of the unit employees actually does, or does not, wish to be represented by a particular union protects employee free choice in the best possible way. Accordingly, *Levitz*'s point about effectuating employees' free choice does not undermine Petitioner's probability of success in this case.

Moreover, the factual record regarding the disaffection petition does not present a strong basis for concluding that THGH had an objectively reasonable basis to conclude the union lost support.  In *Levitz*, the Board held "an employer may rebut the continuing presumption of an incumbent union's majority status, and unilaterally withdraw recognition, only on a showing that the union has, in fact, lost the support of a majority of the employees in the bargaining unit." *Levitz*, 333 N.L.R.B. at 725. To make this showing, the employer must prove loss of majority status "by a preponderance of the evidence," involving "objective evidence" that the union has lost majority support."  *Id.*, *see also id.* at 723 ("some objective evidence").  The latter typically means "evidence external to the employer's own (*subjective*) impressions."  *See Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 368 n.2 (1998).

For the reasons explained above, the Court believes THGH's reliance on the petition misses the mark legally based on the uncontested decertification election results in favor of the union. But beyond that, the Court agrees with Petitioner that the disaffection petition does not on this record amount to objective evidence of a loss of the union's majority support.  There are no dates on any of the pages.  Three of the seven pages contain no heading or other language identifying them as part of the disaffection petition or describing any purpose at all; and some signatures are illegible without accompanying printed names.  Petitioner claims that this is enough, and that contextual clues and testimony before the ALJ fills in any gaps, at least sufficient to meet its preponderance burden as set out by the NLRB.  The Court disagrees.  In *Diversicare*, the Board

16

decision relied on by THGH, a group of employees signed a petition with language stating that the employees "wish for a vote to remove the Union[.]"  *Diversicare Leasing Corp.*, 351 NLRB 817 (2007).  After receiving the petition, the employer compared the signatures on the petition with those on a recent paycheck receipt list and determined that the petition had been signed by more than fifty percent of the employees in the bargaining unit.  Consequently, the employer withdrew union recognition.  The Board found no violation of the NLRA.  This case is distinguishable based on the lack of dates, the absence of heading language, the presence of illegible signatures, and scant review by the employer.  And to the extent there are any possible gap fillers here, the ALJ found them not to be credible.  (*See* ALJ Decision at 29-30, ECF No. 56-1, PageID.3067-3068).

For all these reasons, the Court determines that Petitioner has made a clear showing of a likelihood of success on the merits.  Accordingly, this factor augurs in favor of granting the preliminary injunction motion.

### 2. *Irreparable Harm*

Petitioner has also made a clear showing of irreparable harm. The Board has long recognized that "the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether." *Karp Metal Prod. Co.*, 51 NLRB 621, 624 (1943).  This underlying harm augurs in favor of the injunction here.  To be sure, "a district court may not presume irreparable injury with regard to likely unfair labor practices generally." Rather, "irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."  *Frankl v. HTH Corp.*, 650 F.3d 1334, 1362 (9th Cir. 2011).  But "[i]n making the latter determination, inferences from the nature of the particular unfair labor practice

at issue remain available." *Id.*  Notably "failure to bargain in good faith . . . has long been understood as likely causing an irreparable injury to union representation." *Id.*  "[E]ven if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties." *Id.* at 1363.  The Court is able to draw this permissible inference here.  Petitioner has demonstrated a likelihood of success on its merits regarding the unlawful withdrawal of recognition claim by pointing to union attendance data (ECF No. 2-15) and a witness affidavit (ECF No. 2-16) stating, among other things, attendance between unit members and union representatives at the meeting following withdrawal was half that before withdrawal.  (*Id.*).

THGH's arguments to the contrary are not persuasive.  The Court sees no "unusual circumstance[s] indicating that union support is not being affected or that bargaining could resume without detriment as easily later as now." *See Frankl*, 650 F.3d at 1363.  In the main, Respondent contends that the union had already fallen out of favor with a majority of the bargaining employees via the disaffection petition and so there is no union support at risk of eroding.  Respondent further quibbles with the attendance data cited by Petitioner, but the hospital claims that to the extent there is any decline in attendance it is consistent with its position that the unit employees were upset by the union's blocking charge.  This is merely a repackaging of the hospital's argument with respect to likelihood of success and does not fare any better here.  Respondent's reliance on *McKinney ex rel N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1123 (8th Cir. 2015) is distinguishable on this basis.

The hospital further contends that the Court should take into account the alleged delay in the pursuit of injunctive relief in this matter.  To the extent there was any delay, however, the Court does not see it as rising to an unusual case.  The parties disagree at what constitutes the relevant

period (Petitioner says the delay was 4 months; Respondent says 7 months).  But regardless, it is less than the delays other courts found did not conclusively augur against injunctive relief.  *See, e.g.*, *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 545 (4th Cir. 2009) (18-month delay).  Moreover, "[t]he factor of delay 'is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief.'"  *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 965 (9th Cir. 2010) (quoting *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988)).  Here, the Court is able to issue an order returning matters to the status quo of that which existed before the charged unfair labor practices took place by issuing the requested injunctive order.

The Court concludes the second equitable element favors issuing the requested injunction.

### 3. *Balance of Equities*

The parties offer competing arguments with respect to this factor.  Petitioner contends that the equities weigh in favor of issuing an injunction because, without interim relief, the union will be unable to bargain collectively and advance the interests of Respondent's employees.  There is little countervailing injury, it says, from the simple requirement that Respondent recognize and bargain in good faith on an interim basis pending final Board decision.  Respondent sees things differently and claims that the equities weigh in the hospital's favor because, it says, patient care and employee morale will be compromised if the Court orders the collective bargaining.  For one thing, it says, requiring union recognition would negatively impact its ability to provide pay increases to the unit employees.  And the Court should respect the wishes of its employees, it says, when weighing the equities here.

"In considering this factor, the Court must (1) balance the harm Plaintiff would suffer if its request for a preliminary injunction were denied against the harm Defendant would suffer if an

injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Georgia-Pac. Consumer Prod. LP*, No. 1:09-CV-318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009) (citing *Corporate Express Office Prods. v. Warren,* Nos. 01–2521 DBRE & 01–2667 DBRE, 2002 WL 1901902, at *27 (W.D.Tenn. May 24, 2002).

There is a strong likelihood of irreparable harm absent an injunction. While no single factor is dispositive, in the 10(j) context courts "must take into account the probability that declining to issue the injunction will permit the alleged[ ] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority.'" *Frankl*, 650 F.3d at 1365 (quoting *Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.,* 19 F.3d 449, 460 (9th Cir. 1994)). The erosion of union support in the face of a strong showing of likelihood of success on the merits of the unfair labor practices claim in this case is inherently harmful. Petitioner has shown that it is likely to prevail on its claims before the Board, and concomitantly, it has shown a likelihood of irreparable harm that warrants injunctive relief.

The risk of harm to Respondent, in contrast, is not substantial. A preliminary injunction would return the parties to the bargaining table—the position they would be in following the decertification election and before the withdrawal. And as Petitioner points out, any agreement reached could provide contingencies in case of a Board decision that is favorable to Respondent. The Court is not convinced, furthermore, by the parade of horribles presented by Respondent. Bargaining will take time and resources, to be sure, but that process did not impede operations during the lengthy history between NOCH and NOCHEA. No doubt under the current structure things are more antagonistic than they once were, but the Court sees nothing that meaningfully tips the balance against the injunction requested here. On balance, the dispute at present looks like

20

two parties that are in the midst of growing pains.  When an issue about representation arose, both sides agreed to resolve their differences with an election.  Rather than wait, and live, with the results it agreed to, the employer gambled that the raw numbers had changed and withdrew recognition, the result being that the process both sides agreed to—the election—cannot unfold without emergent relief from the Court.   Accordingly, this factor augurs in Petitioner's favor.

### 4. *Public Interest*

With respect to the final *Winter* factor, the Court concludes it would be in the public interest to issue the requested injunction.  Here, "a court must weigh the potential public benefits against the potential public costs."  *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1574 (7th Cir. 1996). Respondent claims that an injunction is not necessary to protect the integrity of the collective bargaining process because any interim relief granted by the Court would provide the same relief the Board may or may not ultimately provide.  But as the Seventh Circuit and other courts have noted, "[t]he public interest is furthered, in part, by ensuring that 'an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.'"  *Id.* (quoting *Miller, for and on Behalf of N.L.R.B. v. California Pacific Medical Center,* 19 F.3d 449 (9th Cir. 1994)); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.").  Beyond that, Respondent repeats its previous arguments with respect to the disaffection petition.  But for reasons explained above, these arguments do not undercut Petitioner's likelihood of success on the merits, nor do they meaningfully change the calculus with respect to this factor.

### 5. *Scope of Relief*

The Court determines, therefore that the *Winter* factors augur in favor of issuing a preliminary injunction.  The remaining matter is on the specific relief requested found at pages 8 through 10 of the Petition.  (See ECF No. 1, PageID.8-9).  Petitioner has since limited the relief requested to the violations found by the ALJ and has withdrawn the proposed affirmative order at 1(b).  The remaining request essentially seeks an order restraining Respondent from withdrawing union recognition and refusing to recognize and bargain in good faith with the union.  To that end, Petitioner asks the Court to order Respondent to 1) immediately recognize and, upon request, bargain in good faith with the union; 2) post physical copies of the injunction at certain locations in the hospital; 3) distribute electronic copies of the same; 4) convening an in person meeting(s) during which the injunction order would be read; and 5) provide a sworn affidavit affirmatively stating compliance with the injunction order.

The Court discussed the scope of the relief requested with the parties during oral argument.  Upon careful consideration, the Court determines to issue an order consistent with Petitioner's request except for the request for a mandatory meeting during which the injunction order would be read.  The Court determines the other methods of dissemination are sufficient to meet the purposes of the injunction, and that a meeting would unnecessarily impede the hospital's operation.

### CONCLUSION

For these reasons, Petition is entitled to injunctive relief under Section 10(j) in accordance with this Opinion.  The Court will separately order the specific relief requested.


Dated:  October 25, 2024              /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      UNITED STATES DISTRICT JUDGE